**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

GEORGE A. GRAYIEL, an individual,

Plaintiff,

v.                                                          **CASE NO.: 3:15-CV-821-TBR**

AIO HOLDINGS, LLC, a Delaware limited
liability company; SAMIR ANASTAS, an
individual; GREGORY ANASTAS, an
individual; SARINPRAPA TEEMA, an
individual; and BLUE LIGHT OF
KENTUCKY LIMITED LIABILITY
COMPANY, a Kentucky limited liability
company,

Defendants.
_____/

**PLAINTIFF  GEORGE A. GRAYIEL'S RESPONSE TO**
**MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS**

NOW COMES Plaintiff, GEORGE A. GRAYIEL ("**Plaintiff**" or "**Grayiel**") and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, submits the following Response to the Motion for Summary Judgment and the Memorandum in Support thereof [Dkt. No. 125-1] ("**Defendants' Summary Judgment Motion**") submitted by AIO Holdings, LLC ("**AIO**"), Samir Anastas ("**Samir**"), Gregory Anastas ("**Greg**"), Sarinprapa Teema ("**Teema**") and Blue Light of Kentucky Limited Liability Company ("**Second Blue Light**").   In Support of his Response, Plaintiff respectfully states:

**PRELIMINARY STATEMENT**

Defendants' Summary Judgment Motion is without merit, should be denied, and summary judgment on the issue of the statute of limitations for Plaintiff's causes of action should be entered in favor of Plaintiff Grayiel.  The validity of Grayiel's claims against the Defendants and the

argument that no reasonable jury could fail to find Defendants liable are addressed in Plaintiff's Summary Judgment Motion, which should be granted in its entirety.

On the issue of statute of limitations, Grayiel makes two primary arguments. First, all relevant statutes of limitations should be tolled based on the discovery rule, which is well-settled law in the State of Kentucky, and tolls a statute of limitation for a Kentucky cause of action if defendants engaged in acts designed to fraudulently conceal an injury, or the defendant's fault for such an injury. Twist and Defendants went to extraordinary lengths to conceal their fraudulent scheme to evade Twist's creditors. These lengths included a fraudulent complaint and consent judgment, lying in deposition testimony, and the surreptitious continued control of the Natural Gas Assets and revenues. These acts clearly obstructed the prosecution of Plaintiff's claims under Kentucky's equitable estoppel statute, KRS § 413.190(2), and for that reason as well the applicable statutes of limitations are tolled. Second, the fraud perpetrated by the Defendants is ongoing and many relevant acts occurred within the statute of limitations on all counts of Plaintiff's Amended Complaint. Accordingly, the relevant statute of limitations for all counts has not even begun to run, let alone lapsed.

The Court need not find that Defendants are liable in order to reject their statute of limitations defenses and find in favor of Grayiel. The issue is whether, given Grayiel's evdience regarding concealment, the statute of limitations is tolled or has not yet begun to run. The decision is simple and straightforward – Plaintiff has shown a complex and ongoing scheme to fraudulently encumber, transfer and divert the Natural Gas Assets and their revenues that was explicitly perpetrated to fool and deceive Grayiel and Twist's creditors.

Finally, as set forth in summary below, and in greater detail in Plaintiff's Summary Judgment Motion, Grayiel has clearly set forth all of the elements necessary to assert claims as to

all counts – including that AIO and Gregory are respectively liable on Grayiel's binding judgment against Twist because AIO is the alter ego of Twist, and Gregory abused and disregarded the corporate form such that respecting the veil between Gregory and AIO would further sanction a fraud.

## BACKGROUND

1.     A comprehensive statement of facts opposing Defendants' Summary Judgment Motion is set forth in the *Corrected Memorandum of Law in Support of Plaintiff George A. Grayiel's Motion for Partial Summary Judgment*, filed on February 26, 2018 [Dkt. No. 129-1] ("**Plaintiff's Summary Judgment Motion**"), together with the exhibits attached thereto and referenced therein,  which provide a detailed discussion of the fraud perpetrated by and among the Defendants to shield the Natural Gas Assets[1] from the creditors of Twist and the Twist Entities. For the sake of brevity, Plaintiff will not repeat those factual allegations, but instead incorporates Plaintiff's Summary Judgment Motion and will refer to it in connection with specific arguments in response to Defendants' Summary Judgment Motion.

**Efforts by Twist and Defendants to Fraudulently Conceal Twist's Assets**

2.     From January 2000 through December 2001, Grayiel (a retired employee of the United States Postal Service) invested nearly $900,000 – most of his life savings (the "**Grayiel Investment**") – in a natural gas drilling scheme and fraud perpetuated by Martin Twist ("**Twist**") through a labyrinth of companies solely controlled by Twist, including but not limited to Martin Twist Energy Company, LLC ("**MTEC**"), Blue Flame Energy Company, LLC ("**Blue Flame**"), Cherokee Drilling Company, LLC ("**Cherokee Drilling**"), Cherokee Energy Company, LLC ("**Cherokee Energy**"), Joerhea Realty, LLC ("**Joerhea Realty**"), and Seca Energy, Inc. ("**Seca**")

---

[1] Any capitalized term not defined herein shall have the meaning prescribed to it in Plaintiff's Summary Judgment Motion.

(collectively, the "**Twist Entities**") and the West Virginia oil and gas wells controlled by the Twist Entities (the "**Natural Gas Assets**").

3.       Twist induced the Grayiel Investment by convincing Grayiel to execute, at a minimum, twenty subscription and/or partnership agreements with certain Twist Entities.[2]  Twist further induced the Grayiel Investment by directing MTEC and Seca to enter into a May 10, 2001 Promissory Note and  Security Agreement wherein Grayiel loaned $500,000 to MTEC and Seca, which loan was secured by certain of the Natural Gas Assets (as amended, the "**2001 Grayiel Loan**").[3]  On August 6, 2001, MTEC repaid the 2001 Grayiel Loan.[4]

4.       As investors and creditors such as Grayiel, as well as government authorities, learned of Twist's violations of civil and criminal laws and began to file lawsuits, Twist, with the help of others including the Defendants, engaged in a multi-year campaign to fraudulently conceal the Natural Gas Assets from the reach of creditors.  Twist and the Defendants accomplished this in two ways.  First, Twist commonly disposed of the Natural Gas Assets to purported third parties that were, in reality, controlled by Twist, in order to conceal Twist's assets from his creditors and later his estate.  Second, Twist began to search for a "creditor" to "encumber" the Natural Gas Assets to place such assets beyond the reach of creditors.  McAdam Declaration at ¶ 8.[5]

5.       In 2005, Twist approached a Louisville attorney named Thomas McAdam, III ("**Thomas McAdam**"), who Twist had known since high school, for advice on how to create the

---

[2] *See* copies of Subscription Agreements, Plaintiff's Summary Judgment Motion at Exhibit 1.
[3] A collection of loan documents in connection with the 2001 Grayiel Loan is attached as **<u>Exhibit 1</u>**.
[4] Defendants go to great lengths in their Summary Judgment Motion to argue that the existence of the 2001 Grayiel Loan somehow absolves the Defendants for their fraudulent acts.  This is not so.  First, Grayiel, unlike AIO, was not paid back more than he was owed, while Gregory, through the Agreed Judgment took possession of assets he believed to be worth over $2 Million in exchange for principal debt of only $250,000.  Further, Grayiel, unlike AIO, did not engage in fraudulent conduct to compel payment from Twist or Twist Entities.
[5] *See* McAdam Declaration at Dkt. 53-3.

appearance that the Natural Gas Assets had been legitimately transferred beyond the reach of Twist's creditors, thereby rendering Twist and the Twist Entities judgment-proof.  *Id.*

6.      In or around 2005, Twist instructed attorney Thomas McAdam to draft a complaint ("**Armstrong Complaint**") for Lonny Armstrong, ("**Armstrong**"), then an executive of various Twist Entities, including MTEC and Cherokee Drilling.[6]  McAdam Declaration at ¶ 11.

7.      The Armstrong Complaint was to be filed against Twist, as well as MTEC and another Twist Entity, Cherokee Aviation, LLC, the two entities that at that time owned an interest in the Natural Gas Assets.  *Id.*

8.      The Armstrong Complaint would falsely allege that Twist had breached a 1999 employment agreement with Armstrong (the "**Employment Agreement**").  *Id.*

9.      As detailed by Armstrong in his October 18, 2015 declaration filed in this case (the "**First Armstrong Declaration**")[7] and corroborated by McAdam, the Armstrong Complaint would seek damages in the amount of $500,000 and a right to a percentage of royalties from the Natural Gas Assets on grounds that Twist failed to pay Armstrong an annual bonus and royalty payments supposedly due to Armstrong under the Employment Agreement.  McAdam Declaration at ¶ 11; First Armstrong Declaration at p. 3.

10.      Twist's goal was for Armstrong, then a trusted employee, to obtain a judgment lien over the Natural Gas Assets such that Twist, MTEC, and Cherokee Aviation would be protected from Grayiel's lawsuit as well as others.   McAdam Declaration at ¶ 11; First Armstrong Declaration at p. 3.

11.      The Armstrong Complaint was never filed.  McAdam Declaration at ¶ 13.

---

[6] *See* Armstrong Complaint, Dkt. 86-2, Ex. 2.
[7] *See* First Armstrong Declaration, Dkt 86-3.

12.    The First Armstrong Declaration further describes how Twist would engage in iterative schemes to conceal his assets from creditors and government authorities, including through the creation of nominee owners such as Cherokee Drilling and Blue Flame.  First Armstrong Declaration at p. 5.  The accuracy of this description of Twist's actions was later "confirmed [in] every aspect by Twist."  *See Martin v. A.I.O. Holdings, LLC,* No. 0C9C31, 2015 WL 10026129, at *8-9 (W. Va. Cir. Ct. Oct. 29, 2015), *aff'd sub nom*, *State ex rel. Kaminski v. Evans*, 2016 WL 1411730 (W.Va. Apr. 7, 2016) (the "**Martin Opinions**").[8]

13.    McAdam later learned that Twist had abandoned the Armstrong Complaint because Twist decided to shift ownership of the Natural Gas Assets to other Twist Entities in an alternative attempt to shield assets from his creditors.  McAdam Declaration at ¶ 14.

14.    Twist had in fact already disposed of certain Natural Gas Assets in order to conceal his beneficial ownership and evade collection activity from a myriad of government and private creditors.  *Id.*  To wit, Twist transferred certain Natural Gas Assets from MTEC, Blue Flame, and Cherokee Drilling to Joerhea Realty.  Notwithstanding this transfer, at all times, Twist maintained control of Joerhea Realty.  *Id.*  Joerhea Beasley is the name of Twist's half-brother, who was dominated and controlled by Twist at all times material ("**Joerhea**").  Joerhea has special needs and is not able to manage a web of financial entities, even though he is listed as the owner and manager of Joerhea Realty.

15.    The First Armstrong Declaration and  the January 10, 2017 Declaration of Lonny Armstrong ("**Second Armstrong Declaration**")[9] also describe how Twist habitually schemed to transfer various assets beyond the reach of his creditors.   First Armstrong Declaration at p. 5; Second Armstrong Declaration at ¶¶ 32-56.  Findings of fact have been made in respect of these

---

[8] *See* Martin Opinions, Dkt. 86-20.
[9] *See* Second Armstrong Declaration, Dkt. 86-4.

transfers by the Circuit Court of West Virginia, Jackson County.  *See, e.g.,* First Martin Opinion at *8-9; Twist Indictment at p. 2-3.[10]

16.      For example, Twist asked Armstrong to form Blue Flame in Armstrong's name because Cherokee Drilling had incurred debts Twist did not want to pay.  Second Armstrong Declaration at ¶¶ 44-56.

17.      Further, prior to the Agreed Judgment entered in favor of AIO, MTEC had already transferred the Natural Gas Assets to another Twist-controlled entity, Appalachian Energy Partners 2003-S, LLP ("**Appalachian Energy Partners**"), even though such Natural Gas Assets were supposedly to be transferred to AIO as part of the Agreed Judgment.  *See* Martin Opinion, Dkt. 86-20 at p. 10.  The sole managing member and registered agent of Appalachian Energy Partners 2003-S, LLP is Cherokee Energy.  *Id.*

18.      Immediately prior to his Incarceration, on October 22, 2013, Twist executed a Confirmation and Quit Claim Deed (the "**Quit Claim Deed**").[11]

19.      Pursuant to the Quit Claim Deed, Twist, through Appalachian Energy Partners, quitclaimed his interest in the Natural Gas Assets to AIO.  The Natural Gas Assets had supposedly been conveyed to AIO almost five years prior, pursuant to the Agreed Judgment.  However, Twist apparently failed to realize that Appalachian Energy Partners still owned an interest in the Natural Gas Assets.  Accordingly, the Quit Claim Deed transferred to AIO "all of [Appalachian Energy Partners'] right, title, and interest, in and to the" Natural Gas Assets.

20.      Therefore, by executing the Quit Claim Deed prior to his Incarceration, Twist finally ensured that no Twist Entity could claim any legal ownership interest in the Natural Gas

---

[10] *See* Twist Indictment, Dkt. 86-10.
[11] *See* Quit Claim Deed, Dkt. 84-17.

Assets, even though AIO and the Twist Entities claimed AIO owned all of the Natural Gas Assets since the December 2, 2008 Agreed Judgment entered in favor of AIO.

21.    The Quit Claim Deed was not recorded in either Kanawha County, Roane County, or Jackson County, West Virginia until April or May of 2014 – months after Twist died and around the same time that AIO and Second Blue Light executed the Second Blue Light Agreement, and less than two years before Grayiel commenced this lawsuit.

22.    Most importantly, the sham AIO Complaint and Agreed Judgment at the heart of this litigation were intentionally designed to conceal AIO, Gregory and Twist's fraudulent scheme. The Complaint referenced only a $2,000,000 line of credit that had been breached, with no dollar amount sought.    At most, a principal balance of $250,000 was owed under the AIO Note. Plaintiff's Summary Judgment Motion at ¶ 53.    The Agreed Judgment did not state an amount of damages awarded, and AIO and Gregory believed that the assets transferred pursuant to the Consent Judgment had a value in excess of $2 Million. Plaintiff's Summary Judgment Motion at ¶ 62. The AIO Complaint and Agreed judgment were a highly effective mechanism for concealment of the fraud.    Twist's creditors, including Grayiel, were fooled.    AIO and Gregory furthered the deception by lying under oath at Gregory's deposition in the Martin case as to the connections between AIO and Twist.    Plaintiff's Summary Judgment Motion at ¶ 98.

**Grayiel's Lawsuit against Twist and the**
**2015 Discovery of AIO's Involvement in the Twist Fraud**

23.    In 2008, Grayiel sued Twist, his associates and numerous Twist Entities in the Circuit Court of Putnam County, West Virginia alleging, among other things, violations of numerous state securities laws, fraud and conversion, styled as *Grayiel v. Appalachian Energy Partners 2001-D LLP et al.*, No. 08-C37-378  (the "**West Virginia Litigation**").[12]

---

[12] *See* Complaint filed in West Virginia Litigation, Dkt. 86-19 at Ex. 1.

24.     Twist sought to dismiss the West Virginia Litigation based on the relevant subscription agreements' arbitration clauses.  Grayiel Declaration at ¶ 6.[13]

25.     However, the West Virginia Securities Commission filed an Amicus Brief ("**Amicus Brief**") in which it argued that the arbitration clauses were unconscionable because they required Grayiel to travel to Indiana or Kentucky to make his claims against Twist.  It also argued that the resulting cost of "travel and legal fees would be exorbitant and prohibitive," especially given the fact that Grayiel had lost his life savings to Twist.[14]

26.     The West Virginia Supreme Court ultimately remanded the case to the lower court in part because, as the Court stated in its November 15, 2012 Opinion, "[i]f an agreement to arbitrate imposes high costs that might deter a litigant from pursuing a claim, a trial court may consider those costs in assessing whether the agreement is substantively unconscionable."[15]

27.     On August 15, 2014, the West Virginia court issued Judgment Orders in Grayiel's favor in the total amount of $2,671,880.84, first against the Twist Entities and later against the Estate of Martin Twist (collectively, the "**West Virginia Judgments**").[16]

28.     On August 18, 2014, on account of the Judgment, Grayiel filed a Statement of Claim in the *Matter of the Estate of Martin R. Twist, Deceased*, Case No. 14-P-001071, in the Jefferson District Court for the Commonwealth of Kentucky.[17]   At or around that time, Grayiel learned that the Twist estate contained nearly no assets, and that the revenues from the Natural Gas Assets appeared to have been diverted.  Grayiel Declaration at ¶ 11.

---

[13] *See* Grayiel Declaration, Dkt. 53-6.
[14] *See* Amicus Brief, Dkt. 53-6, Ex. A. at p. 8.
[15] *See* Dkt. 53-6, Ex. B at p. 20.
[16] *See* West Virginia Judgments, Dkt. 86-18 Ex. 18**.**
[17] *See* Statement of Claim, Dkt. 86-19.

29.     At this time, Grayiel was aware of AIO's connection to Twist and the fact that there had been an assignment of certain of the Natural Gas Assets to AIO.  Grayiel Declaration at ¶ 12. Grayiel did not assume that there had been a fraud perpetrated on Twist's creditors via the sham AIO Complaint, and presumed that the Agreed Judgment and subsequent assignments were legitimate.  *Id*.  Grayiel also understood that another Twist victim, Dr. Bengfort, had brought a lawsuit against AIO that was dismissed for lack of evidence.  *Id*.[18]

30.     As stated in his Declaration filed in this case, Grayiel tried to follow events diligently, but was not aware and did not locate any public information or records that would have provided Grayiel with information that the transfers of the Natural Gas Assets to AIO was a fraud. *Id*.  Grayiel, on his own, contacted West Virginia government agencies to inquire into well records for the Natural Gas Assets, and even filed a Freedom of Information Act request. (Grayiel Depo. 27:9-19)[19].  Further, Grayiel visited county departments to obtain lease information for the Natural Gas Assets, and even inquired with the West Virginia Secretary of State as to Twist's numerous entities.  (Grayiel Depo. 99:5 to 100:7).  None of Grayiel's efforts resulted in him discovering the fraud of Twist and the Defendants because evading creditors such as Grayiel was the purpose of the fraud.

31.     Grayiel retained Holland & Knight to collect the West Virginia Judgments.  The focus of that investigation quickly turned to ascertaining whether Twist's assets had been dissipated.  Grayiel Declaration at ¶¶ 13-14.

32.     The first evidence of such dissipation occurred when it was learned that Twist had transferred his interest in Crown Mountain Lookout, LLC, a company that owned certain real

---

[18] Unlike Grayiel in this case, Dr. Bengfort could not rely upon the testimony of Armstrong and McAdam, knowledge of the first attempted sham Armstrong Complaint, or Gregory's own testimony in this case, all of which taken together confirm the Defendants' liability as a matter of law.

[19] A copy of transcript excerpts from the February 24, 2017 Deposition of Grayiel is attached hereto as **Exhibit 2**.

estate located in the U.S. Virgin Islands to Teema for no consideration, after Grayiel had initiated the West Virginia Litigation. Grayiel Declaration at ¶ 15.

33.     Subsequent to settling the Crown Mountain dispute with Teema, as well as his efforts to remove Teema as Executrix of the Twist Estate, Grayiel became suspicious of AIO and the legitimacy of its receipt of the Natural Gas Assets and its alleged "ownership" of the Natural Gas Assets. Grayiel Declaration at ¶¶ 16-19.

34.     Grayiel continued to investigate the Natural Gas Asset Transfers and AIO, particularly to obtain evidence that the transfers to AIO constituted a fraud. Grayiel was diligent in his attempts to confirm that the AIO transfer was a fraud, but a breakthrough came in July 2015, when Grayiel obtained this evidence. Lonny Armstrong, Twist's former manager in charge of the Natural Gas Assets, provided a sworn statement to the effect that the transfers of the Natural Gas Assets to AIO was orchestrated by Twist to intentionally defraud creditors such as Grayiel. Grayiel Declaration at ¶¶ 20-21. (Grayiel Depo. 128:6-25)

35.     The First Armstrong Declaration was executed on October 18, 2015, and Grayiel initiated the above-captioned case shortly thereafter. Grayiel Declaration at ¶ 22.

### RESPONSE

## I.     All of Plaintiff's Claims are Timely under the Circumstances

In their Summary Judgment Motion, Defendants go to great lengths to concoct a strawman argument: that the statute of limitations for each and every one of Plaintiff's claims has run because Plaintiff had public notice of the entry and recordation of the Agreed Judgment and other public filings made on behalf of AIO. But Plaintiff is not disputing that Defendants' papered their wrongful acquisition of the Natural Gas Assets – that is the entire point – Defendants papered the transactions in a fraudulent attempt to convince the world AIO had legitimately executed and taken control of the Natural Gas Assets on a $2,000,000 secured debt. In reality, any purported debt was

an order of magnitude less than $2,000,000, and Twist maintained complete operational and economic control of the Natural Gas Assets. The "notice" to Grayiel of the public Agreed Judgment was the precise mechanism by which Defendants perpetrated and concealed the fraud. In essence, Defendants' entire defense is predicated on the argument that Grayiel should have <u>known</u> that a judgment duly entered by a Kentucky Court and the Complaint upon which it was founded was a fraud.

Further, this fraud continues until this day, and many of the fraudulent acts at issue, including the March 2014 Second Blue Light Agreement and Defendants' continued receipt of oil and gas revenue from the Natural Gas Assets, fall well within the applicable statute of limitations.

### A.  Due to Fraudulent Concealment by Twist and the Defendants, Grayiel Only Learned of His Claims against Defendants in July 2015

### 1.  The Discovery Rule

Due to the actions of Twist and the Defendants in fraudulently concealing their improper transfers of the Natural Gas Assets and the revenues therefrom, all statutes of limitation applicable to Plaintiff's causes of action have been tolled.

Under Kentucky law, the discovery rule provides that a cause of action accrues when the injury is, or should have been, discovered. The discovery rule operates to toll the statute of limitations to allow an injured plaintiff to discover the identity of the wrongdoer where there is fraudulent concealment or a misrepresentation by the defendant of his role in causing the plaintiff's injuries. *McLain v. Dana Corp.*, 16 S.W.3d 320, 326 (Ky. Ct. App. 1999).

The "general rule in [Kentucky] has been that the limitation period runs from the date the fraud was perpetrated." *Shelton v. Clifton*, 746 S.W.2d 414, 416 (Ky. App. 1988). However, "where it would not have been reasonable for the plaintiff to have discovered the injury on the actual date the fraud was perpetrated, the limitations period does not begin to toll until the date

that the fraud was discovered or, through the exercise of reasonable diligence, should have been discovered." *First Fid. Mortg. v. Robertson*, 2011 Ky. App. Unpub. LEXIS 581 *5, 2011 WL 3361583 (Ky. App. 2011) (unpublished). An action will be tolled only if "the plaintiff is able to demonstrate why the fraudulent act could not, through reasonable diligence, have been discovered sooner." *Id.* at *5-6 (citing *McCoy v. Arena*, 295 Ky. 403, 174 S.W.2d 726 (Ky. App. 1943)).

Here, Twist and later the Defendants, clearly engaged in a campaign of fraudulent concealment in order to obfuscate Plaintiff's injury, namely, the fraudulent scheme of diverting assets away from Twist and the Twist Entities in order to evade creditors.  The evidence set forth in Plaintiff's Summary Judgment Motion and above demonstrate that no reasonable trier of fact could conclude otherwise, and summary judgment should be entered in favor of Grayiel on the issue of whether the statute of limitations was tolled on the basis of the discovery rule.

Twist regularly transferred the Natural Gas Assets among entities controlled through him by proxy (see above), and as early as 2005, was formulating plans to orchestrate a fraudulent foreclosure in order to evade creditors.  In Gregory and later Teema, Twist found his willing and knowing accomplices.

**The Sham AIO Loan and the Sham Agreed Judgment**

In 2005, around the same time that Twist approached McAdam and Armstrong to fraudulently encumber the Natural Gas Assets, Twist approached Gregory to obtain a loan and become a friendly "secured creditor" that could encumber the Natural Gas Assets and place them out of reach of the creditors of Twist and the Twist Entities.  Plaintiff's Summary Judgment Motion at ¶ 24.

While drafting the AIO Loan documents, the nature of the fraudulent concealment was already evident.  The July 2005 Fleu Email, sent from the attorney for Twist and AIO, included

documentation in connection with the AIO Loan, to be entered into by and among AIO and various Twist Entities, including a promissory note evidencing the AIO Loan, a deed of trust providing certain oil and gas wells located in West Virginia as security, and *a release of that deed of trust*, even though the parties had not yet entered into the loan agreement. *Id.* at ¶¶ 33-35. On October 5, 2005, Gregory sent an email to Twist and Fleu regarding the Release Documents, stating his displeasure with certain changes made to the Release Documents without his input. Gregory states in this email "[b]oth releases were intended to be limited in nature. To accommodate [Twist] so that if he wanted to hock his assets (that I have not financed) he could do so." *Id.* at ¶ 36.

Twist and the AIO Borrowers never planned to take advantage of the full credit line offered under the AIO Note. The $2 Million line of credit stated in the AIO Note, and the appearance of $2 Million in valid debt, was necessary to encumber the Natural Gas Assets and preclude further litigation from creditors and investors. *Id.* at ¶ 43.

Regardless of whether there was a net loan in the first instance, in the face of serious creditor litigation including the West Virginia Litigation brought by Grayiel, Twist, AIO and Gregory hatched a plan to fraudulently encumber and assign the Natural Gas Assets, and make it appear that they had been assigned to AIO, when in fact all economic and actual control of the Natural Gas Assets remained with Twist. *Id.* at ¶¶ 47-67.

To accomplish this, Twist once again turned to McAdam, the attorney who prepared the fraudulent Armstrong Complaint, to file the fraudulent AIO Complaint in the Foreclosure Court, claiming that MTEC had defaulted on its obligations under the AIO Note. Twist informed McAdam that the purpose of the AIO Complaint was to shield assets from investors, i.e. Grayiel, and creditors, by putting them into the hands of other creditors whom he trusted, such as AIO. *Id.* at ¶¶ 48-49. The AIO Complaint sought damages not to exceed the $2 Million outstanding under

the AIO Note, plus accumulated interest.  Conspicuously, and in furtherance of the fraud, there is no calculation of damages in the AIO Complaint.  *Id.* at ¶ 53.

According to Gregory, at the time of the filing of the AIO Complaint, the principal indebtedness under the AIO Note was at most $250,000.  The inclusion of the $2 Million figure was calculated to perpetrate a fraud and obtain a judgment and assignment of value in excess of the purported debt while leaving the world and Grayiel to believe a $2 Million judgment had validly been entered.  *Id.* at ¶ 53.

Less than a month after filing the AIO Complaint, on October 30, 2008, the AIO Foreclosure Defendants entered into the Agreed Judgment with AIO,  pursuant to which AIO was granted immediate and sole possession of the Natural Gas Assets. *Id.* at ¶ 59.  Neither AIO nor Gregory ever performed a valuation of the Natural Gas Assets in connection with the AIO Complaint or the Agreed Judgment.  *Id.* at ¶ 62  Gregory, however, believed the value of the Natural Gas Assets to be <u>greater</u> than the $2,000,000.  *Id.* at ¶ 62.  No determination of the amount of any liability owed to AIO was ever submitted to the Foreclosure Court, and it is undisputed that the principal indebtedness owed to AIO as of the date of the Agreed Judgment was only at most $250,000.  *Id.* at ¶ 63.  Gregory never discussed with Twist that the Agreed Judgment would only transfer a portion of the Natural Gas Assets that directly related to the $250,000 in outstanding indebtedness owed under the AIO Note, as the deal was always that AIO would receive all the Natural Gas Assets through the Foreclosure Transfer and that Twist would maintain operational and economic control.  *Id.* at ¶ 65.

As McAdam explains, the purpose of the AIO Complaint and the resulting Agreed Judgment (both of which he drafted) was to create a façade whereby it would appear that the

Natural Gas Assets had been legitimately transferred to an independent third-party owed $2 Million, while the Natural Gas Assets would in fact remain under the control of Twist. *Id.* at ¶ 66.

### Twist and Defendants Conceal Twist's Continued Control of the Natural Gas Assets; Gregory Lies under Oath to Further the Fraud

Notwithstanding the fraudulent Natural Gas Assets Transfers, Twist retained control and ownership of the Natural Gas Assets via the 530/AIO Operating Agreement, executed immediately after the Agreed Judgment but never disclosed to the Court or to the public.

On December 4, 2008, AIO and 530 West Main, LLC ("**530**"), a Twist Entity managed, owned, and controlled by Twist, signed an Operating Agreement (the "**530/AIO Operating Agreement**"). *Id.* at ¶ 70. The 530/AIO Operating Agreement allowed Twist to maintain operational control over and beneficial ownership of the Natural Gas Assets. Specifically, the 530/AIO Operating Agreement purportedly allowed Twist to manage certain Natural Gas Assets and split the net income from such Natural Gas Assets with AIO fifty-fifty, but only after payment of all expenses incurred by Twist and 530 in connection with operation of the Natural Gas Assets, including any litigation fees in connection with the Natural Gas Assets Transfers. *Id.* at ¶ 71. The 530/AIO Operating Agreement permitted Twist and 530 to use revenues from the Natural Gas Assets to defend AIO in litigation in connection with the Agreed Judgment, as Gregory knew that there was litigation risk because of the transfer of the Natural Gas Assets, and that creditors were seeking to collect from Twist and the Twist Entities. *Id.* at ¶¶ 71-72. Further, 530 was not obligated to transfer any revenues from the Natural Gas Assets to AIO until such net income totaled $500,000. *Id.* at ¶ 73.

In short, only two days after entry of the Agreed Judgment, Gregory gave Twist complete control over the operations of and the revenues from the Natural Gas Assets, even though Gregory had never previously received an expense report in connection with the Natural Gas Assets. *Id.* at

16

¶¶ 74-76.  The 530/AIO Operating Agreement was a sham - neither Gregory nor AIO received any well revenue until after Twist's death more than five years later.  *Id*. at ¶ 76.

The 530/AIO Operating Agreement was so well hidden that Scott Kaminski, the AIO lawyer hired by Twist, had no knowledge of its existence until Gregory's deposition in connection with the Martin Litigation.  When Kaminski learned of Twist's control over the Natural Gas Assets and that AIO was nothing more than a front for Twist's fraudulent scheme, Kaminski immediately contacted the disciplinary committee for the State of West Virginia and withdrew from the Martin Litigation.  *Id*. at ¶ 101.  At the deposition for the Martin Litigation, Gregory offered false testimony that directly conflicts with his testimony in this case. For example, Gregory testified in the Martin Litigation that he loaned Twist over $1 Million, that Twist had "no managerial discretion" in AIO and that he was not aware that AIO took ownership of the Natural Gas Assets as a result of the Agreed Judgment until September 2011.  *Id*. at ¶ 98.

**Twist is Incarcerated and the Fraudulent Concealment Continues**

On July 9, 2013, Twist pled guilty to tax evasion and, in late October 2013, was incarcerated in federal prison.  A few weeks prior to his incarceration, Twist and Teema orchestrated a plan to maintain control over the Natural Gas Assets and the revenues therefrom. To accomplish this, Teema, with assistance from Twist, incorporated Second Blue Light for the purpose of receiving revenue from the Natural Gas Assets without consideration.  *Id*. at ¶¶ 102-105.

In addition to Teema's receipt of Natural Gas Asset Revenue without consideration, Twist orchestrated to transfer membership interests in Crown Mountain Lookout, LLC, a St. Thomas real estate holding company previously owned by Twist, to Teema in exchange for no consideration.  *Id*. at ¶¶ 115.

After Twist died in prison in February 2014, Teema offered to pay AIO and Gregory 50% of the profits from the Natural Gas Assets to induce AIO to continue to permit her to collect the fraudulently transferred Natural Gas revenues. *Id.* at ¶ 116. To that end, AIO, Gregory, and Second Blue Light and Teema entered into the Second Blue Light Agreement, in March 2014, pursuant to which Second Blue Light would continue to operate the Natural Gas Assets and pay half of the net proceeds to AIO. *Id.* at ¶ 117. Pursuant to the Second Blue Light Agreement, AIO and Second Blue Light split the revenues from the Natural Gas Assets that were the subject of the fraudulent Agreed Judgment to this very day. *Id.* at ¶ 118.

**Teema's Fraudulent Concealment of Twist Assets from Twist's Estate**

Teema served as executrix for Twist's estate upon his death, charged with reporting Twist's assets upon his death to the probate court. *Id.* at ¶ 123.

Teema did not report to the Probate Court Twist's interests or the interests of the Twist Entities in the Natural Gas Assets. On April 23, 2014, as executrix, Teema filed the Twist Inventory Report with the probate court, purporting to state the assets of Twist at his death. *Id.* at ¶¶ 123-124. The Twist Inventory Report lists the value of First Blue Light as only $4,000. *Id.* at ¶ 125. However, on March 25, 2014, Teema forwarded an October 29, 2008 email from Twist's email account to her own personal email address, which listed the value of 530 (the predecessor-in-interest to Second Blue Light and former operator for the Natural Gas Assets) as "$500,000 (+$50,000 stock value)." *Id.* Offshore Energy is also listed as a Twist asset on the inventory report. Teema admits that she used the March 25, 2014 Teema Email to create the Twist Inventory Report. *Id.*

The above facts clearly demonstrate a concerted effort to fraudulently conceal a direct injury to Plaintiff, namely the fraudulent diversion of the Natural Gas Assets to the detriment of creditors. Accordingly, as a matter of law, the applicable statute of limitations should be tolled.

## 2.    __Equitable Estoppel__

Similar to the discovery rule outlined above, Kentucky has a general equitable estoppel statute that applies the estoppel doctrine to the statute of limitations for Plaintiff's causes of action.

KRS 413.190(2) states, in part:

> When a cause of action mentioned in KRS 413.090 to 413.160 accrues against a resident of this state, and he by absconding or concealing himself or by any other indirect means obstructs the prosecution of the action, the time of the continuance of the absence from the state or obstruction shall not be computed as any part of the period within which the action shall be commenced.

KRS 413.190(2).

In interpreting KRS 413.190(2), the Supreme Court of Kentucky has stated:

> A claim of equitable estoppel is widely utilized by parties who seek to avoid a statute of limitation defense. Long ago a tolling statute was enacted which provides that a resident of this State who absconds or conceals himself "or by any other indirect means obstructs the prosecution of the action" shall not have benefit of the statute of limitation so long as the obstruction continues. KRS 413.190(2). We have held that this tolling statute is simply a recognition in law of an equitable estoppel or estoppel *in pais* to prevent fraudulent or inequitable application of a statute of limitation. *Adams v. Ison,* Ky., 249 S.W.2d 791 (1952). Our decisions construing the statute and applying equitable estoppel appear to require "some act or conduct which in point of fact misleads or deceives plaintiff and obstructs or prevents him from instituting his suit while he may do so." *Id.* at 792.

*Munday v. Mayfair Diagnostic Lab*., 831 S.W.2d 912, 914 (Ky. 1992).

The essential elements of equitable estoppel include: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice. *Fluke Corp. v. Lemaster*, 306 S.W.3d 55, 62 (Ky. 2010) (*citing Sebastian-Voor Properties, LLC v. Lexington-Fayette Urban County Government*, 265 S.W.3d 190, 194-95 (Ky. 2008)).

The statutory equitable estoppel clearly applies to Plaintiff and his claims. Plaintiff lacked knowledge and the means to obtain knowledge of the fraudulent scheme perpetrated by Twist and the Defendants. Despite conducting his own investigation of Twist's business dealings for years, it was not until Lonny Armstrong came forward and disclosed Gregory's involvement in Twist's fraud that Plaintiff learned the extent of his injury. Plaintiff, in good faith, relied upon the Agreed Judgment and the public filings made in the State of West Virginia as to the Natural Gas Assets, and could not reasonably have known the extent of the fraud perpetrated by Twist and the Defendants. Plaintiff was directly injured by the acts of Twist and the Defendants – entry of the fraudulent Agreed Judgment and the subsequent transactions between the Defendants – as it deprived Plaintiff of the ability to collect on the West Virginia Judgment from the Twist Judgment. Accordingly, equitable estoppel applies to Plaintiff's claims and the applicable statutes of limitations should be tolled.

## B.  The Statutes of Limitation Have Not Run Because the Fraud Is Ongoing

Even if this Court was to determine that reasonable diligence would somehow have revealed the nature of the fraud perpetrated by Twist and the Defendants prior to the emergence of Lonny Armstrong in July 2015, much of the fraudulent conduct perpetrated by Defendants occurred within the applicable statute of limitations period for many of Plaintiff's claims.[20]  For instance, the Second Blue Light Agreement, a continuance of the fraud at issue and the transfer by AIO of the Natural Gas Assets to Second Blue Light, was executed in March 2014. AIO and Second Blue Light continue to receive revenues from the Natural Gas Assets to this day, a

---

[20] Fraudulent Transfer: 5 Years (KRS § 413.120); Conversion: 2 Years (KRS § 413.125); Fraud: 5 Years (KRS § 413.120(11)); Aiding and Abetting Fraud: 5 Years (KRS § 413.120(11));  Civil Conspiracy: 1 Year (KRS § 13.140(1)(c)).

continuation of the fraud that began in 2005 when Twist first hatched his plan to find a friendly creditor to fraudulently encumber his assets.

Further, even though the statute of limitations for Plaintiff's civil conspiracy claim is one year, the statute "begins to run at the commission of the last act in furtherance of the conspiracy." *Bassett*, 2005 WL 3767016, at *6 (citing *District Union Local 227 v. Fleischaker*, 384 S.W.2d 68 (Ky.App. 1964)). Here, the conspiracy is *ongoing*, as Defendants continue to split revenues from the Natural Gas Assets to this very day.

## II.    AIO Is Liable for the West Virginia Judgment As an Alter Ego of Twist, and Gregory is Liable for the Debts of AIO under Kentucky's Veil Piercing Doctrine

Defendants' Summary Judgment Motion attempts to argue that Twist, and Twist alone, can be liable on a veil piercing theory due to his control over AIO and the fraud outlined above and in Plaintiff's Summary Judgment Motion. Defendants conveniently disregard that Plaintiff is seeking a two-step form of relief in connection with Count IX of his Amended Complaint. First, Plaintiff is seeking a judicial determination that AIO is the alter ego of Twist, and that AIO is therefore liable for the debts of Twist, in particular the West Virginia Judgments. Second, Plaintiff seeks a judicial determination that Gregory has used AIO to perpetrate a fraud, and that AIO's corporate veil should be pierced and Gregory should be liable for the debts of AIO, including the West Virginia Judgments.

The West Virginia Judgments are enforceable against Twist in Kentucky pursuant to KRS § 426.955. On August 18, 2014, on account of the West Virginia Judgments, Grayiel filed a Statement of Claim in the *Matter of the Estate of Martin R. Twist, Deceased*, Case No. 14-P-001071, in the Jefferson District Court for the Commonwealth of Kentucky.[21] There is no question that Grayiel has a valid and cognizable debt against Twist and the Twist Entities based upon the

---

[21] *See* Statement of Claim, Dkt. 86-19.

West Virginia Judgments and the Statement of Claim filed in Twist's probate proceedings ("**Twist Debt**").  There has been no argument by Defendants that the Twist Judgments are not enforceable as against the Twist Entities and Twist, or that Grayiel has not made a valid creditor claim in the Kentucky Probate Court against the Twist estate based upon the Twist judgments.  Therefore, contrary to Defendants' legally and factually baseless statement to the contrary, the underlying cause of action is clearly the Twist Debt, for which AIO can be held liable as Twist's alter ego, and for which Gregory can further be held liable based upon piercing of the corporate veil and abuse of the corporate form.

"A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."  *Dole Food Co. v. Patrickson,* 538 U.S. 468 (2003).  However, "there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud.  *United States v. Bestfoods,* 524 U.S. 51, 62–63 (1998).

Further, where a corporation has no assets of its own independent of those controlled by the persons claimed to be in control of the corporation, the court may find that the corporation is just a shell, and is actually the alter ego of the individuals exerting leadership and control over it. *See American Collector's Exchange, Inc. v. Kentucky State Dem. Central Exec. Committee,* 566 S.W.2d 759. 761 (Ky. App. 1978). Under such circumstances, a court may properly pierce the corporate veil in the interest of justice. *See Commonwealth, Natural Resources & Environ. Protection Cabinet v. Neace,* 14 S.W.3d 15, 19 (Ky. 2000); *Culver v. Culver,* Ky. App., 572 S.W.2d 617, 622 (1978); *Nutrition Rich Prod., Inc. v. Nutritional Res., Inc.*, No. 2000-CA-002838-MR, 2003 WL 1339309, at *3 (Ky. Ct. App. Feb. 21, 2003) (piercing the corporate veil and holding the corporation liable for the debts of a third party, due to the corporation being a sham used to

subvert public policy and to enable the third party individuals to avoid payment of debts due under a valid out-of-state judgment).

Recently, the Kentucky Supreme Court has explained the equitable doctrine of piercing the corporate veil and established a new standard for the doctrine:

> Piercing the corporate veil is an equitable doctrine invoked by courts to allow a creditor recourse against the shareholders of a corporation. In short, the limited liability which is the hallmark of a corporation is disregarded and the debt of the pierced entity becomes enforceable against those who have exercised dominion over the corporation to the point that it has no real separate existence. A successful veil-piercing claim requires both this element of domination and circumstances in which continued recognition of the corporation as a separate entity would sanction a fraud or promote injustice.

*Inter–Tel Technologies, Inc. v. Linn Station Props., LLC,* 360 S.W.3d 152, 155 (Ky. 2012).

To pierce a corporate veil a court must find two separate elements: "(1) domination of the corporation resulting in a loss of corporate separateness; *and* (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *Id.* at 165; *Pro Tanks Leasing v. Midwest Propane & Refined Fuels, LLC,* 988 F. Supp. 2d 772, 783 (W.D. Ky. 2013).

Plaintiff's Summary Judgment Motion contains a detailed discussion of why AIO, and in turn, Gregory are liable for the Twist Debt as a matter of law. Plaintiff's Summary Judgment Motion at pp. 40-49.

First, Plaintiff's Summary Judgment Motion clearly demonstrates that, until Twist's death in federal prison, at every stage of AIO's existence it served as the alter ego of Twist. AIO was utilized for the sole purpose of fraudulently shielding the Natural Gas Assets from Twist's creditors, and Twist exerted complete control over AIO. Gregory made no effort to maintain corporate formalities for AIO and worked in concert with Twist to use AIO as a tool to commit a fraud against Twist's creditors. While Gregory claims to be the sole owner of AIO by and through

Advantage Investments, a British Virgin Islands company, the only draft operating agreement in existence shows that Offshore Energy, LLC, an entity formed and controlled by Twist, is also a member of AIO.

Twist dominated and controlled AIO at all times material, and used AIO as a fraudulent tool to obtain the AIO Agreed Judgment in order to defraud creditors and specifically Grayiel. Twist paid and issued instructions to AIO's attorneys, retained operational control of AIO's assets after entry of the Agreed Judgment, retained all revenues from AIO's assets, and abused AIO's corporate form to the detriment of Grayiel. As an alter ego of Twist, AIO is liable for the amounts awarded in the West Virginia Judgments and the Twist Debt generally.

Second, Gregory has himself abused and knowingly allowed Twist's abuse of AIO's corporate form with the specific purpose of harming Grayiel as a creditor, such that the corporate veil as between Gregory and AIO should be pierced and Gregory held liable for the Twist Debt. The express statements of AIO's attorneys, as well as Gregory himself, demonstrate that Gregory authorized and permitted AIO to be a mere instrumentality of Twist so as to knowingly assist and facilitate the Twist fraud to the detriment of Twist's creditors, specifically Grayiel. Gregory at all times knew his conduct was wrongful with respect to AIO, and that is why he lied in his deposition about Twist's involvement in AIO during the Martin Litigation. Plaintiff's Summary Judgment Motion at p. 33. When Kaminski, AIO's counsel in the Martin Litigation and Twist's counsel in the West Virginia Litigation, discovered that AIO was nothing more than a tool used by Twist to commit fraud, Kaminski immediately sought the advice of the disciplinary committee. *Id*. at ¶ 100.

AIO did not adhere to corporate formalities whatsoever, and Twist and Gregory created AIO for the purpose of committing an injustice against creditors such as Grayiel by shielding the

Natural Gas Assets behind an overstated secured debt.  Gregory's motive for aiding and abetting the Twist fraud was simple: money.  Gregory believed that unless he materially assisted Twist in the fraud, abused AIO's corporate form and allowed Twist to abuse AIO's corporate form, he would not be paid back.  This is an obvious and clear cut case justifying the application of the alter ego and corporate veil piercing doctrines under Kentucky law.  Accordingly, a judicial determination is warranted, holding that AIO is the alter ego of Twist and that the corporate veil should be pierced so that Gregory is liable for all debts of AIO, including the Twist Debt.

## III.   Defendants Have Not Met Their Burden for Summary Judgment on the Merits

Defendant's Summary Judgment contains a short recitation of Plaintiff's causes of action and perfunctory arguments as to why they are entitled to judgment as a matter of law.  Rather than burden the Court with redundancy, Plaintiff hereby incorporates his Summary Judgment Motion, and his argument that he is entitled to Summary Judgment as a matter of law as to Causes of Action 1-6 and 9.  In the alternative, Plaintiff argues, for the reasons set forth in his Summary Judgment Motion and above, that triable issues of fact exist and that Defendants' Summary Judgment Motion should be denied.

Plaintiff's Summary Judgment Motion seeks, among other things, summary judgment:

- against AIO for intentional fraudulent transfer (KRS § 378.010) and constructive fraudulent transfer (KRS § 378.020), and sets forth undisputed evidence that: (1) Twist intended to transfer the Natural Gas Assets to AIO in order to shield them from creditors; (2) Twist and Gregory did so by having AIO file a sham lawsuit and obtain the sham Agreed Judgment for what AIO and Gregory believed to be assets valued in excess of $2 million on a $250,000 purported debt under circumstances where all other creditors were intentionally hindered and delayed by procedural defenses that were determined by the West Virginia Supreme Court to be part of the fraud; (3) this was the second iteration of the scheme – in the first version, Twist was going to have Armstrong file a fabricated employment complaint and encumber the assets; (4) AIO and Gregory knew that this was Twist's intent; and (5) AIO received and held the Natural Gas Assets in its name for that purpose, intending to give them back to Twist at some point in the future while Twist received all revenue and exerted total control in the interim.  *See* Plaintiff's Summary Judgment Motion pp. 26-35;

- against Second Blue Light for intentional fraudulent transfer (KRS § 378.010) and constructive fraudulent transfer (KRS § 378.020) due to the fraudulent transfer of 530 West Main's and First Blue Light's rights in the Natural Gas Assets to Second Blue Light for no consideration. *See* Plaintiff's Summary Judgment Motion pp. 35-37;

- against the Defendants for aiding and abetting a fraud, due to substantial assistance provided to Twist in committing fraud against the Kentucky Court system and the public by way of the AIO Complaint and the Agreed Judgment. *See* Plaintiff's Summary Judgment Motion at pp. 37-39; and

- Against the Defendants for civil conspiracy to aid and abet fraud and fraudulent transfers, as the conspiracy that involved Twist, AIO, Samir, Gregory, and Teema began in 2005 and continues today as Teema and AIO continue to profit from the Second Blue Light Agreement. The Natural Gas Assets that were fraudulently transferred to AIO via the Foreclosure Action are now being used by Defendants to profit handsomely at the expense of Grayiel and Twist's other creditors. *See* Plaintiff's Summary Judgment Motion at pp. 39-40.

As to Plaintiff's remaining causes of action, Plaintiff states as follows:

### A.    <u>Count VII (Fraud)</u>

Defendants argue that they are entitled to summary judgment as a matter of law in connection with Plaintiff's claim of fraud, listed as Count VII in the Amended Complaint, because Defendants never made a misrepresentation to Plaintiff. The Defendants are mistaken, as there is clearly an issue of fact as to the involvement of Defendants in the material misrepresentations made to the Kentucky Court system and the public by way of the AIO Complaint, the Agreed Judgment and subsequent documents filed in the public record systems for the State of West Virginia.

A party claiming fraud under Kentucky law must establish six elements by clear and convincing evidence. *See Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009). The six elements of a fraud claim are: (1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was

false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff. *Id.* at 549.

Plaintiff is confident that, at trial, he would be able to demonstrate that Defendants knowingly made a series of material and false representations to Plaintiff by way of the sham AIO Complaint and the Agreed Judgment, as well as documents subsequently filed publicly in the State of West Virginia. These misrepresentations were made to falsely represent that AIO held and enforced a $2 Million secured debt that subsumed the entirety of the Natural Gas Assets and to induce Plaintiff not to seek collection from the Natural Gas Assets or the revenues therefrom, which resulted in substantial injury to Plaintiff. Gregory and AIO knew that the debt in question was not worth more than $250,000 and believed that the Natural Gas Assets were worth in excess of $2 Million. Gregory further lied at his deposition on behalf of AIO in the Martin case and actively concealed the connections between Twist and AIO and surreptitiously allowed Twist to retain control of the Natural Gas Assets and their revenues. Grayiel, believing that the Natural Gas Assets and their Revenues had validly been transferred to AIO, relied on these misrepresentations to his substantial detriment. Accordingly, Plaintiff has adequately alleged fraud and issues of fact exist as to Plaintiff's Cause of Action for Fraud and Defendants' Summary Judgment Motion should be denied.

**B.** **Count VIII (Wrongful Conversion)**

Defendants argue that they are entitled to summary judgment as a matter in law in connection with Plaintiff's claim for wrongful conversion, listed as Count VIII in the Amended Complaint, because Defendants never had dominion or control over Plaintiff's assets. Defendants are mistaken, and, at trial, Plaintiff will show that Defendants deprived Grayiel of his property –

the Grayiel Investment – by fraudulently taking certain rights, title and interests in the Natural Gas Assets, which were purchased in part with the Grayiel Investment.

Under Kentucky law, wrongful conversion is "the wrongful exercise of dominion and control over the property of another." *Jones v. Marquis Terminal, Inc.,* 454 S.W.3d 849, 853 (Ky. App. 2014). Kentucky Courts have developed a seven factor test to determine if a wrongful conversion occurred: (1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property. *Ky. Ass'n of Counties All Lines Fund Trust v. McClendon,* 157 S.W.3d 626, 632 n. 12 (Ky. 2005)).

At all times relevant to this action, Grayiel retained ownership and had legal title and the right of possession to the approximately $900,000 of his life savings, of which he was solicited to invest in the Twist Entities by Twist. As a result of the Agreed Judgment, AIO fraudulently acquired possession, title, and control of the Natural Gas Assets. Under the Agreed Judgment and the subsequent dealings between AIO and Second Blue Light, the Defendants systematically and unlawfully encumbered and transferred the Natural Gas Assets as a means of keeping defrauded investors, including Grayiel, from ever recovering returns on their investments. Thus, Defendants each exerted dominion over the Grayiel Investment in a manner which deprived Grayiel's rights to use and enjoy the property, as a result of the fraudulent transfer of assets. Defendants' intentional

misuse of investment funds was intended to interfere with Grayiel's possession and retention of returns on his investment or his initial investment.  At all times relevant to this action, Grayiel sought the return of the Grayiel Investment from the Defendants, and the failure of the Defendants to return the Grayiel Investment to Grayiel caused Grayiel to suffer a loss of property. Accordingly, the actions of these Defendants in misappropriating and misusing the Grayiel Investment constitutes a wrongful conversion of Grayiel's property, and Defendants' Summary Judgment Motion should be denied.

## CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that the Court deny Defendants' Summary Judgment Motion and enter partial summary judgment in favor of Plaintiff as to Causes of Action 1-6 and 9.

Respectfully submitted,

Dated:  March 16, 2018                    HOLLAND & KNIGHT LLP

                               /s/ Warren E. Gluck, Esq.
                               Warren E. Gluck, Esq.
                               Elliot A. Magruder, Esq.
                               *admitted pro hac vice*
                               Holland & Knight LLP
                               31 West 52nd St.
                               New York, NY 10019
                               Tel: (212) 513-3396
                               warren.gluck@hklaw.com
                               elliot.magruder@hklaw.com


                               Richard A. Bixter, Jr., Esq.
                               *admitted pro hac vice*
                               Holland & Knight LLP
                               131 S. Dearborn St., 30th Floor
                               Chicago, IL 60603
                               Tel: (312) 422-9032
                               richard.bixter@hklaw.com

Michael T. Boardman
*admitted pro hac vice*
Holland & Knight LLP
400 S. Hope St., 8th Floor
Los Angeles, CA 90071
Tel:  (213) 896-2450
michael.boardman@hklaw.com

James M. Burd, Esq.
Edward M. O'Brien, Esq.
Wilson, Ecker, Moskowitz, Edelman &
Dicker, LLP
100 Mallard Creek Road, Suite 250
Louisville, KY 40207
Tel:  (502) 238-8500
james.burd@wilsonelser.com
edward.obrien@wilsonelser.com

*Counsel for Plaintiff George A. Grayiel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 16, 2018, I electronically filed the foregoing with the Clerk of the Court, which will send notice of filing via the Court's ECF system to:

James M. Burd

Edward M. O'Brien

F. Larkin Fore

Sarah M. Fore

Bryan J. Dillon

Richard A. Bixter

Michael T. Boardman


/s/ *Warren Gluck*_____

*Counsel for Plaintiff George A. Grayiel*

#55766398_v2