UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| GEORGE A. GRAYIEL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:15-CV-821-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| AIO HOLDINGS, LLC, | ) | **ORDER GRANTING IN PART AND** |
| SAMIR ANASTAS, | ) | **DENYING IN PART MOTIONS FOR** |
| GREGORY ANASTAS, | ) | **SUMMARY JUDGMENT** |
| SARINPRAPA TEEMA, and | ) | |
| BLUE LIGHT OF KENTUCKY | ) | |
| LIMITED LIABILITY COMPANY, | ) | |
| | ) | |
| Defendants. | | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion for Summary Judgment filed by

Defendants AIO Holdings, LLC ("AIO"); Gregory Anastas ("Gregory"); Samir Anastas

("Samir"); Sarinprapa Teema ("Teema"); and Blue Light of Kentucky Limited Liability

Company ("Second Blue Light") [R. 125], and on the Motion for Partial Summary Judgment

filed by Plaintiff George A. Grayiel ("Grayiel" or "Plaintiff") [R. 128]. For the reasons

discussed below, the Court will grant the Defendants' Motion as to Count 4 in its entirety, as to

Counts 5 and 6 against Samir only, as to Count 7 against Samir and Teema only, and as to Count

8 in its entirety, and will deny both motions as to all other claims.

## I.    BACKGROUND

This case has a complex procedural and factual background, involving convicted con

man Martin Twist[1] and the trail of confusion and destruction he left in his wake. Twist owned

and controlled various entities involved in a natural gas drilling operation in West Virginia (the

---

[1] Now deceased and not a party to this suit.

"Natural Gas Operation"). [R. 86-4 at ¶¶ 1, 2, 6, 7]  These entities included Martin Twist Energy

Company, LLC ("MTEC"), Blue Flame Energy Company, LLC ("Blue Flame"), Cherokee

Drilling Company, LLC ("Cherokee Drilling"), Cherokee Energy Company, LLC ("Cherokee

Energy"), Joerhea Realty, LLC ("Joerhea"), and Seca Energy, Inc. ("Seca") (collectively, "Twist

Entities"). *Id.*; [R. 128-20; R. 134-1 at 151:11-12; R. 128-5 at 40:18-20]

One of Twist's former employees, Lonny Armstrong (who served in a variety of

capacities for some of the Twist Entities), described a laundry list of "Twist's unscrupulous

business practices" in an affidavit.  According to Armstrong, "Twist regularly cheated or conned

his investors, employees, and associates through deceit, 'hyped-up' representations, and outright

lies." [R. 86-4 at ¶ 32]  This included "wrongful and unlawful behavior to avoid paying his

investors and creditors, including transfer[ring] his assets beyond their reach" and "actively

avoid[ing] paying creditors and eventually stop[ping] paying creditors altogether unless they

were absolutely essential to the [Natural Gas Operation]." *Id.* at ¶¶ 33–35.  Armstrong also said

"[w]hen one of the Martin Twist Entities accrued creditors representing debts beyond Twist's

ability to pay, he would simply create another business entity and transfer his assets to the new

entity" and that "[b]ecause of his unscrupulous business practices, entities such as . . . Dickerson

Corporation, and [others] sued Twist to recover what they were rightfully owed." *Id.* at ¶¶ 39–40.

### A.  Grayiel's Initial Investment and Loan

Plaintiff, a West Virginia resident [R. 86 at ¶ 1; R. 88 at ¶ 1], claims that from January

2000 through December 2001, he invested almost $900,000.00 (the "Grayiel Investment") in "a

natural gas drilling scheme perpetuated by . . . Twist, through a labyrinth of companies solely

controlled by Twist, including but not limited to" MTEC, Blue Flame, Cherokee Drilling,

Cherokee Energy, Joerhea, and Seca. [R. 129-1 at pp. 3–4]  Grayiel alleges that "Twist induced

the Grayiel Investment by convincing Grayiel to execute, at a minimum, twenty subscription and/or partnership agreements with Twist Entities . . . He defaulted on these obligation[s]." *Id.* at p. 4. Grayiel says that "Twist further induced the Grayiel Investment by directing MTEC and Seca to enter into a May 10, 2001 Promissory Note and Security Agreement wherein Grayiel loaned $500,000 to MTEC and Seca, which loan was secured by certain [natural gas assets]" and that "[o]n August 6, 2001, MTEC repaid the 2001 Grayiel Loan." [R. 136 at p. 4 (citing R. 128–2)] Defendants argue that they are also victims of Twist just like Grayiel — except in a worse position, because they loaned money to Twist that he did not repay. [*See*, *e.g.*, R. 141 at pp. 2–3]

## B. Twist's Efforts to Evade Creditors

### *The Formation of Blue Flame*

According to Lonny Armstrong, "[i]n April, 2004, when Twist asked [Armstrong] to form Blue Flame, Cherokee Drilling had accrued debts that Twist did not want to pay," so "[t]o protect Cherokee Drilling's assets from creditors, Twist decided to form Blue Flame and then transfer Cherokee Drilling's assets to Blue Flame." [R. 86-4 at ¶¶ 44–45] Twist told Armstrong that he wanted him to form Blue Flame "because he was 'tired of all the lawsuits, hassles, etc. and wanted to start out fresh and clean.'" *Id.* at ¶ 50 (internal quotation marks omitted). He also told Armstrong that he would "'do it right' by paying employees, vendors, taxes, and other debts through Blue Flame, and unlike Cherokee Drilling, he would not allow Blue Flame to accrue debts." *Id.* at ¶ 51. Twist told Armstrong to put Blue Flame in Armstrong's name, and that he did not want his own name associated with the entity. *Id.* at ¶ 52. Twist's office manager, Jerry Baker, completed the necessary formation papers at Twist's direction. *Id.* at ¶¶ 46–47. The paperwork listed Baker and Armstrong as Blue Flame's organizers, with Baker as its sole member and Armstrong as its sole manager. *Id.* at ¶ 48. Armstrong said, "I now know that the formation of Blue Flame was just another of Twist's many frauds" and "[b]y keeping his name

off Blue Flame, he could control every aspect of Blue Flame's operation, which he did, then blame everyone else when bills, taxes, and vendors [went] unpaid." *Id.* at ¶ 54.

### Bengfort and Layne Wells

According to Armstrong, at some unspecified time in 2005, he traveled with Twist to the site of an oil and gas well called "Bengfort #1." [R. 86-4 at ¶ 9]  There, Armstrong met Gregory and Samir (Gregory's father). *Id.* at ¶ 10.  Armstrong says that Twist hoped the two would invest in the Bengfort #1 well and perhaps other, as-yet undrilled wells too. *Id.* at ¶ 11.  After inspecting Bengfort #1, Samir and Gregory agreed to invest in that well and two new wells to be drilled: "Layne #2" and "Bengfort #2." *Id.* at ¶¶ 12, 13.  Armstrong states that "[a]t no point during this time was a credit proposal, as opposed to an investment arrangement, discussed." *Id.* at ¶ 14.

Armstrong claims that according to his records, Samir and Gregory, through AIO, invested approximately $360,000.00 in Bengfort #1, Layne #2, and Bengfort #2, while Blue Flame invested $37, 205.64 in those same wells. *Id.* at ¶¶ 17, 18.  Armstrong said that to let Twist track AIO's investment in the wells, Twist instructed Armstrong to form a limited liability company called "Exploration Escrow" and open a bank account for it. *Id.* at ¶ 19.  Armstrong did so, forming the LLC on November 14, 2005, and opening a bank account ("Exploration Account") in its name on April 17, 2006. *Id.* at ¶¶ 20, 21.  Armstrong said Blue Flame used funds deposited in the Exploration Account to drill the wells. *Id.* at ¶¶ 22, 23.

### The Armstrong Complaint

According to Armstrong, in January 2005, Twist called Armstrong with an unusual request: to be sued for $500,000.00.  *Id.* at ¶ 57.  Armstrong said that the lawsuit (the "Armstrong Complaint") was to claim violation of an employment contract requiring Twist to pay Armstrong an annual bonus and royalty interest in gross production revenues of oil and gas produced by the Natural Gas Assets. [R. 86-4 at ¶ 58]  Twist told Armstrong that if he "sued him

and two other Martin Twist Entities, and got a judgment against them, the judgment would put a lien on the [Natural Gas Operation's] production and equipment, thus further sheltering Twist's assets from disgruntled investors or creditors." *Id.* at ¶ 59. Armstrong said that he "knew that none of the facts associated with the Bonus were true from Twist's perspective, but rather this was a scheme where Twist intended to use me to defraud his creditors and investors." *Id.* at ¶ 59. Twist told Armstrong that he had hired a lawyer, Thomas McAdam III, to draft the complaint. *Id.* at ¶ 60.

According to a Declaration executed by McAdam, in or around 2005, Twist approached McAdam and explained "that he operated a natural gas drilling business and that a number of investors, creditors and regulatory agencies were or would be suing him . . . [and] that he needed the natural gas assets to become 'encumbered' by a creditor whom he trusted," specifically naming Armstrong. [R. 53-3 at ¶¶ 1, 3, 8, 9] In what McAdam describes as "a lapse of judgment," he "made the mistake of becoming involved in Twist's scheme." *Id.* at ¶¶ 5, 7. McAdam drafted the Armstrong Complaint, then on May 2, 2005, signed it and mailed it to Armstrong, who apparently sat on it for several months. [R. 86-4 at ¶ 62; R. 53-3 at ¶¶ 10–12]

### *The AIO Lien*

Twist seems to have simultaneously pursued multiple ways to evade creditors in 2005. Armstrong states that "[a]round the same time that Mr. McAdam was drafting the Armstrong Complaint," Twist told Armstrong "that he was going to have a $2 million lien placed on the [Natural Gas Operation's] assets to accomplish the same goals that he tried to accomplish through [Armstrong's] lawsuit." [R. 86-4 at ¶ 66] Twist told Armstrong that attorney Chud Dollison was going to draft the lien document. *Id.* at ¶ 68. On June 20, 2005, Gregory and/or

Samir[2] formed AIO. [R. 88 at ¶ 2; R. 86-4 at ¶ 15]  Gregory confirmed that the "sole purpose of AIO was to loan Twist entities money" and confirmed that "as time went on, another purpose of AIO emerged . . . to hold assets that used to belong to Martin Twist or his entities," and that AIO did none of the work of the actual operation of the natural gas assets. [R. 128-5 at 40:22-25, 41:1-20]  Gregory claims that he is the sole owner of AIO through an entity called Advantage Investments, LLC, and that Twist never owned part of AIO. [R. 134-1 at 83:1-7]  However, Gregory testified that the Pedley Firm (which Gregory testified represented both himself and Twist, and which Defendants do not dispute was later disbanded after being accused of conspiring with Twist to defraud other investors, [R. 134 at p. 7 n.1]), drafted an operating agreement for AIO in 2005 listing Offshore Energy LLC (another Twist Entity) as a member of AIO along with Advantage Investments LLC. [R. 144-1 at 35:1-21; R. 128-6 at p. 37]  As Defendants point out, however, the agreement was unsigned. [R. 128-6]

Approximately two days after AIO's formation, on or about June 22, 2005, Twist, MTEC, Cherokee Energy, Cherokee Drilling, and Seca signed a revolving promissory note ("Note") listing themselves as borrowers and AIO as lender. [R. 125-2 at p. 1]  The Note bears two signatures: Martin Twist's, and Joerhea E. Beasley's (four times, once as managing member for each Twist Entity).[3] [R. 125-2 at p. 4]  The Note provided that Twist and the other entities could borrow up to $2,000,000.00 at a time. *Id.* at pp. 1–3.

On August 15, 2005, the lien document ("Deed of Trust") was executed. [R. 86-4 at ¶ 72] The Deed of Trust recited that in exchange for AIO's loan, MTEC gave AIO a security interest

---

[2] The Answer filed by AIO, Gregory, and Samir confirms that either Gregory or Samir formed AIO.  Armstrong says his understanding is that Gregory formed AIO. [R. 86-4 at ¶ 15]

[3] Gregory testified that Joerhea "was some way through Martin" and "[i]t was one of his entities or something like that."  [R. 128-5 at 40:18-20]  According to Plaintiff's expert, based on the documents he reviewed and conversations with Plaintiff's counsel, Joerhea Beasley is Twist's half-brother and suffers from "severe mental limitations." [R. 128-23 at p. 9]

in oil, gas, and mineral interests (the "Natural Gas Assets"). [R. 125-3 at pp. 2–4] Beasley signed the document as managing member of MTEC, and Armstrong notarized it. [R. 125-3 at p. 18] The parties dispute what Gregory believed regarding the value of the Natural Gas Assets. Gregory testified "I thought that his assets were worth more than what he was asking for," and that — while he did not remember how much money Twist was asking for at the time — Twist and the Twist entities pledged all their assets to AIO in exchange for an agreement where AIO would give Twist up to $2,000,000.00 at Gregory's sole discretion. [R. 134-1 at 157:1-21] Plaintiff points to this testimony as proof that Gregory believed the Natural Gas Assets were worth more than $2,000,000, while Defendants insist that "Gregory never expressed an opinion as to the value of the Natural Gas Assets." [R. 137 at p. 3] Gregory testified that Twist told him the Natural Gas Assets were worth more than two million dollars, and that he did not undertake any independent efforts to value the assets. [R. 134-1 at 166:11-20] There appears to be no dispute that at the time of the Agreed Judgment discussed below, the Natural Gas Assets were worth at least $721,607.00, as valued by Plaintiff's expert. [R. 128-23 at p. 14]

Armstrong finally verified the Armstrong Complaint on August 23, 2005, but per Twist's instructions, it was never filed. [R. 53-3 at ¶¶ 11, 13; R. 86-4 at ¶ 65] On September 27, 2005, the Deed of Trust was recorded in Jackson County and Roane Counties in West Virginia. The next day, it was recorded in Kanawha County, West Virginia. [R. 125-3 at pp. 78, 52, 26] UCC-1 Financing Statements recording the security interest of AIO in all the chattel paper, contracts, documents, equipment, general intangibles, inventory, securities, and accounts of MTEC, Cherokee Drilling, and Seca were recorded with the West Virginia Secretary of State on September 30, 2005. [R. 125-4]

That same day, Robert Fleu with the Pedley Firm emailed Twist directly with the subject line "Changes in Release Documents" asking Twist to ensure the documents said what he wanted. [R. 128-9]  Twist forwarded the email to Gregory. [R. 128-8]  On October 5, 2005, Gregory replied to both Twist and Fleu in relevant part:

> Both releases originally were to be limited in nature.  To accommodate Martin so that if he wanted to hock his assets (that I have not financed) he could do so.  If I was moving to [sic] slow for him on wells 2 through 5.
> I need these releases to be limited in scope.  I need to know that these releases do **NOT**:
>     1. fully [sic] release the loan agreements until there has been proof of payment.
>     2. give [sic] up title and interest to the wells that the funds (loans) were used to drill
>     3. that [sic] they give up NO equity interest in any of the partnerships that the general partner has assigned for consideration of the loans
> This was the agreement that I understood from Martin a few months back, when these were written up.
> Martin this also allows you to file this release if you choose to raise additional financing and also will save my ass as far as security interest is concerned.

[R. 128-9 (emphasis original)]  Defendants say this email shows AIO was trying to protect its interests in a legitimate loan transaction, not trying to shield Twist's assets. [R. 134 at p. 9]  But another plausible interpretation of this email (and its references to pre-signed releases to accommodate Twist "hock[ing]" assets and raising additional financing) is that Gregory was openly acknowledging that AIO took assets never intended to secure its loan but rather to shield these assets from other creditors.

While it is not dispositive of the question of fraud, the parties dispute whether AIO advanced any funds pursuant to the Note at all and if so, how much.[4]  Gregory claims that it did, to the tune of $360,000 "in various increments . . . between July 2005 and November of 2005."

---

[4] Teema claims that Plaintiff "judicially admits" that it did, but that is not an accurate characterization of Plaintiff's brief in support of his Motion for Summary Judgment. [R. 137 p. 8]  Plaintiff's brief merely references the purpose of AIO's formation (according to Gregory, to loan Twist and his entities money) and that Gregory **purportedly** contributed $360,000 to AIO's parent entity for a loan to Twist and Twist entities. [R. 129-1 p. 8]

[R. 125-11 at ¶ 3]  Gregory testified that the $360,000.00 came from a loan to AIO from Advantage Investments (its parent). [R. 144-1 at 11:1-25]  Plaintiff disagrees that AIO ever loaned Twist and the Twist Entities $360,000, but he says that even this testimony is contradicted by Gregory's testimony in an earlier lawsuit, where Gregory claimed AIO loaned Twist approximately $1,100,000, which was only partly paid back (leading Gregory to file suit). [R. 129-1 at pp. 19–20; R. 128-18 at 23:1-17]  Defendants claim that Gregory's testimony indicated AIO paid $350,000 to Twist, but someone else paid Twist $750,000 for equipment. [R. 134 at p. 23]  Gregory's earlier testimony is at the very least ambiguous and — at least with the only context the Court has — could certainly be read as claiming a $1,100,000 loan to Twist from AIO. [R. 128-18 at 23:1-17]

Armstrong, on the other hand, stated that he never received any money from AIO on behalf of Twist other than approximately $360,000.00 which Armstrong says AIO *invested* in the Bengfort and Layne wells. [R. 86-4 at ¶ 75]  Armstrong further said that "[i]f Twist ever received any of the $2 million from AIO, he kept it quiet," but "it would have been unusual for Twist to have kept something like that quiet because he would always call me to brag about any money or investments that MTEC received." *Id.* at ¶¶ 76–77.  Plaintiff argues that Gregory admits that at the time of the Agreed Judgment (discussed below), the principal amount owed under the loan was only $250,000.00. [R. 144 at p. 2]  (It is unclear whether Plaintiff intended to concede with this statement that AIO did in fact loan Twist and the Twist Entities either $360,000 or $250,000.) According to Armstrong, on or around October 2005, he received a counter check from AIO in the amount of $50,000 with "AIO" hand-written on it. [R. 86-4 at ¶¶ 24–25]  Armstrong states that he received two additional checks from AIO, both for $50,000, to fund Blue Flame's drilling of the Layne #2 well; Twist instructed Armstrong to deposit these checks

into the Exploration Account. [R. 86-4 at ¶¶ 29–30] Armstrong says that Twist (not AIO) transferred the remaining $210,000 to Exploration Escrow. [R. 86-4 at ¶ 31]

Payment records show that on July 22, 2005, AIO made out a cashier's check for $150,000.00 to "Martin Twist Energy LLC." [R. 125-1 at p. 15 n.2; R. 125-17 at p. 1] AIO wrote checks to Exploration Escrow in the amount of $60,000.00 on October 12, 2005, $50,000.00 on October 18, 2005, and $50,000.00 on October 31, 2005. [R. 125-1 at ¶ 3; R. 125-17 at pp. 2, 3, 4] The October 12th check bears faint writing, in what appears to be the "memo" line, reading "Bengford #1." [R. 125-17 at p. 2] Likewise, the October 18th check bears faint writing in the same location, appearing to read "Layne #2." [R. 125-17 at p. 3] The October 31st check also appears to say "Layne 2" in the memo line. [R. 125-17 at p. 4] On either November or possibly October 27, 2005,[5] AIO wrote a $50,000.00 check to Exploration Escrow. [R. 125-1 at 15 n.2] This check appears to bear the memo "Layne #2." [R. 125-17 at p. 5] Gregory says that these checks were all advances under the Note. [R. 125-11 at ¶ 3] Of the $360,000.00, Defendants say Twist and his entities paid back approximately $110,000.00 and then defaulted, leaving $250,000.00 plus possibly interest owed. [R. 125-1 at pp. 15-16] Defendants later argue that interest eventually brought the total amount owed to either $430,000.00 or $460,000.00 (the reason for the discrepancy is unclear). [R. 137 at p. 15; R. 141 at p. 3] Gregory testified that eventually Twist owed $250,000.00 under the Note. [R. 134-1 at 167:4-5] He also testified that he repeatedly asked Twist to pay back the loan over an extended period, and Twist kept promising to repay. [R. 134-1 at 160:19-25, 160:1-18]

---

[5] Defendants say this check was dated November 27, but the copy of the check in the record is not clearly legible and might be read as bearing a date of "10/27/05" or "11/27/05."

On September 8, 2006, MTEC, Cherokee Energy, Blue Flame, and Seca entered into an Assignment and Bill of Sale with Joerhea, in which these entities conveyed to Joerhea certain rights in most of the Natural Gas Assets. [R. 125-5]  This document recited that various assignments effective as of August 1, 2005 had assigned to certain limited liability drilling partnerships oil and gas wells located in Kanawha, Jackson and Roane Counties and a portion of acreage and rights to permit them to operate the wells. [R. 125-5 at p. 1]  These assignments were from MTEC and Seca to various LLPs (many of which Grayiel later sued, as discussed below). *Id.* at p. 8.  Subject to those assignments, effective August 1, 2005, the bill of sale assigned Joerhea the rights MTEC had reserved in its assignments and its managing general partner rights under the partnerships, and provided that Joerhea "shall be entitled to receive the all [sic] of proceeds attributable to or from the Subject Interests on and after" that date. *Id.* at p. 3.  The bill of sale was recorded in Kanawha County on September 22, 2006. *Id.* at p. 18.

In 2006, Dickerson Corporation sued Twist to collect a debt. [R. 86-4 at ¶ 78]  On November 16, 2006, Twist emailed Dollison, appearing to ask him whether the Deed of Trust could be used to evade collection. [R. 53-2 at p. 41]  Armstrong said that in 2006 and 2007, cash flow was very tight; Blue Flame did not have money to drill wells or pay employees.  *Id.* at ¶¶ 79-80.  In January 2007, Twist cut Armstrong's salary by nearly 50%; on April 7, 2007, Twist fired Armstrong. *Id.* at ¶¶ 82, 92–93.

On October 9, 2007, Twist forwarded an email to Gregory, copying Dollison and attaching formation documents for AIO. [R. 128-11]  That same day, Twist forwarded an email to Gregory (copying Dollison), with the subject line "AIO Holdings, LLC; DE S/S file no. 3988159. [R. 128-11]  Twist told Gregory that he owed the Delaware Secretary of State and "NARI" certain amounts. [R. 128-11]  Twist further explained: "only YOUR confidential name,

address, and phone # are listed with NARI . . . the state sends NARI the tax bill each year, and they forward it to you . . . you have ordered a copy of the 'certificate of formation' from Delaware for $85 through the triad service bureau . . . [if] you have any questions, call me." [R. 128-11] Defendants argue that these documents are available online or to anyone who pays the Secretary of State for them, and that emailing the documents "does not evidence domination or control over an entity," and that if Twist were controlling AIO, he would file the corporate documents rather than remind Gregory to do so. [R. 134 at p. 18]

### *The AIO Complaint and Grayiel Sues Twist*

McAdam said that "[i]n or around 2008 . . . Twist once again approached [McAdam] with the same problem." *Id.* at ¶ 15. This time, Twist told McAdam "that he wanted his assets to be encumbered by a creditor called AIO, whose owners were friends of his." *Id.* at ¶ 15. So McAdam again obliged Twist. *Id.* at ¶ 16. This time, Twist told McAdam to draft a complaint (the "AIO Complaint") for "breach and enforcement of an alleged $2 million credit facility as between MTEC and an attorney, Charles B. Dollison[,] as trustee for the benefit of AIO." *Id.* The Complaint alleged that "AIO entered into an agreement in which MTEC obtained a line of credit in the amount of $2 million and in which Twist, and various Twist Entities, including MTEC, Cherokee Drilling, Joerhea, [Cherokee Energy], and [Seca] (collectively the 'Foreclosure Defendants') granted a security interest to 'all it [sic] their right, title and interest in and to certain drilling leases, personal property, and other assets . . . .' (the 'Foreclosure Assets')." *Id.* It further alleged that AIO "advanced certain funds" to Martin Twist Energy, LLC, in an amount to be determined but not to exceed $2,000,000.00 plus interest, and asked for judgment in that same amount. *Id.* at pp. 13, 14. However, McAdam was never given "any evidence that any money changed hands pursuant to the credit facility . . . [or] any evidence as to the value of the Foreclosure Assets to be foreclosed upon pursuant to the verified AIO Complaint." *Id.* at ¶ 17.

As with the Armstrong Complaint, Twist gave McAdam all the details to include, and McAdam had nominal or no interaction with AIO. *Id.* at ¶ 18.

On September 12, 2008, Twist emailed Gregory, asking him to review "the AIO complaint . . . to be filed, by [McAdam] on Monday" and saying that unless Gregory had changes, "we need to meet and have your signature both on it, and the retainer agreement [. . . ] the defendants will want to sign an agreed judgment. [. . . ] time is of the essence." [R. 128-9] Per Twist's instruction, McAdam filed the AIO Complaint in Jefferson Circuit Court on September 23, 2008. [R. 53-3 at ¶ 19; *id.* at p. 9] The suit named not only all the borrowers under the Note, but Joerhea and Blue Flame. [R. 125-6 at pp. 1–2] Gregory denied in an affidavit that the lawsuit was fraudulent. [R. 125-11 at ¶ 8] Gregory also claims that he at first tried to sue Twist using his own lawyer, but that lawyer was taking too long, so Twist suggested McAdam and Gregory agreed. [R. 134-1 at 136:21-24]

On October 30, 2008, AIO entered into an Agreed Judgment. [R. 53-3 at p. 25] Armstrong described the quick settlement as follows: "[i]nstead of fight the lawsuit, like Twist usually did, he signed an Agreed Judgment, as did G. Anastas, on behalf of AIO, [and] Beasley . . . on behalf of MTEC, Cherokee Drilling . . . Cherokee Energy . . . and Joerhea." [R. 86-4 at ¶ 86] Gregory, McAdam, and Bryan J. Dillon (then an attorney for the defendants to that suit; now defense counsel for Defendant Teema) also signed it. [R. 125-7 at p. 2]

According to McAdam, this Agreed Judgment granted AIO "immediate [and] sole possession of all" of the Natural Gas Assets. [R. 53-3 at ¶ 20; R. 86-4 at ¶ 87] Defendants say that Twist "was only given a contract to operate the wells," and that "AIO remained the owner of the assets and could fire Twist at any time." [R. 134 at p. 14] McAdam says Twist told him "that the purpose of these actions was to shield the assets from investors and creditors by putting them

in the hands of other creditors, whom he trusted." [R. 53-3 at ¶ 22]  Armstrong agreed that the Agreed Judgment "was just one more example of how Twist kept creditors from obtaining assets to which they were entitled." [R. 86-4 at ¶ 88]

On November 1, 2008, the Kentucky Secretary of State administratively dissolved First Blue Light (defined below) for failure to file an annual report. [R. 53-4 at p. 180]  On November 17, 2008, Grayiel sued Twist, one Thomas Pilcher, one Tammy Twist Curry, one Drew Thomas, MTEC, Cherokee Energy, and eight other Twist entities not involved in this suit.  Grayiel brought claims for violation of the West Virginia Securities Act, Lost Opportunity, Unjust Enrichment/Quantum Meruit, Conversion, Fraud and Intentional Misrepresentation, Negligence, Right of Rescission, and Intentional Infliction of Emotional Distress.  The Jefferson Circuit Court entered the Agreed Judgment transferring the Natural Gas Assets to AIO on December 2, 2008. [R. 53-3 at ¶ 19]  As explained in more detail below, approximately a month later, on January 1, 2009, Joerhea assigned most of its rights and title in the Natural Gas Assets to AIO (which assignment was then recorded on or about January 29, 2009).

## C.  AIO Enters into An Operating Agreement with a Twist Entity

Effective December 4, 2008 — just two days after entry of the Agreed Judgment — AIO and a Twist entity, 530 West Main, LLC ("530 West Main"), entered into an Operating Agreement (the "530 Operating Agreement"), pursuant to which 530 West Main would manage the wells and receive all gross revenues generated by the Natural Gas Assets, pay the associated operating expenses, hold the rest in escrow to pay anticipated expenses and attorney's fees until the escrow amount reached $500,000, and then split the remaining net revenue with AIO on a 50/50 basis. [R. 125-9]  The Operating Agreement also provided for certain minimum payments to 530 West Main regardless of whether there was net revenue remaining after expenses, and for

AIO and 530 West Main to indemnify one another for claims arising out of the 530 Operating Agreement or 530 West Main's management of the Natural Gas Assets. *Id.* Twist and Beasley signed the 530 Operating Agreement on behalf of 530 West Main. *Id.* Defendants admit that Twist was "involved" in or "associated with" 530 West Main. *Id.* at pp. 22–23. Scott Kaminski, a lawyer who Twist hired and paid to represent AIO in a separate state court lawsuit ("Martin Suit") (brought by landowners in West Virginia in 2009 when a natural gas lease with MTEC went wrong), immediately withdrew from representing AIO — years into the case — upon receiving a copy of this operating agreement, because it showed that AIO "had in fact allowed Mr. Twist to operate the wells" after entry of the Agreed Judgment, in complete contravention of what AIO had represented all throughout the lawsuit. [R. 128-14 at p. 5; R. 128-14 at pp. 16-17; R. 128-17 at 17:10-23; 18:14-25, 76:13-19] Yet Defendants argue that Gregory being the one to tell Kaminski about the operating agreement proves that neither he nor AIO were part of a scheme to hide Twist's alleged involvement with AIO. [R. 134 at p. 22]

Gregory testified in a deposition that he did not try to find another company to operate the wells until later. [R. 125-15 at 61:1-12] Gregory says that neither he, nor Samir, nor AIO had "any knowledge, expertise, or familiarity with the operation of oil or gas wells." [R. 125-11 at ¶ 11] According to Gregory, Twist knew this, leaving Gregory feeling that "AIO was at a severe disadvantage" because of Twist's industry knowledge and experience. *Id.* Gregory claims to have essentially been taken hostage by Twist, saying that he "feared that if AIO did not agree to Twist (or an affiliate thereof) operating the wells with the common goal of making money therefrom, Twist would take action to make certain that no sums were recovered from the collateral AIO received." *Id.* Gregory claims that "[t]he sole purpose of AIO . . . in allowing Twist's affiliate to operate the wells was to recoup the amount loaned to the Borrowers and the

interest thereon" and he "felt it was the only chance AIO had to recover any of its loss." *Id.* at ¶ 12. Defendants also cite to the business judgment rule, arguing that Gregory is to be presumed to have been exercising his best business judgment in entering into this contract. [R. 134 at pp. 18–19] But the case Defendants cite merely articulates the business judgment rule in the context of a shareholder derivative action alleging harm to the corporation — unlike this case. *Allied Ready Mix Co. ex rel. Mattingly v. Allen*, 994 S.W.2d 4, 8 (Ky. Ct. App. 1998).

That very same day, December 4, 2008, 530 West Main and Blue Light of Kentucky LLC ("First Blue Light") entered into a "Natural Gas Gathering Contract," pursuant to which First Blue Light (despite having been dissolved a month earlier) would receive gas production from the Natural Gas assets and deliver it into market pipelines. [R. 86-9 at pp. 2, 5] 530 West Main and AIO would pay First Blue Light expenses and a "gathering fee" for each unit of gas delivered. *Id.* at p. 2. The Natural Gas Gathering Contract included a provision under which AIO and 530 West Main would indemnify First Blue Light against any settlement, judgment, attorney fees, etc., incurred as the result of any threatened or actual litigation arising out of the Contract. *Id.* On January 1, 2009, Joerhea assigned all right, title and interest in most of Natural Gas Assets to AIO. [R. 125-8] The assignment was recorded in Roane County and Jackson County, West Virginia, on or about January 29, 2009. *Id.* at pp. 13, 26.

### D. Teema

Enter Defendant Teema. According to her, she met Twist online while looking for a job, then in October 2009 flew from her native Thailand to meet Twist in Louisville, Kentucky. [R. 53-4 at 107:16-24, 108:1-24] In 2009, Teema worked for Twist as a caregiver and babysitter for his son. *Id.* at 123:7-14. Teema and Twist became romantically involved approximately a year later. *Id.* at 111:22-25, 112:1-2. Teema testified that she began working with Twist's businesses

around early 2012, paying bills and printing and sending royalty checks to landowners. *Id.* at 123:24-35, 124:1-25, 125:1-6.

### E. Twist's Federal Indictment

On February 7, 2012, Twist was indicted in the Western District of Kentucky for tax evasion. [*See* 3:12-CR-016-CRS, R. 1]  The indictment charged that Twist hid assets by transferring them between accounts to keep his account balances low.  Part of the way the indictment charged he did this was by creating Blue Flame Energy Co., LLC in the name of a nominee owner in order to conceal the assets of Cherokee Drilling Co., then causing assets of MTEC and Cherokee Drilling to be transferred to Blue Flame and its nominee owner, while Twist retained control.  He also transferred assets from MTEC and Cherokee Drilling to Joerhea and Beasley Realty, LLC, while controlling those entities.  Twist later pleaded guilty, specifically admitting that "he caused Blue Flame Energy to be created in the name of a nominee to conceal assets from the IRS." [3:12-CR-016-CRS, R. 26 at p. 2]  He also admitted sending or causing to be sent to the IRS letters falsely denying ownership and control of Blue Flame. *Id.*

### F. Attempted Sale of the Natural Gas Assets

Gregory testified that he tried to sell some of the Natural Gas Assets and pushed Twist to find a buyer, since Twist knew the business. [R. 134-1 at 208:14-23]  On April 28, 2012, one Doug Douglass emailed Twist a letter of intent dated April 27, 2012. [R. 125-20 at p. 1]  Twist forwarded the email to Gregory on May 5, 2012. [R. 125-20]  The attached letter of intent was addressed to Twist and proposed terms and conditions under which a company called Reserve Oil & Gas Inc. ("Reserve Oil") would purchase the assets of AIO and its affiliates "which is owned, in part, directly or indirectly by Martin Twist," whom the letter referred to as "Shareholder." *Id.* at p. 4.  On May 7, 2012, Douglass emailed Twist a revised letter of intent

"with the changes that were discussed [that] morning." [R. 125-21] The revised letter of intent was dated the same as the previous version, but was instead addressed to Gregory, and removed references to AIO's affiliates and Twist (including his status as shareholder of AIO). *Id.* at pp. 1–2.

On June 22, 2012, Brian Prosek with Steptoe & Johnson emailed Vincent Mallon (copying Douglass), saying "the searches are coming back pretty clean. Therefore, I think we are clearing that hurdle and are ready to complete due diligence," and asking for certain documents. [R. 125-19] Defendants point to this exchange as signifying that Steptoe & Johnson (Grayiel's former counsel) recognized the legitimacy of AIO's secured interest in the Natural Gas Assets. [R. 125-1 at p. 15] On June 26, 2012, Mallon replied "[a]s you know, my client acquired the assets by the agreed judgment and 530 West Main, LLC continued in the day to day management of these assets pursuant to the operating agreement." [R. 125-19] Accordingly, Mallon said that his client did not have the requested documentation, but that it should be requested from Twist. *Id.* Defendants say that these emails and letters of intent demonstrate that AIO was trying to sell the Natural Gas Assets to recoup the unpaid loan amounts. [R. 125-1 at p. 32] Twist emailed Mallon on June 28, 2012:

> i [sic] am gathering the info that they requested.
> i [sic] have instructed them to make 2 checks, with 50% of the proceeds going to AIO & the other 50% going to 530 West Main Properties, LLC. the [sic] name of the entity that will be acquiring AIO simultaneously with the closing is Blue Light of Kentucky LLC, a Ky LLC, with offices at 530 West Main Street, Louisville, KY 40202.
> if [sic] you wish to discuss this, I can be reached at . . .

[R. 125-19] Defendants say that this email merely shows that Twist attempted to take over this deal (which never occurred). [R. 125-1 at p. 31] Plaintiff points out that Gregory did not object to the prospect of AIO only receiving $250,000 from this sale, with 530 West

Main — a Twist entity — receiving the other $250,000. [R. 129-1 at p. 18]  Defendants

argue that this only shows that Gregory was honest about AIO trying to recover its losses,

[R. 134 at p. 19].  On this same email chain, Twist emailed himself the EIN/FEN number

for First Blue Light. [R. 125-19]  The next day, Gregory emailed Twist, asking him to

review an attached settlement agreement in the Martin Suit and send back any changes. [R.

128-16]  Gregory claims that he made the decision to settle the Martin Suit, and that he

only asked Twist to review the settlement because Twist was the one that knew about the

natural gas wells. [R. 134-1 at 104:6-14, 105:11-24]  Ultimately, the proposed sale of the

Natural Gas Assets to Reserve Oil never went through.

### G.  Organization of Second Blue Light

On October 1, 2012, Teema organized "Blue Light of Kentucky Limited Liability

Company" ("Second Blue Light") as a Kentucky LLC. [R. 53-4 at p. 10]  Obviously, this

company is named nearly identically to First Blue Light (the entity being paid under the Natural

Gas Gathering Contract), with the difference being that Second Blue Light's name spells out the

words "Limited Liability Company," while First Blue Light's name only has the abbreviation

"LLC".  Teema testified that the difference between the two is the name and the owner. [R. 53-4

at. 142:13-25]  She said that she did not know who owns First Blue Light (though she thinks

Twist used to), but that she owns Second Blue Light and has since 2012 (around the time she

began working for Twist). *Id.* at 143:1-25, 144:1-3.  She testified that she did not pay for Second

Blue Light. *Id.* at 147:18-25.  She further testified that she did not open a new bank account for

Second Blue Light. [R. 128-19 at 48:10-12]  She testified that she created the company with

Twist's help, but that the companies are different in that they "don't do the same job." [R. 53-4

at 144:16-25]  Teema could not clearly explain the difference further other than to say that her

- 19 -

company operated the gas wells, but she did not know what the other company did. *Id.* at 145:1-9

Teema testified that Second Blue Light gets paid, and she pays herself from the company. *Id.* at 145:10-23. Teema admitted that Second Blue Light used the same checking account formerly used by First Blue Light. [R. 137-2, 57:1-25, 58:1-25] During Teema's second deposition, counsel read into the record a letter signed (or stamped) by Twist as well as Teema, addressed to someone at First Capital Bank, asking the bank to connect six accounts such that they could "be viewed and transferred between online on the cash management website." [R. 128-19 at 56:20-25, 57:1-3] The listed accounts were associated with TB Management, LLC; Beasley Realty; 530 West Main; First Blue Light; Joerhea Realty; and Hunter Rhea Twist (apparently, Twist's son). *Id.* at 57:7-14; R. 53-4 at 123:18-19. Teema's counsel stated on the record during her deposition that Teema owns "possibly . . . two percent" of Beasley Realty and 530 West Main. [R. 53-4 at 152:3-7] Teema also testified to owning two percent of "Jarea Realty, LLC" (possibly meaning Joerhea). *Id.* at 153:17-18.

### H. Twist's Imprisonment and Death

On July 9, 2013, Twist pled guilty to the Western District indictment. On or around October 22, 2013, Appalachian Energy Partners 2003-S, LLC executed a quit-claim deed (the "Twist Entity Quit-claim Deed") in favor of AIO, releasing all of its right, title, and interest in the Natural Gas Assets to AIO. [R. 53-4 at p. 37] Twist signed as President. [R. 53-4 at p. 38] In late 2013,[6] Twist went to federal prison. On February 6, 2014, Grayiel won default judgment against all defendants except Martin Twist (one of the "West Virginia Judgments"). [R. 86-18 at p. 2] On February 23, 2014, Twist died in prison. [*See* 3:12-CR-016-CRS, R. 44] Teema, as executrix of Twist's estate, filed an inventory and appraisal of estate listing among other assets a

---

[6] Just when is not clear from the record.

98% interest in each of several entities (Beasley Realty; TB Management, LLC; Joerhea; Offshore Energy; and 530 West Main). [R. 53-4 at 160:10-12; R. 128-21 at p. 2] The total estimated value of Twist's estate, according to the inventory, was $255, 955.00.

## I. AIO Enters into an Operating Agreement with Second Blue Light

On March 25, 2014, an email was forwarded from the email account of the deceased Twist to one of Teema's email accounts. [R. 128-22; R. 53-4 at 115:18-20] The original email was dated October 29, 2008, and purported to list cash, stock, and assets associated with the Natural Gas Operation. [R. 128-22] Teema testified that she sent the 2014 email, and that she had access to Twist's email account after he was incarcerated. [R. 128-19 at 31:1-14] The email reflected Twist's estimate of the value of 530 West Main in 2008 as being "$5000,000 (+$50,000 stock value)," in stark contrast to Teema's 2014 estimate of its value on the inventory ($4,000.00). [R. 128-19; R. 128-21 at p. 2] Teema responds that the value Twist placed on 530 West Main in 2008 does not establish its value in 2014. [R. 142 at p. 3]

On March 31, 2014, AIO and Second Blue Light entered into the "Agreement Regarding Operation of Wells" (the "Second Blue Light Agreement"). [R. 125-10] The Second Blue Light Agreement recited that AIO currently owned the natural gas wells, Second Blue Light had been operating the wells, and the parties wanted Second Blue Light to continue to operate the wells "with a view towards ultimately acquiring the [w]ells along with" other property identified in the Agreement. [R. 125-10] Second Blue Light would continue to operate the wells and receive one half of the net proceeds generated by the sale of natural gas from the wells (after payment of certain expenses). [R. 125-10] The purchase price for these assets was $466,392.00, and Second Blue Light's payments to AIO (apparently, including payments of AIO's share of the net proceeds) would be credited towards the purchase price. [R. 125-10 ("[a]ll amounts paid by Blue

Light to AIO, whether under Paragraph 2 of this agreement or otherwise, shall be credited towards the purchase of the items set out in the attached Exhibit . . .")]  Defendants describe the purchase price as being "based on the sums loaned to Twist in 2005." [R. 125-1 at p. 25]  Teema signed for Second Blue Light, while the signature for AIO is illegible. [R. 125-10]

Teema testified that she operates Second Blue Light. [R. 128-19 at 47:17-19]  She further testified that as of the date of her deposition (September 20, 2017) she continued to receive payments from Second Blue Light. *Id.* at 48:7-9.  Teema testified that Second Blue Light contracted with AIO to operate the wells "[b]ecause when Martin [Twist] passed away, AIO came to — that he owned the wells, and I — I don't have agreement [sic] with AIO to operate it, so we sit down and talk." [R. 128-19 at 76:19-25, 77:1-2]  She testified that Gregory and Samir came to her after Twist died and discussed entering into an agreement with Second Blue Light, which Dillon helped her negotiate. *Id.* at 77:7-14.  Gregory admitted that he did not look for anyone else to operate the wells besides Teema and Tammy, Twist's daughter who approached Gregory about operating the wells. [R. 125-15 at 239:23-25, 240:1-22]  Gregory testified that he was busy raising his children and running other businesses, that Tammy and Teema were the only people he knew who knew about the wells, and that he felt that Teema was "a better option" because he was afraid that if he went with Tammy, he "would end up in the same trap that [he] did with Martin." [R. 125-15 at 239:14-25, 240:1-17]  Gregory did not further explain why he trusted Twist's lover over Twist's daughter.  On August 15, 2014, Grayiel won default judgment against Twist's estate (another of the "West Virginia Judgments"). [R. 86-18 at p. 7][7]

<hr />

[7] The Court does not address Teema's brief argument, raised for the first time in her Reply, that Plaintiff's claims are barred by the doctrine of *res judicata* due to the West Virginia Judgments. [R. 142 pp. 7-8; *Ryan v. Hazel Park*, 279 F. App'x 335, 339 (6th Cir. 2008) ("Generally, this Court has found that an issue raised for the first time in a reply to a response brief in the district court is waived. . . . ") (internal quotation marks and citation omitted).

## J. This Lawsuit

On November 6, 2015, Plaintiff filed the instant suit. [R. 1] This is actually the second round of dispositive motion practice in this case. The first round began on December 1, 2016, when Defendants AIO, Gregory, Samir, and Teema filed a Motion for Summary Judgment as to all of Plaintiff's claims. [R. 45] After briefing, the Honorable Thomas B. Russell denied the Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(d), which provides that the court may deny a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." [R. 80]; Fed. R. Civ. P. 56(d). The Court found Plaintiff's Rule 56(d) declaration sufficient, and denied the motion for summary judgment, explicitly stating that "[i]n so doing, the Court expresses no opinion on the merits of either parties' position." *Id.* at pp. 1–2. The parties then conducted additional discovery throughout 2017 and continuing into early 2018. [*See, e.g.*, R. 117] The First Amended Complaint [R. 86], filed during this period, contains nine separate counts. On February 23, 2018, the parties filed their respective Motions for Summary Judgment [R. 125; R. 128]. These motions have been more than adequately briefed and are now ripe for consideration.

## II. ANALYSIS

### A. Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining a motion for summary judgment, a court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). The court may not "weigh the evidence and determine

the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986). "The mere existence of a scintilla of evidence in support of [a party's] position will be insufficient; there must be evidence on which the jury could reasonably find for" the moving party. *Id.* at 252. The initial burden of establishing no genuine dispute of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* at 324. Where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat that fact as undisputed. Fed. R. Civ. P. 56(e).

Typically, the Court applies the same standard of review to cross-motions for summary judgment as when only one party files. *McKim v. New Market Techs., Inc.*, 370 F. App'x 600, 603 (6th. Cir. 2010). The Court evaluates each motion on its own merits, drawing all reasonable inferences against the party whose motion is under consideration. *Beal ex rel. Putnam v. Walgreen Co.*, 408 F. App'x 898, 902 (6th Cir. 2010). Summary judgment for one side is not necessarily appropriate simply because the parties file cross-motions for summary judgment. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001) (footnote omitted).

## B. Statutes of Limitations

Defendants argue that each of Plaintiff's claims (filed on November 6, 2015) are time-barred. [R. 125-1 at p. 34] Each statute of limitation[8] is addressed in turn below.

---

[8] The Court agrees that Plaintiff's alter ego and veil piercing theories (contained in Count 9) are theories of recovery rather than separate causes of action with their own statutes of limitations. *See CDK Glob., LLC v. Scott & Reynolds, LLC*, No. 1:14-CV-00045-JHM, 2017 WL 956594, at *3 (W.D. Ky. Mar. 10, 2017) ("Neither veil piercing or successor liability are causes of actions . . . .").

***Wrongful Conversion as to AIO, Gregory, Samir, and Teema (Count 8)[9]***

Defendants first argue that the two-year statute of limitations for Plaintiff's conversion claim (found in Ky. Rev. Stat. Ann. § 413.125) expired on January 1, 2011, at the latest, because the alleged conversion "is the transfer of the 'Natural Gas Assets' to AIO," and that transfer occurred "no later than January 1, 2009, the date of the Assignment and Bill of Sale." [R. 125-1 at p. 34 (citing R. 125-8)]. They argue that the discovery rule does not change this outcome, because the latest date at which Plaintiff was put on notice was January 29, 2009, the date of the public recordation of the Joerhea assignment of the Natural Gas Assets to AIO. [R. 125-1 at p. 34]

Plaintiff argues that the discovery rule tolls the accrual of his claim for conversion. [R. 136 at p. 12] As Defendant points out, the Western District of Kentucky has explained that "[u]nder Kentucky law, the discovery rule provides that a cause of action accrues when the injury is, or should have been, discovered. However, the discovery rule does not operate to toll the statute of limitations to allow an injured plaintiff to discover the identity of the wrongdoer unless there is fraudulent concealment or a misrepresentation by the defendant of his role in causing the plaintiff's injuries." *Madison Capital Co., LLC v. S & S Salvage, LLC*, 765 F. Supp. 2d 923, 932 (W.D. Ky. 2011) (quoting *McLain v. Dana Corp.*, 16 S.W.3d 320, 326 (Ky. Ct. App. 1999)). The Western District has held that this discovery rule is applicable to conversion claims. *Id.* at 932; *Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Bowling Green Recycling LLC*, No. 115CV00024GNSHBB, 2017 WL 6508359, at *5 (W.D. Ky. Dec. 19, 2017) ("Where conversion has taken place by way of a wrongful taking, the accrual date for the statute of

---

[9] While the conversion claim ultimately fails on the merits, discussion of the statute of limitations defense to this claim is included both to demonstrate that it is necessary to reach the merits of the conversion claim, and because the arguments regarding factual issues demonstrating a genuine issue of material fact as to fraudulent concealment for this claim also overlap with the arguments as to the other statutes of limitations.

limitations is set based on the discovery rule, which provides that a cause of action accrues when the injury is, or should have been with the exercise of reasonable diligence, discovered." (citing *Madison Capital*, 765 F. Supp. 2d at 932–33).

Plaintiff argues that both Twist and these Defendants fraudulently concealed "their improper transfers of the Natural Gas Assets and the revenues therefrom" through "a campaign of fraudulent concealment in order to obfuscate Plaintiff's injury, namely, the fraudulent scheme of diverting assets away from Twist and the Twist Entities in order to evade creditors." [R. 136 at p. 12]  The Court agrees that the Plaintiff has shown there are genuine issues of material fact as to whether these Defendants engaged in fraudulent concealment.  Armstrong's Declaration and McAdam's Affidavit would permit a reasonable finder of fact to conclude that they did. Both men testified as to Twist's words and actions showing his intent to use the AIO Complaint to hide assets in concert with AIO and its owners, which permits the inference that AIO and Gregory had the intent to assist Twist.  McAdam specifically recounts that Twist told McAdam he wanted his assets to be encumbered by AIO, whose owners were his friends, and that Twist had McAdam draw up the AIO Complaint to that end.  The fact that this is not direct evidence of these Defendants' intent does not mean that it is worthless; it merely means that it is indirect evidence.  Similarly, a raft of other evidence potentially implicates the Defendants in Twist's schemes and efforts to conceal them, such as:

- Twist's September 12, 2008 email to Gregory attaching the AIO Complaint and stating the defendants would want to sign an agreed judgment and that time was of the essence;

- The fact that on December 4, 2008, two days after Twist conveyed the bulk of the Natural Gas Assets to AIO pursuant to entry of the Agreed Judgment, AIO and

530 West Main (a Twist entity) entered into the 530 Operating Agreement, and 530 West Main and First Blue Light entered into the Natural Gas Gathering Contract, which agreement essentially handed the operation and revenues of the Natural Gas Assets back to Twist and his entities;

- Twist and Teema's request that the bank connect the accounts of First Blue Light, Twist's son, and several entities listed on Twist's estate inventory as being 98% owned by Twist (TB Management, LLC; Beasley Realty; 530 West Main; and Joerhea);

- The fact that Teema, as executrix of Twist's estate, valued 530 West Main as essentially worthless compared to its value six years earlier;

- Teema's testimony that Twist helped her create Second Blue Light and that she owns the company but did not pay for it;

- The fact that Kaminski withdrew from representing AIO upon receiving a copy of the 530 Operating Agreement (likely because it showed that AIO had allowed Twist to operate the wells after entry of the Agreed Judgment, while representing to the West Virginia courts that AIO was the sole owner and operator of the wells);

- The letter from Reserve Oil stating that Twist was a "shareholder" or owner of AIO;

- Mallon's June 26, 2012 email to Steptoe & Johnson directing questions about the Natural Gas Assets to Twist (tending to show that AIO did not have knowledge of or control over these assets); and

- The fact that Second Blue Light operates the wells that are part of the Natural Gas Assets, and splits the revenue between Teema and AIO.

On the other hand, Plaintiff is not entitled to summary judgment on this point, since the evidence is not so strong as to compel a reasonable factfinder to conclude that Defendants engaged in fraudulent concealment. Gregory's Affidavit insists that the AIO lawsuit was a valid attempt to foreclose on collateral pursuant to a default on a valid loan. A reasonable jury might conclude that Gregory's October 5, 2005 email to Twist and Fleu evidences AIO's sincere efforts to protect a legitimate debt, and that the June 2012 emails show that AIO was simply trying to sell the Natural Gas Assets to recoup its losses. And Armstrong and McAdam's testimonies are not without their issues. Both witnesses might be incentivized to minimize their own role in events and exaggerate (or fabricate) the facts against these Defendants in order to avoid liability, to placate potential litigants (including Grayiel), and in McAdam's case, perhaps to stave off a bar complaint or an ethical inquiry. As for the other evidence, none of it definitively proves facts of such clear significance that a reasonable person could not find for one side. At bottom, a reasonable jury could choose to believe Gregory, or they could choose to believe Armstrong and McAdam. Thus, the evidence is sufficient to preclude summary judgment as to the issue of fraudulent concealment and thus as to this statute of limitations.

Defendants argue that they cannot be accused of fraudulent concealment because "the transactions of which [Plaintiff] complain [sic] were publicly recorded," putting him on notice on or before January 29, 2009." [R. 125-1 at p. 35]. But this misses the point of Plaintiff's argument, which is not that he did not know about the transactions until the date he filed, but that the public filings **were themselves** part of the fraudulent concealment. The Defendants' argument that the transfers and their fraudulent nature cannot be separated, *see* [R. 141 at p. 9],

would essentially require that the discovery rule not apply once a transfer is recorded. But the Defendants do not cite to any authority demonstrating that to be the case. This is true both for conversion claims and, as discussed below, for the fraud-based claims.

First, the *Madison Capital* case which Defendants cite is unhelpful because it involves dissimilar facts. That case involved a plaintiff who had notice of a conversion due to knowledge of an asset sale (specifically, of certain mining equipment), but there was "no allegation or evidence that either Defendant engaged in fraudulent concealment of the alleged conversion or its respective identity." *Madison Capital*, 765 F. Supp. 2d at 928, 933. Likewise, the Court is not convinced by Defendants' citation to *Shelton v. Clifton*, 746 S.W.2d 414 (Ky. Ct. App. 1988) for the proposition that recordation triggers accrual of a cause of action. *Shelton* did not involve conversion claims or the discovery rule applicable to conversion claims, but involved the application of a completely *different* discovery rule applicable to the fraud-based claims brought by Grayiel. Further, as discussed below, even for the claims to which it is relevant, *Shelton* does not support Defendants' position, because it does not state that recordation or public filing of a document automatically triggers the accrual of the claims.

The *Bradley* case Defendants cite is similarly unhelpful, because that case involved no concealment on the defendant's part. *Bradley v. Nat'l City Bank of Kentucky*, No. 2003-CA-002711-MR, 2004 WL 3017297, at *2 (Ky. Ct. App. Dec. 30, 2004). By contrast, here there is evidence to support a finding that Defendants did engage in fraudulent concealment. Finally, *Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004) also fails to persuade the Court. *Ball* found the Plaintiffs' claims of "fraudulent acts of concealment" regarding their personal injury claims under Tennessee law to be meritless where the Plaintiffs did not point to any specific act of concealment, but only pointed to "national security classification" of information relating to

Oak Ridge, along with news articles. *Ball v. Union Carbide Corp.*, 385 F.3d 713, 723 (6th Cir. 2004). These facts are hardly similar to those here.

Similarly, the Court finds the Defendants' other arguments that various evidence and testimony shows that Plaintiff knew or should have known of his injury much sooner all demonstrate, at the most, the existence of a genuine dispute as to the material fact of whether Plaintiff should have known of the conversion (or indeed any of the alleged torts) more than two years before he filed his suit.[10] [*See* R. 125-1 at p. 36; R. 141 at p. 8; R. 142 at pp. 4–6] Accordingly, the Court finds that there are genuine issues of material fact foreclosing summary judgment as to the statute of limitations on the conversion claim.

### Common Law Fraud as to AIO, Gregory, Samir, and Teema (Count 7) and Aiding and Abetting Fraud as to AIO, Gregory, Samir, and Teema (Count 5)

The statute of limitations for both fraud and aiding and abetting fraud is set out in Ky. Rev. Stat. Ann. § 413.120(11) (formerly numbered subsection 12): "The following actions shall be commenced within five (5) years after the cause of action accrued: . . . (11) An action for relief or damages on the ground of fraud or mistake." Ky. Rev. Stat. Ann. § 413.120; *Bariteau v. PNC Fin. Servs. Grp., Inc.*, 285 F. App'x 218, 224 (6th Cir. 2008) (recognizing that the limitation applies to aiding and abetting fraud). There is a different discovery rule applicable to this statute of limitations, set out in Ky. Rev. Stat. Ann. § 413.130(3): "In an action for relief or damages for fraud or mistake, referred to in subsection (11) of KRS 413.120, the cause of action shall not be deemed to have accrued until the discovery of the fraud or mistake. However, the action shall be commenced within ten (10) years after the time of making the contract or the perpetration of the fraud." Ky. Rev. Stat. Ann. § 413.130(3). *Shelton* makes clear that in order

---

[10] Many of these arguments center on Plaintiff's knowledge with regard to Twist. It is not clear that what Plaintiff knew about Twist is relevant, however. After all, Defendants argue elsewhere in their briefs that suspicion of Twist is not to be equated with suspicion of these defendants. [*See* R. 125-1 p. 8; R. 137 p. 15]

for this discovery rule to apply, "the party seeking to set aside the conveyance [must] establis[h] that he could not have discovered the fraud by the exercise of reasonable diligence," in which case, "the five-year period is extended to ten years." *Shelton*, 746 S.W.2d at 416.

While the parties do not draw a distinction between the discovery rule applicable to the conversion claim and the fraud-based claims, Defendants argue that the five-year statute of limitations for Plaintiff's claims of fraud and aiding and abetting fraud expired on January 29, 2014, "at the latest," because the alleged fraud occurred either on December 2, 2008 (the date of entry for the Agreed Judgment) or January 29, 2009 (the date the Assignment and Bill of Sale were recorded). [R. 125-1 at p. 38] They argue Plaintiff cannot show why he could not have discovered the alleged fraudulent acts sooner through reasonable diligence (as the parties agree is required for the discovery rule to apply). *Id.* at pp. 37–38; R. 136 at p. 13. Defendants argue that Plaintiff knew or should have known of the alleged fraud, due to his investigation of the wells, retention of counsel who investigated the wells and discovered the transfer to AIO, and his 2008 suit against Twist and Twist entities. [R. 125-1 at p. 39] Defendants argue that *Shelton* demonstrates that since the transfers at issue were a matter of public record, the discovery rule cannot apply to Plaintiff's claim. [R. 125-1 at pp. 35, 37]

However, *Shelton* did not state that recordation automatically triggers accrual of the statute of limitations in Ky. Rev. Stat. Ann. § 413.120(11), such that the discovery rule cannot apply after recordation. On the contrary, the Kentucky Court of Appeals in *Shelton* analyzed the issue of the plaintiffs' diligence at length and found that diligence lacking given one of the defendants' conveyance to his wife via a recorded deed. *Shelton*, 746 S.W.2d at 419. There would have been no reason for the *Shelton* court to analyze whether the plaintiffs exercised all

reasonable and ordinary diligence in discovering the alleged fraud, if the entire inquiry ended at recordation.

Further, *Shelton* is distinguishable on the facts. This case is unlike *Shelton* and *Pierce v. J.B. Pierce's Tr. in Bankr.*, 38 S.W.2d 254, 256 (Ky. Ct. App. 1931) (cited in *Shelton*), each of which involved a conveyance from a husband to a wife — obviously suspect. By contrast, here, the Agreed Judgment — which was entered by the Jefferson Circuit Court — giving the Natural Gas Assets to AIO specifically stated that Twist and his entities were "[t]hereby released from any further liability to Plaintiff, [AIO], under the promissory note which is the subject of this lawsuit." [R. 125-7 at p. 2] Thus, the Agreed Judgment entered by the court and the facts it contained (that on its face appeared to reflect the litigated compromise of a legitimate commercial debt between two unrelated parties) was not of such a nature that should have automatically triggered suspicion by Plaintiff. It would be a remarkable burden for plaintiffs if they were forced to regard agreed judgments entered by courts with suspicion of fraud. Defendants argue that because Plaintiff did not attach the Natural Gas Assets or include the AIO Defendants in his lawsuit against Twist and certain Twist entities, he "chose his remedy" in the form of a money judgment, rather than recovery of the assets. *Id.* However, the Court again notes that Defendants repeatedly emphasize that Twist is not a party to this suit, and vehemently deny that any of them were involved in his schemes. Thus, it makes little sense to say that Plaintiff "chose his remedy" against defendants he never sued before (or had reason to sue back in 2008).

Next, Defendants argue that the Plaintiff does not indicate why he became suspicious of the transfer in 2015 but was not suspicious before. [R. 125-1 at p. 40] Again, however, that is unresponsive to the Plaintiff's argument that he exercised reasonable diligence but was hindered

by the efforts of the Defendants to conceal the fraudulent nature of their actions. Defendants state that Plaintiff "simply indicates his focus changed in 2015 and he 'renewed' his investigation into the transfer to AIO." *Id.* But an examination of the deposition transcript reveals a genuine issue as to whether the Plaintiff "renewed" his investigation.

They argue that the Plaintiff never explains why he could not have obtained the information from Armstrong or McAdam sooner than he did, and that he cannot claim that Defendants kept him from doing so. [R. 125-1 at p. 40; R. 141 at pp. 8-9] Similarly, they argue that despite various governmental agencies' investigations of Twist, "Plaintiff and his then counsel chose not to freeze, attach or go after any of Twist's assets while the lawsuit was pending from 2008-2014. Instead, they sought a money judgment. . . . [t]he passage of time between the transfer in 2008 and his alleged discovery of the fraud in 2015 when interviewing Lonny Armstrong was due solely to Plaintiff's inaction." *Id.* at p. 10.

First, the significance of the Plaintiff's not obtaining a prejudgment attachment of Twist's assets is unclear. Setting aside the issue regarding veil piercing (addressed below), Plaintiff attempts to hold these Defendants liable for **their own** allegedly tortious actions. Second, all these arguments ignore the Plaintiff's explanation that the reason he could not have discovered sooner the fraudulent nature of the Defendants' actions and involvement in furthering Twist's schemes is that the Defendants actively concealed these facts. In other words, the Plaintiff already gave a reason, but rather than attacking it head-on, Defendants now demand another reason behind *that* reason. Taken to their logical conclusion, Defendants' arguments essentially boil down to an unsupported argument that unless the Plaintiff establishes that the investigation conducted by his counsel could not possibly have been faster or more efficient, Defendants are

entitled to the benefit of their fraudulent concealment. Next, Defendants argue that there is no evidence of fraudulent concealment. [R. 141 at p. 10] But as already discussed, there is.

Finally, any argument that such a reading of the discovery rule in this case will allow claims to lie dormant indefinitely is misguided, as shown by the statement of the Kentucky Court of Appeals in *Lemaster v. Caudill*, 328 S.W.2d 276 (Ky. 1959), where the Court explained that "[o]rdinarily we believe that if no matters of estoppel are shown, the ten year period would preclude any suit resulting from the perpetration of a fraud." *Lemaster v. Caudill*, 328 S.W.2d 276, 282 (Ky. 1959). Thus, there is little danger that this reading of the discovery rule will result in claims lying dormant indefinitely; as *Lemaster* explains, the ten-year statute of repose will normally provide an outside timeframe in which such claims must be brought. Thus, genuine issues of material fact foreclose summary judgment as to the statute of limitations for fraud and aiding and abetting fraud.

### *Fraudulent Conveyance — Actual Fraudulent Conveyance as to AIO (Count 1); Actual Fraudulent Conveyance as to Teema and Second Blue Light (Count 2); Constructive Fraudulent Conveyance as to AIO (Count 3); Constructive Fraudulent Conveyance as to Teema and Second Blue Light (Count 4)*

Defendants state that "[t]he accrual date for the claim and the notion of discovery of the fraud is . . . specifically addressed in KRS 378A.090." *Id.* at p. 41. However, this statute applies to "[a] claim for relief with respect to a transfer or obligation under *this* chapter," Ky. Rev. Stat. Ann. § 378A.090 (emphasis added), and Plaintiff's fraudulent transfer claims are not brought under Ky. Rev. Stat. Ann. Chapter 378A, which is the Kentucky Uniform Voidable Transactions Act. Rather, they are brought under a completely different chapter, the now-repealed Ky. Rev. Stat. Ann. Chapter 378, Fraudulent and Preferential Conveyances, which (as discussed below) applies here because the transfers at issue were made before January 1, 2016. *See In re Licking River Mining, LLC*, 603 B.R. 336, 365, 380-81 (Bankr. E.D. Ky. 2019), *as amended* (July 19,

2019) ("Actions for relief under K.R.S. § 378.020 are subject to a five-year statute of limitations under the version of K.R.S. § 413.120(12) that was in effect as of each of the Petition Dates. . . . As of the Petition Dates, Kentucky's statute of limitations for its actual fraudulent transfer statute was five years. K.R.S. § 413.120(12)."). Thus, the applicable statute of limitations to both the actual fraudulent conveyance claims and the constructive fraudulent conveyance claims is the same as that for the fraud and aiding and abetting claims just discussed above: Ky. Rev. Stat. Ann. § 413.120(11). *See, e.g., McMurray v. McMurray*, 410 S.W.2d 139, 140 (Ky. 1966) (applying the statute of limitations to constructive fraudulent conveyance statute, Ky. Rev. Stat. Ann. § 378.020); *Morgan v. Hibbard, Spencer, Bartlett & Co.*, 299 Ky. 57, 61, 184 S.W.2d 218, 220 (1944) (applying the statute of limitations to actual fraudulent conveyance statute, Ky. Rev. Stat. Ann. § 378.010). Defendants include little analysis in their section addressing this statute of limitations, but refer to their earlier discussion of the accrual date of the five-year statute of limitations for fraud and aiding and abetting fraud. [R. 125-1 at p. 41] As already discussed, there are genuine issues of material fact as to whether Plaintiff has shown that he could not have discovered the fraudulent nature of the transfers sooner by the exercise of reasonable diligence, such that the discovery rule should toll the accrual of the statutes of limitation in this case.

Further, recent persuasive authority interpreting a similar statute supports such an interpretation of the discovery rule specifically in the context of fraudulent transfer claims. *In re Fair Fin. Co.*, 834 F.3d 651 (6th Cir. 2016) dealt with "a classic Ponzi scheme," in which the owners of a company made millions of dollars' worth of insider loans for their own benefit. *In re Fair Fin. Co.*, 834 F.3d 651, 658, 659 (6th Cir. 2016). The trustee in the company's bankruptcy brought fraudulent transfer claims, including a claim seeking to avoid obligations incurred under a loan and security agreement. The defendant argued the claim was time-barred. Under the

Ohio Uniform Fraudulent Transfer Act ("UFTA"), the applicable statute of limitations with a discovery rule[11] provided that "[a] claim for relief with respect to a transfer or an obligation that is fraudulent . . . is extinguished unless [the] action is brought . . . within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or reasonably could have been discovered by the claimant." *Id.* at 670 (citing Ohio Rev. Code § 1336.09(A)).

Making an "*Erie* guess" as to how the Ohio Supreme Court would rule, the Sixth Circuit held that this discovery rule "begins to run at the point when a plaintiff discovers or, in the exercise of reasonable care, could have discovered the transfer *and its fraudulent nature*." *Id.* at 674 (emphasis added). Among other factors, the court found persuasive decisions from many other jurisdictions reaching the same conclusion for other states' versions of the UFTA, along with the reasoning that if the rule were otherwise, it would reward successful concealment of a fraudulent transfer. *Id.* at 673-74. Thus, even though the execution of the loan and security agreement was reasonably discoverable when the debtor company's offering circulars were filed with the state Division of Securities, the statute of limitations did not begin to run until the FBI raided the debtor's offices and the injured investors were able to discover the fraudulent nature of the agreement and the lien created thereunder. The Court noted that the operators of the Ponzi scheme delayed the point when investors could reasonably have discovered the fraudulent nature of the transfer through their "purposefully inadequate disclosures and improper accounting practices, both of which were undertaken with [the defendant's] acquiescence." *Id.* at 674.

---

[11] The statute of limitations under the Ohio UFTA for constructive fraudulent transfer did not have a discovery rule (unlike the actual fraudulent transfer statute). However, that is not the case with the Kentucky statutes at issue here, as Ky. Rev. Stat. Ann. § 413.120 applies equally to the actual fraudulent conveyance statute and to the constructive fraudulent conveyance statute.

Accordingly, for all the reasons discussed above, genuine issues of material fact foreclose summary judgment as to whether the statute of limitations bars Plaintiff's claims for fraudulent conveyance.

### Civil Conspiracy as to AIO, Gregory, Samir, and Teema (Count 6)

Defendants argue that the one-year statute of limitations for Plaintiff's civil conspiracy claim expired well before Plaintiff filed his suit. While they recognize that the statute of limitations "begins to run at the commission of the last act in furtherance of the conspiracy," they argue that this claim is grounded in the 2008 transfer of the Natural Gas Assets from Twist and Twist-controlled entities to AIO (recorded on January 29, 2009). [R. 125-1 at p. 42 (*citing Bassett v. Nat'l Collegiate Athletic Ass'n*, No. Civ. A. 5:04-425-JMH, 2005 WL 3767016 (E.D.Ky. May 3, 2005))] They further argue that "[e]ven if the alleged conspiracy is said to be the agreement AIO later entered with [Second] Blue Light on March 31, 2014 . . . the conspiracy claim fails as a matter of law due to the filing in November 2015, more than one year after AIO and [Second] Blue Light entered into the Agreement." *Id.*

Plaintiff responds that the statute of limitations for civil conspiracy has not run because the conspiracy is ongoing due to AIO and Second Blue Light continuing to split revenues from the Natural Gas Assets pursuant to the Second Blue Light Agreement. [R. 136 at p. 21] Defendants argue in reply that the Plaintiff has provided no law supporting that the payments to AIO under that contract "suffice as an unlawful agreement to do an unlawful act" and that "[t]here is no support under Kentucky law for counting the payments received under the agreement as a separate unlawful act supporting a conspiracy and there is certainly no evidence or law which would support tolling the statute of limitations based on the monthly payments AIO received from operation of the wells." *Id.* at pp. 14–15.

However, Defendants characterize "the wrong alleged by Plaintiff" too narrowly. Plaintiff has alleged a civil conspiracy to defraud creditors, with a scheme starting with the formation of AIO in 2005, including the Agreed Judgment and transfer of the Natural Gas Assets to AIO, and continuing until after the filing of this lawsuit under the Second Blue Light Agreement. There are genuine issues of material fact as to whether the Second Blue Light Agreement (which Teema testified in 2017 was still resulting in Second Blue Light's and Teema's receipts of revenues from the Natural Gas Assets) was simply a continuation of this fraudulent scheme, or an innocent choice of well operator by AIO. Accordingly, the Defendants have failed to show that there is no genuine issue as to a material fact that the statute of limitations for civil conspiracy has run, and summary judgment on this issue is denied.

### C. Merits of Individual Claims

Having found genuine issues of material fact as to whether these claims are time-barred, the Court proceeds to the merits of each claim.

### *Fraudulent Conveyance*

### *AIO's Potential Liability for Fraudulent Conveyance (Count 1 and Count 3)*

Counts 1 and 3 of the First Amended Complaint are claims against AIO for avoidance of fraudulent transfers to AIO based on the Note, Deed of Trust, AIO Complaint, Agreed Judgment, and the assignment from Joerhea, under both a theory of actual fraud (Count 1, citing Ky. Rev. Stat. Ann. § 378.010) and a theory of constructive fraud (Count 3, citing Ky. Rev. Stat. Ann. § 378.020).

The previous version of Kentucky's fraudulent transfer law (which Plaintiff cited in his First Amended Complaint, and which was repealed effective January 1, 2016) contained the following provisions for actual fraudulent conveyances and constructive fraudulent conveyances, respectively:

Every gift, conveyance, assignment or transfer . . . made with the intent to delay, hinder or defraud creditors, purchasers or other persons, and every . . . action commenced or judgment suffered, with like intent, shall be void as against such creditors, purchasers and other persons. . . .

Ky. Rev. Stat. Ann. § 378.010.

Every gift, conveyance, assignment, transfer or charge made by a debtor, of or upon any of his estate without valuable consideration therefor, shall be void as to all his then existing creditors, but shall not, on that account alone, be void as to creditors whose claims are thereafter contracted . . . .

Ky. Rev. Stat. Ann. § 378.020.

Defendants argue that under both the previous and current versions of the fraudulent transfer statute, Plaintiff cannot prove he is entitled to void the transfer to AIO resulting from the Agreed Judgment, because that transfer was "due to the preexisting indebtedness of Twist and the Borrowers to AIO" and because the transfer resulted from "[e]nforcement of a security interest in compliance with Subtitle 9 of KRS chapter 355." [R. 125-1 at p. 44] Defendants do not explain why the earlier version of the fraudulent transfer statute, which was in effect at the time of the allegedly fraudulent transfer to AIO (which took place no later than the Agreed Judgment in 2008 and/or Joerhea's assignment in 2009), would not apply to this case. The Western District of Kentucky and the Bankruptcy Court for the Eastern District of Kentucky both recently found that the earlier statute applies to transfers made before the modern version of the statute took effect in January 2016. *CDK Glob., LLC v. Scott & Reynolds, LLC*, No. 1:14-CV-00045-JHM, 2017 WL 956594, at *5 (W.D. Ky. Mar. 10, 2017; *In re Licking River Mining, LLC*, 603 B.R. 336, 381 n.22 (Bankr. E.D. Ky. 2019), *as amended* (July 19, 2019). The Kentucky Court of Appeals has likewise so held. *Moran v. Peoples Bank of Kentucky, Inc.*, No. 2013-CA-001532-MR, 2015 WL 4498809, at *3 n.3 (Ky. Ct. App. July 24, 2015). Hence, the Court finds that the earlier statute applies to this case.

### *Count 1: Ky. Rev. Stat. Ann. § 378.010 (Actual Fraudulent Conveyance as to AIO)*

Defendants first point to Ky. Rev. Stat. Ann. § 378A.080(5)(b) as foreclosing as a matter

of law Plaintiff's claim for fraudulent transfer based on the Agreed Judgment in the AIO case:

> (5) A transfer is not voidable under KRS 378A.040(1)(b) or KRS 378A.050 if the
> transfer results from . . .
>
> (b) Enforcement of a security interest in compliance with Subtitle 9 of KRS
> Chapter 355, other than acceptance of collateral in full or partial satisfaction
> of the obligation it secures.

Ky. Rev. Stat. Ann. § 378A.080(5)(b). But that statute is a part of the new Kentucky fraudulent

conveyance law which took effect in 2016, and so does not apply. As the Kentucky Court of

Appeals recently explained:

> The [newer version of the statute, the Uniform Voidable Transactions Act
> ("UVTA")] does not contain retroactivity language. KRS 446.080(3)
> provides: "No statute shall be construed to be retroactive, unless expressly
> so declared." "Kentucky law prohibits the amended version of a statute from
> being applied retroactively to events which occurred prior to the effective
> date of the amendment unless the amendment expressly provides for
> retroactive application." Furthermore, the United States Bankruptcy Court
> for the Eastern District of Kentucky held the "UVTA does not state that it
> is retroactive. Therefore, any transfer occurring prior to its enactment  . . .
> must be considered under the repealed chapter 378, which was in effect at
> the time of the pertinent transfers."

*Orchard v. W. Energy Prod., LP*, No. 2019-CA-000066-MR, 2019 WL 5293489, at *2 (Ky. Ct.

App. Oct. 18, 2019) (citing *Commonwealth, Dept. of Agriculture v. Vinson*, 30 S.W.3d 162, 168

(Ky. 2000) *and In re Licking River Mining, LLC v. Monday Coal, LLC*, 571 B.R. 241, 245 n.3

(Bankr. E.D. Ky. 2017)).

Defendants also argue that "long-standing Kentucky case law" shows that proof of a

preexisting indebtedness is a valid defense to a claim of fraudulent conveyance. [R. 125-1 at pp.

44–45; R. 134 at p. 27] However, the sole authority Defendants cite to support this point is a

2014 case, *Jadco Enterprises, Inc. v. Fannon*, 991 F. Supp. 2d 947, 949 (E.D. Ky. 2014), which

analyzes Ky. Rev. Stat. Ann. § 378.010. Far from supporting Defendants' argument, *Jadco* held that "[t]he correct analysis first looks at the badges of fraud, followed by the validity of pre-existing debt. The fact finder should then determine if there was any fraudulent intent behind the transfer(s). **The analysis does not end once evidence of pre-existing debt is offered.**" *Id.* at 953 (emphasis added). "[O]nce the plaintiff offers evidence of badges of fraud . . . the defendants will be required to show the good faith of the transaction by a preponderance." *Id.*

There are genuine disputes of material fact as to all three *Jadco* inquiries. First, under either version of the statute, there appear to be several badges of fraud present (or at least genuinely in dispute). Under the previous version of the statute, there are "four generally recognized badges of fraud that Kentucky courts consider," one of which is "where the transfer or conveyance is made by a debtor in anticipation of a suit against him or after a suit has begun or is pending against him." *CDK*, No. 1:14-CV-00045-JHM, 2017 WL 956594 at *5. Here, the affidavits of Armstrong, McAdam, and Gregory are enough to show a genuine dispute as to whether the transfer of the Natural Gas Assets to AIO was made in anticipation of a suit against Twist and the Twist Entities. Since "a single badge of fraud is enough to raise a presumption that the challenged transfer is fraudulent," if a jury resolved this genuine dispute with a finding that the transfer was made in anticipation of litigation, the burden would then shift to Defendants to show that the transfers were made in good faith. *Kentucky Petroleum Operating Ltd. v. Golden*, No. CIV. 12-164-ART, 2015 WL 927358, at *4 (E.D. Ky. Mar. 4, 2015). This opinion has already explained why the validity of the preexisting debt and the existence of fraudulent intent are genuinely in dispute. Defendants' arguments to the contrary (to the extent they are not circular, assuming the validity of the transfers) attack Plaintiff's interpretation of the evidence, including whether that evidence truly allows inferences about the intent of these Defendants or

conclusions about the alleged inadequacy of the consideration — hardly proof of the absence of genuine disputes as to material facts.

Defendants further argue that Gregory's lack of notice of Twist's allegedly fraudulent intent means that his title should not be affected under section 378.010 because that section does not apply to purchasers without notice. [R. 134 at p. 27]  But AIO did not "purchase" the Natural Gas Assets under anyone's theory of the case.  Finally, Defendants attempt to argue that Ky. Rev. Stat. Ann. § 378.010 "is not applicable to future creditors." *Id.*  However, that is simply not true. *See Golden*, No. CIV. 12-164-ART, 2015 WL 927358 at *5.  Thus, genuine issues of material fact foreclose summary judgment for either side as to the merits of Count 1.

### Count 3: Ky. Rev. Stat. Ann. § 378.020 (Constructive Fraudulent Conveyance as to AIO)

Defendant argues without citation to supporting authority that Ky. Rev. Stat. Ann. § 378.020 "disqualifies [Grayiel] due to the timing of his debt," because he did not obtain a judgment against Twist and his entities until 2014. [R. 134 p. 33]  That statute provides that as to then existing creditors, "[e]very gift, conveyance, assignment, transfer or charge made by a debtor, of or upon any of his estate without valuable consideration therefor, shall be void."  Unlike § 378.010, fraudulent intent is not required. *Madison Capital Co., LLC v. Smith*, No. 3:08CV-382-H, 2009 WL 482093, at *4 (W.D. Ky. Feb. 25, 2009), *as amended* (Mar. 4, 2009).  Citing to *Smith*, Plaintiff counters that "[c]ontingent debts yet to ripen into a present liability are sufficient under KRS 378.020," meaning that Twist was a "debtor" to Grayiel (and presumably, though Plaintiff does not explicitly argue this, that Grayiel was a "creditor" of Twist's) on the date of the allegedly fraudulent transfer from Twist to AIO. [R. 129-1 at p. 34]  Plaintiff further explains his position in his Reply in Support of his Motion for Partial Summary Judgment, where he asserts that he was  "a present creditor at the time of the operative transfer [to AIO]" because by the time of the Agreed Judgment, "the West Virginia litigation filed by Grayiel against Twist

and the Twist Entities was well underway." [R. 144 at pp. 19–20]  Plaintiff did not cite to authority dealing with the specific question of whether initiation of litigation confers creditor status for purposes of the fraudulent conveyance statutes.  Nevertheless, there is highly persuasive authority for the proposition that a plaintiff may be a "creditor" for purposes of Ky. Rev. Stat. Ann. § 378.020 on the date of filing his complaint or possibly even well before that time, well before the date of entry of judgment.  Thus, the Court rejects Defendants' argument that as a matter of law, Grayiel did not become a creditor of Twist and his entities until he obtained a judgment against them.  Rather, genuine issues of material fact as to whether and when Grayiel became a creditor foreclose summary judgment as to this count.

In *Smith*, the Western District of Kentucky held that "status as a guarantor, where liability is contingent upon a future default, ma[de] [a defendant] a debtor" on the date of a transfer for purposes of Ky. Rev. Stat. Ann. § 378.020, even though default and entry of judgment against the guarantor did not occur until *after* the complained-of transfer. *Smith*, 2009 WL 482093 at *4. The *Smith* court began by noting that "[t]he purpose of this statute is to place the creditors back in the same position they enjoyed immediately prior to any voidable conveyance." *Id.* (citing *Mattingly v. Gentry*, 419 S.W.2d 245 (Ky. 1967)).  It reasoned that since the statute does not define the term "and no recent Kentucky cases have provided any reasonable guidance" as to its meaning, the term "debtor" is not a narrowly defined term of art, but can instead be read as defined in Black's Law Dictionary: "one who owes an obligation to another, esp. an obligation to pay money." *Id.*  The Court then looked to Black's definition of a guarantor, and found that a guarantor fit within its definition of a debtor, because "[a] contingent guaranty is a promise to pay a debt in the event of a specific occurrence, usually a default," and while the obligations of guarantors and debtors are different, a debtor's obligations are often contingent on a variety of

factors just like that of a guarantor. *Id.* The court closed by citing to two cases, including *Daniels v. Goff*, 232 S.W. 66 (Ky. Ct. App. 1921). The court cited to *Goff* for its holding that "existing liabilities" was "broad enough to include 'conditional or contingent obligations'" and said that while *Goff* was "not precedent for [its] ruling, it was 'generally consistent with it.'" *Smith*, 2009 WL 482093, at *5.

*Goff*, in turn, sheds further light on the issue. In *Goff*, Daniels sued Goff contesting the results of an election. Goff won the suit, including a judgment for costs. Two tracts of land were sold to satisfy the judgment, but Daniels's wife and son sought to set aside the sale, claiming that each of them owned the tracts, not Daniels. The original suit between Daniels and Goff had been filed in October 1916. One tract of land was conveyed to Daniels's son by Daniels and his wife in June 1917 and the conveyance was recorded in September 1917. Daniels conveyed his interest in the other tract of land to his wife in an instrument which was dated January 1916 but not recorded until October 1917.

The Kentucky Court of Appeals found that these conveyances were without consideration. *Id.* at 67. Analyzing an old version of the constructive fraudulent conveyance act (stating that transfers for no consideration "shall be void as to all [a debtor's] then existing liabilities"), the court concluded that the phrase "'[e]xisting liabilities' is a sufficiently broad and comprehensive term to embrace conditional or contingent obligations, which may or not in the future result in indebtedness." *Id.* at 68. The Court reasoned that Goff "had a right to assume, because of Daniels' record title, that he was litigating with a party who would be good for the costs at the end of the suit" if he won. *Id.* at 67. The Court further reasoned that "[t]he word 'liabilities' includes debts and indebtedness; but it is broader, and includes in addition existing obligations, which may or may not in the future eventuate in an indebtedness. For instance, one

may be at the date of a conveyance by him the surety of another which he never contemplated he would have to pay, and yet it would be an existing liability whether he ultimately had it to pay or not." *Id.* Since Daniels had voluntarily sued Goff knowing that the loser would have to pay the costs of the winner, and since Goff had actually incurred most of the costs of litigating before recorded title to the land changed, the court held that "there was an existing liability" from Daniels to Goff at the time the deeds were recorded. *Id.* at 68. Thus, while the *Goff* opinion was interpreting slightly different statutory language than that at issue here (and pointed out "the difference between existing liabilities and existing debts," *id.*), much of its reasoning nonetheless closely tracks that of the *Smith* court interpreting the language of the modern statute.

Similarly, in *Hager v. Coleman*, 208 S.W.2d 518 (Ky. Ct. App. 1948), the Kentucky Court of Appeals rejected an argument that plaintiffs were not "existing creditors" for purposes of a suit brought under both Ky. Rev. Stat. Ann. §378.010 and 378.020. In that case, Coleman stabbed Hager, putting him in the hospital. Two days later, while Hager was still in the hospital, Coleman transferred a bank account to his wife. Five days later, Hager died. Hager's wife and children sued Coleman, won a judgment against him, and sought to set aside the transfer to Coleman's wife as actually and constructively fraudulent. The defendants argued that the plaintiffs were not existing creditors because "they had no cause of action at that time, and could not have a cause of action until the death of the husband and father." *Hager*, 208 S.W.2d at 519. The court rejected this argument, explaining that "[c]ertainly Butler Coleman had reason to believe and anticipate that some sort of action might be taken against him. If Hager survived he could have brought suit, and having died, either his personal representative, or as in this action, his widow and children could bring it." *Id.*; *but see Anglin v. Conley*, 71 S.W. 926, 927 (Ky. Ct. App. 1903) ("The mere fact that the appellant knew that the grantor had assaulted the appellee

did not charge him with notice that a cause of action existed in his favor against the grantor, or that the grantor was making the conveyance with a fraudulent intent to evade the payment of such judgment as might be recovered thereon.").

More recently, the Eastern District of Kentucky found a genuine issue of fact regarding when a party became a "then-existing creditor" in *Princesse D'Isenbourg et Cie, Ltd. v. Kinder Caviar, Inc.*, No. CIV.A. 3: 12-004-DCR, 2013 WL 147841 (E.D. Ky. Jan. 14, 2013). The plaintiff in this case argued that it became a "then-existing creditor" at the time the original complaint was filed or alternatively when the court granted summary judgment in its favor on the issue of liability, while one of the defendants argued that the plaintiff did not become a creditor until the entry of judgment in the plaintiff's favor. Citing to *Smith*, the court in *Kinder Caviar* explained that while "Kentucky courts have not explicitly decided whether a creditor can be considered a 'then-existing' creditor prior to the entry of a Judgment against the debtor," "[t]here is some authority that KRS § 378.020 includes obligations to pay that are contingent on the happening of other events." *Kinder Caviar,* 2013 WL 147841 at *7. The court pointed out that the plaintiff had sufficiently showed a badge of fraud (which is relevant to analysis under the actual fraudulent transfer statute). *Id.* Specifically, the plaintiff had shown a confidential and close familial relationship between transferor and transferee as well as transfers made during the pendency of a prior lawsuit. *Id.* Given this, and given that the main purpose of the Kentucky fraudulent conveyance statutes is "to place the creditors . . . in the same position [they] would have been in immediately prior to any voidable conveyance," the court found that in the case before it, "the relevant date of inquiry in this matter [wa]s the date on which [the debtor] filed its original complaint." *Id.* (requiring defendant "to show, by clear and convincing evidence, that all

transfers made after [the date of filing of the complaint] were made in good faith and for legitimate reasons").

Likewise, Kentucky courts analyzing the *actual* fraudulent conveyance statute, Ky. Rev. Stat. Ann. § 378.010, have repeatedly stated that under that statute, a claim for damages makes one a creditor. *See Sewell v. Damrell's Adm'r*, 267 S.W.2d 398, 399 (Ky. Ct. App. 1954) (analyzing the actual fraudulent conveyance statute where transfer was made soon after being served with a lawsuit and stating that "[a] person who has a claim for damages against a grantor is a creditor within the meaning of the statute"); *Lewis v. Barber*, 49 S.W.2d 328, 329 (Ky. Ct. App. 1932) (same). While there is an obvious distinction between the actual fraudulent conveyance statute and the constructive fraudulent conveyance statute in that the former does not require a plaintiff have creditor status at the time of the conveyance, the Court nevertheless finds these cases persuasive. For one thing, given the protection which the actual fraudulent conveyance statute extends to subsequent creditors, it is unclear why the distinction between a person becoming a creditor at the time of filing suit (or having a claim) as opposed to his becoming a creditor at the time of obtaining a judgment would matter unless the rule also holds for constructive fraudulent transfer. Second, the parties did not cite, and the Court did not find, authority to the effect that the meaning of the word "creditor" differs between the two statutes. To the contrary, the Eastern District of Kentucky recently stated in the context of analyzing the actual fraud statute (but in a case which involved the *constructive* fraud statute as well) that "'[a] person who has a claim for damages against a grantor is a creditor within the meaning of' **Kentucky's fraudulent conveyance statutes**, even before that claim has been reduced to judgment." *Evans v. Armenta*, No. CV 14-329-GFVT, 2016 WL 7971244, at *2 (E.D. Ky. May 20, 2016) (emphasis added) (quoting *Lewis*, 49 S.W.2d at 329). Thus, the *Evans* court's

statement did not differentiate on this point between Ky. Rev. Stat. Ann. §§ 378.010 and 020, even though it would have been far more logical to do so if such a distinction existed.

Further, other jurisdictions examining the meaning of the term "creditor" under other fraudulent transfer statutes have interpreted that term in light of those statutes' purposes and similarly concluded that the term can include an "investor" with a claim even before judgment is rendered. First, in *Carroll v. Stettler*, 941 F. Supp. 2d 572 (E.D. Pa. 2013), the Eastern District of Pennsylvania found that victim "investors" in a Ponzi scheme qualified as creditors of the defendants because under the statutory definition, "a person is a creditor if he 'has a right to payment'" and the plaintiffs presented undisputed evidence that their investments were "100% fully refundable through the entire process." *Id.* Thus, the court ruled, "even though the right ha[d] not been reduced to judgment" at the time of the court's decision, "the plaintiffs qualif[ied] as creditors under PUFTA." *Id.*

Likewise, in *In re McDowell*, 87 B.R. 554 (Bankr. S.D. Ill. 1988), the bankruptcy court for the Southern District of Illinois found that the sale of the oil interests that did not comply with applicable registration and securities laws "merely created a right in the investors to rescind their purchases within the statutory time period," that "[t]he investors' potential claims against debtor did not mature until such time as they elected to rescind their purchases and *took the affirmative step of filing suit* against debtor, . . . . [and that] absent such an election, the investors did not become 'creditors' of debtor for purposes of Illinois fraudulent conveyances law." *Id.* at 560 (emphasis added).

Finally, in *Donell v. Kowell*, 533 F.3d 762, 771 (9th Cir. 2008), the Ninth Circuit explained that in a Ponzi scheme, when the operator takes money from innocent victims, the victims are "not actually investors, but rather tort creditors with a fraud claim for restitution

equal to the amount they gave." *Id.* at 775.  To the extent that certain innocent victims actually received *more* than their money back, they became transferees of the Ponzi scheme operator, and the other innocent victims remained creditors who could then avoid the transfers over the amount of the initial investments of the "winners." *Id.* at 775–76.  While these cases involve statutes and fact patterns that are distinguishable in a variety of ways from the ones at issue here, they nevertheless illustrate that the approaches taken by other jurisdictions analyzing fraudulent conveyance statutes broadly comports with the result the Court reaches here.

In light of all the authority just recounted, the Court finds that Grayiel is not foreclosed as a matter of law from attaining "then existing creditor" status before the date of his judgment against Twist.  Rather, there are genuine issues of material fact as to whether Grayiel became a creditor of Twist before obtaining a judgment against him.  First, applying *Smith*'s reasoning to this case in light of the purpose of the fraudulent transfer statute at issue, there is a genuine issue of material fact whether due to Grayiel's investment, Twist was under an obligation to pay money to Grayiel on the date of the transfer of the Natural Gas Assets from him to AIO, and was therefore a "debtor" to Grayiel on that date for purposes of § 378.020 (necessarily meaning Grayiel was a "creditor" at the same time).  Second, there is a genuine issue of material fact as to whether Grayiel became a creditor by virtue of his initiation of litigation against Twist.  In addition to filing suit against Twist and several of his entities on November 17, 2008, counsel for Grayiel sent a demand letter to Twist and a number of his entities over a year before that, on November 1, 2007, demanding the return of his investment and threatening civil and criminal legal action. [R. 125-13 pp. 146–47]  Due to this letter, Twist "[c]ertainly . . . had reason to believe and anticipate that some sort of action might be taken against him." *Hager*, 208 S.W.2d at 519.

The question then becomes on what date the transfer occurred. Grayiel bases this count of constructive fraudulent transfer on "the Natural Gas Assets Transfers," which are defined elsewhere in the Complaint with reference to several transactions: the Note, Deed of Trust, AIO Complaint, Agreed Judgment, and the assignment from Joerhea to AIO. [*See* R. 86 pp. 11, 22–23] As detailed earlier in this Opinion, these transactions occurred, respectively, on June 22, 2005 (the date of the Note); August 15, 2005 (the date of execution of the Deed of Trust); September 23, 2008 (the date of filing of the AIO Complaint); October 30, 2008 (the date of the parties' entry into the Agreed Judgment) or December 2, 2008 (the date of the entry by the Jefferson Circuit Court of the Agreed Judgment); and January 1, 2009 (the date of the assignment from Joerhea to AIO) or January 29, 2009 (the date the Joerhea assignment was recorded). Grayiel filed his original complaint against Twist in the middle of these dates, on November 17, 2008 — years after the Note and Deed of Trust, and weeks after the filing of the AIO Complaint and the parties' entry into the Agreed Judgment, but weeks *before* the entry of the Agreed Judgment and the assignment from Joerhea to AIO. Further, as noted, Twist became aware no later than November 1, 2007, of Grayiel's potential lawsuit against him. This renders the issue of when the Natural Gas Assets were actually transferred to AIO an issue of material fact.

That leaves the sufficiency of the consideration as the only remaining issue as to the § 378.020 claim against AIO. As explained above, the parties dispute the amount (and possibly the existence) of the alleged debt, but in any event the maximum amount of the debt, including interest, was $460,000.00, while the undisputed "lowball" valuation of the Natural Gas Assets at the time of the transfer from Plaintiff's expert is $721,607.00. Thus, there is a genuine issue of material fact as to the sufficiency of the consideration involved in the transfer of the Natural Gas

Assets to AIO as effectuated by the Note, Deed of Trust, AIO Complaint, Agreed Judgment, and Joerhea Assignment. Genuine issues of material fact foreclose summary judgment for either side as to the merits of Count 3.

### Other Defendants' Potential Liability for Fraudulent Conveyance (Count 2 and Count 4)

Counts 2 and 4 of the First Amended Complaint are claims against Teema and Second Blue Light for avoidance of fraudulent transfers to Teema and Second Blue Light based on Teema's incorporation of Second Blue Light and the execution of the Second Blue Light Agreement, under both a theory of actual fraud (Count 2, citing Ky. Rev. Stat. Ann. § 378.010) and a theory of constructive fraud (Count 4, citing Ky. Rev. Stat. Ann. § 378.020). Citing *Bank of Am., N.A. v. Corporex Companies, LLC*, 99 F. Supp. 3d 708, 710 (E.D. Ky. 2015) (citing *CNH Capital Am. LLC v. Hunt Tractor, Inc.*, 568 F. App'x. 461, 470 (6th Cir. 2014)), Defendants argue in their Motion for Summary Judgment that Samir, Gregory, and Teema cannot be held liable for the allegedly fraudulent conveyance to AIO for various reasons. [R. 125-1 at p. 45] But none of the fraudulent transfer claims are against Samir or Gregory, and the counts which pertain to Teema and Second Blue Light (Counts 2 and 4) are predicated on completely separate transfers than the transfers to AIO that underlie Counts 1 and 3. The remaining arguments are addressed below.

### Count 2: Ky. Rev. Stat. Ann. § 378.010 (Actual Fraudulent Conveyance as to Teema and Second Blue Light)

First, Teema argues that the right to collect the revenues from the Natural Gas Assets belonged to 530 West Main, which merely chose First Blue Light and then later Second Blue Light as contractors to operate the wells, and that choosing contractors does not qualify as a "conveyance" at all, such that there was nothing for which to give consideration. [R. 137 at pp. 22–24] But Teema does not cite any authority showing that as a matter of law, a contract cannot

be a "conveyance" for purposes of the statute, and for that reason, the Court declines to so find.

That leaves the question of whether there was a transfer or a conveyance at all a fact issue, tied

up (like so many other issues in this case) with the determination of whether Second Blue Light's

organization and the Second Blue Light Agreement were part of Twist's (and potentially these

Defendants') schemes.

Plaintiff points to multiple badges of fraud. These include that the transfers took place

during the pendency of Plaintiff's suit against Twist. [R. 129-1 at p. 36] There can be no

genuine dispute that both Teema's organization of Second Blue Light (on October 1, 2012) and

the Second Blue Light Agreement (on March 31, 2014) occurred after Grayiel filed suit against

Twist (November 17, 2008), but before Grayiel won default judgment against Twist's estate (on

August 15, 2014). Thus, there is at least one badge of fraud present,[12] and the burden shifts to

Teema[13] and Second Blue Light to show that the transfers were made in good faith.

Ultimately, the intent behind the transfers is a jury question. Whether Second Blue Light

was simply a contractor which a blameless AIO innocently chose is a genuinely disputed

question of material fact. That determination will rest in large part on the conclusions the jury

reaches regarding the transfer of the Natural Gas Assets to AIO and whether AIO was an

innocent creditor of Twist's or a willing confederate in his schemes. It will also rest in part on

the specific facts pertaining to Teema and Second Blue Light. A reasonable jury could look, for

example, to the almost identical names of First Blue Light and Second Blue Light along with the

---

[12] Teema argues that the transfer did not take place during the pendency of Plaintiff's litigation against Twist, because the date of filing of the Agreed Judgment (October 30, 2008) predates the date of filing of Grayiel's suit against Twist (November 17, 2008). [R. 137 p. 24] However, this argument concerns the wrong transaction, since counts 2 and 4 focus on completely separate actions (the 2012 incorporation of Second Blue Light and the 2014 execution of the Second Blue Light Agreement) as fraudulent transfers to Teema and Second Blue Light.

[13] As Teema does not raise the issue of whether she herself was a transferor of the transactions that are the subject of Counts 2 and 4, the Court will not *sua sponte* grant summary judgment on that basis.

fact that Second Blue Light used the same checking account used by other Twist entities and which was formerly used by First Blue Light and might conclude that the similarity was calculated to enable a fraud. It could take the fact that Teema did not pay for Second Blue Light as innocent or not. It could look to the romantic relationship between Twist and Teema and assign more or less weight to that fact. Teema argues that the purpose of "Second Blue Light collecting the revenues was "[t]o help [Teema] to have a job. Have [her] own company. Have [her] own income." [R. 137 at p. 23 (citing R. 137-2 at 49:16-19)] A reasonable jury could choose to believe Teema or to disbelieve her. All the disagreements about how to interpret the evidence ultimately add up to a genuine dispute as to whether these transfers were made with the "intent to delay, hinder or defraud creditors, purchasers or other persons," Ky. Rev. Stat. Ann. § 378.010. Thus, the Court will deny the Defendants' Motion for Summary Judgment as to the merits of Count 2.

### Count 4: Ky. Rev. Stat. Ann. § 378.020 (Constructive Fraudulent Conveyance as to Teema and Second Blue Light)

Unlike the constructive fraudulent transfer count with regard to AIO, Count 4 suffers from a defect: Plaintiff simply has not shown the statutory prerequisite of his status as a then-existing creditor of the transferor or the transferee. First, as the Court noted above, there are genuine issues of material fact as to whether Grayiel was a then-existing creditor of Twist for purposes of the fraudulent conveyance statute at the time of the transfer of the Natural Gas Assets to AIO. But Plaintiff has not pointed to evidence sufficient to show that there was in fact a transfer from Twist to Teema or Second Blue Light. Second, Plaintiff could still recover if he was a creditor of either the transferor or transferees (as explained below, AIO and Second Blue Light/Teema, respectively). But Plaintiff has not pointed to anything to show that he was a creditor of any of them. Thus, this claim must necessarily fail.

First, Plaintiff again points to his lawsuit against Twist as giving him status as a creditor. [R. 129-1 p. 37 ("Plaintiff had pursued legal claims against Twist since at least, [sic] and therefore was a creditor under KRS 378.020.")[14]].  And as discussed above, there is authority that filing a complaint can suffice to make one a creditor for purposes of the fraudulent conveyance statutes.  The problem is, Plaintiff pursued legal claims against *Twist*, not Teema or Second Blue Light. [R. 86-19 p. 6]  So Plaintiff's pursuit of legal claims would only make him a creditor of Twist  and his co-defendants, not any of the defendants in this case.

But Plaintiff has not shown that Twist made any transfers to Teema or Second Blue Light.  Plaintiff argues that "Twist transferred the assets of First Blue Light, which was to be included in the Twist Estate, to Second Blue Light, which was owned by Teema, without consideration and while Plaintiff was a creditor." [R. 129-1 p. 37]  Plaintiff claims that the inventory report Teema (as executrix of Twist's estate) filed with the probate court listed First Blue Light among the assets of Twist's estate, and valued it at $4,000. [R. 129-1 p. 37; R. 135 p. 18; R. 144 p. 13]  However, the inventory report to which Plaintiff cites simply does not support this claim, as it nowhere lists First Blue Light. [*See* R. 128-21 pp. 2–3]  Grayiel's own First Amended Complaint further illustrates that there is no predicate transfer from Twist.  That Amended Complaint bases this count of constructive fraudulent transfer on the "Blue Light Transfers," which are defined elsewhere in the Complaint with reference to the organization of Second Blue Light and the execution of the Second Blue Light Agreement.  Teema — a natural person distinct from Twist — organized Second Blue Light on October 1, 2012, and the Second Blue Light Agreement was entered into by AIO and Second Blue Light — which Teema testified

<hr />

[14] While Plaintiff appears to have inadvertently omitted the date since which he had pursued legal claims against Twist, the complaint shows that Plaintiff's suit against Twist was filed on November 17, 2008.

she owns and has since 2012, [R. 53-4 at 143:1-25, 144:1-3] — on March 31, 2014, well after

Twist went to federal prison in late 2013 and died in early 2014. Since there was no transfer

from Twist, but only from Teema (assuming that organizing an LLC can even count as a

"transfer" for purposes of the constructive fraudulent conveyance statute) and AIO to Teema

and/or Second Blue Light (because of the Second Blue Light Agreement), Plaintiff must show

that he was a "then existing creditor" of one of these three entities (the transferors and

transferees) to state a claim for constructive fraudulent transfer against Teema or Second Blue

Light. But he makes no such argument. Plaintiff has cited to no authority showing that any such

connection which may exist between Twist and Teema/Second Blue Light is enough to count

them as being *the same* as Twist for purposes of Grayiel's creditor status.

Plaintiff simply has made no showing of a predicate transfer from Twist to either Teema

or Second Blue Light, nor otherwise showed that he was a creditor of any of the actual

transferors or transferees involved in these transactions. Thus, the Court will grant the

Defendants' Motion for Summary Judgment as to the merits of Count 4.

### Common Law Fraud as to AIO, Gregory, Samir, and Teema (Count 7)

Count 7 of the First Amended Complaint is a claim for fraud against AIO, Gregory,

Samir, and Teema. In Kentucky, fraud has six elements: "(1) that the declarant made a material

representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew

the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to

act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6)

that the misrepresentation caused injury to the plaintiff." *Flegles, Inc. v. TruServ Corp.*, 289

S.W.3d 544, 549 (Ky. 2009). Plaintiff does not seek summary judgment on the merits of this

claim. [*See* R. 129-1 (seeking summary judgment as to counts 1–5 and 9)] Defendants argue that

the first and third elements (that the declarant made a material representation to the plaintiff and

that the declarant knew the representation was false or made it recklessly) are not met. [R. 125-1 at p. 46]  They argue that the only alleged material representations were made by Twist, not these defendants (for this count, AIO, Gregory, Samir, and Teema), whom Plaintiff claims never to have dealt with before this suit. *Id.*  They argue that taking Grayiel's allegations as true, he does not allege the requisite scienter on the part of AIO, Gregory, Samir or Teema. *Id.* at p. 47.

Plaintiff argues that there is at least an issue of fact as to the misrepresentations, because Defendants were involved in "material misrepresentations made to the Kentucky Court system and the public by way of the AIO Complaint, the Agreed Judgment and subsequent documents filed in the public record systems for the State of West Virginia." [R. 136 at p. 26]  Specifically, Plaintiff points to two alleged misrepresentations: (1) "that AIO held and enforced a $2 Million secured debt that subsumed the entirety of the Natural Gas Assets or the revenues therefrom," even though "Gregory and AIO knew that the debt in question was not worth more than $250,000 and believed that the Natural Gas Assets were worth in excess of $2 Million," [R. 136 at p. 27], and (2) Gregory "lied at his deposition on behalf of AIO in the Martin case and actively concealed the connections between Twist and AIO and surreptitiously allowed Twist to retain control of the Natural Gas Assets and their revenues," such that Plaintiff, "believing that the Natural Gas Assets and their Revenues had validly been transferred to AIO, relied on these misrepresentations to his substantial detriment." *Id.*  Defendants argue in reply only that Plaintiff's arguments are not backed up by citations to evidence in the record. [R. 141 at p. 17]  Further, Gregory testified that the disgraced Pedley firm drafted an operating agreement for AIO in 2005 listing a Twist entity as a member of AIO; that Twist told him the Natural Gas Assets were worth over two million dollars; and that Gregory did not make any effort to independently value the assets.  Gregory made no objection to the prospect of AIO only receiving half the

money from the would-be sale of the Natural Gas Assets to Reserve Oil, and a Twist entity receiving the other half. And Twist emailed Gregory regarding the corporate formalities of AIO, *Twist's purported lender*. All of this is in addition to the plethora of evidence, discussed above, that the defendants fraudulently concealed their actions.

Having reviewed Plaintiff's citations to record evidence, along with the other evidence discussed throughout this opinion, the Court agrees that it supports (but does not mandate) his version of the facts. Thus, the Court will deny Defendants' Motion for Summary Judgment on the merits of the fraud claim against Gregory and AIO. However, as Plaintiff does not explain (and the Court does not see) how Samir and Teema were even allegedly involved in the misrepresentations to Plaintiff, the Court will grant the Defendants' Motion for Summary Judgment as to Defendants Samir and Teema.

### *Aiding and Abetting Fraud as to AIO, Gregory, Samir, and Teema (Count 5)*

Count 5 of the First Amended Complaint is against AIO, Gregory, Samir, and Teema for aiding and abetting tortious conduct. Under Kentucky law, one aids and abets tortious conduct if he "(a) does a tortious act in concert with [another] or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." *Bariteau v. PNC Fin. Servs. Grp., Inc.*, 285 F. App'x 218, 224 (6th Cir. 2008) (citing Restatement (Second) of Torts § 876 (1979)).

Defendants argue that Plaintiff's claim for aiding and abetting fraud must fail because he cannot establish a claim of fraud. However, as discussed above, there are genuine disputes of material fact on the fraud claim. [R. 125-1 at p. 48] Alternatively, they argue that even if Plaintiff could establish a claim of fraud, he cannot show by clear and convincing evidence that

any of the Defendants committed a tortious act in concert with Twist or that any of the Defendants' own conduct, separately considered, constituted a breach of duty to Plaintiff. *Id.* Defendants essentially argue that the Deed of Trust, the Note, and the Agreed Judgment were all aboveboard transactions, that Defendants were unaware of any wrongdoing, and that Plaintiff cannot show otherwise. *Id.* at pp. 49-51. None of Defendants' arguments are truly responsive to the evidence, just discussed, to the contrary. As detailed throughout this opinion, there is a genuine dispute of material fact as to whether the Defendants committed fraud in concert with one another pursuant to a common design. Thus, summary judgment will be denied as to both motions for summary judgment as to the merits of this claim. However, Plaintiff again fails to point to evidence demonstrating a genuine issue of material fact as to Samir's involvement, so the Court will grant Defendants' Motion for Summary Judgment on this count as to Defendant Samir only.

### Civil Conspiracy as to AIO, Gregory, Samir, and Teema (Count 6)

Count 6 of the First Amended Complaint is for civil conspiracy to aid and abet fraud and a fraudulent transfer as to AIO, Gregory, Samir, and Teema. The elements of civil conspiracy under Kentucky law are "'1) an agreement or combination, 2) that is unlawful or corrupt, 3) entered into by two or more persons, 4) for the purpose of accomplishing an unlawful goal.'" *Ellington v. Fed. Home Loan Mortg. Corp.*, 13 F. Supp. 3d 723, 730 (W.D. Ky. 2014) (citation omitted). "In order to prevail on a claim of civil conspiracy, the proponent must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008). For the requisite "concert of action," Kentucky applies the three formulations discussed above from the Restatement (Second) of Torts § 876. *Id.*

Plaintiff does not seek summary judgment on the merits of this claim. [*See* R. 129-1] Defendants argue that they are entitled to summary judgment on this claim because Plaintiff cannot "establish any unlawful or corrupt act by the Defendants or any agreement to do such between Twist and the Defendants." [R. 125-1 at p. 51]  They further argue that Plaintiff cannot show an underlying tort to support the civil conspiracy claim, as he must do. *Id.* at p. 52.  And they argue that even if Plaintiff could show an underlying tort, he cannot show a plan or a concert of action in furtherance of the conspiracy. *Id.* at p. 53; *see also* [R. 142 at pp. 8–9].

As summary judgment is being denied to both parties on Plaintiff's fraud claim against these Defendants, there is clearly a genuine issue of material fact as to whether there is the predicate independent tort upon which to base a civil conspiracy claim.  The analysis as to concert of action is essentially the same as that applicable to the aiding and abetting claim — there are genuine issues of material fact as to whether such a concert of action existed.  As to the unlawful or corrupt combination or agreement, this opinion has already recounted the genuine disputes of material fact concerning whether these defendants formed a common plan to assist Twist in an asset-shuffling scheme that took money which should have gone to Grayiel and diverted it to Twist, Twist Entities, and Defendants.  These disputes go to the very heart of this case.  Since Plaintiff does not explain Samir's involvement in the alleged conspiracy, the Court will grant Defendants' Motion for Summary Judgment on this count as to Defendant Samir only.

### Wrongful Conversion as to AIO, Gregory, Samir, and Teema (Count 8)

Count 8 of the First Amended Complaint is for wrongful conversion against AIO, Gregory, Samir, and Teema, based on the Agreed Judgment and the subsequent deals between AIO and Second Blue Light. [*See* R. 136 at p. 28]  The elements of conversion in Kentucky are:

(1) the plaintiff had legal title to the converted property;

(2) the plaintiff had the right to possess the property at the time of the conversion;

(3) the defendant exercised dominion over the plaintiff's property in a way that deprived the plaintiff of its use and enjoyment;

(4) the defendant intended to interfere with the plaintiff's possession;

(5) the plaintiff demanded return of the property and the defendant refused;

(6) the defendant's act was the legal cause of the plaintiff's loss of the property; and

(7) the plaintiff suffered damages from the loss of the property.

*Ford v. Baerg*, 532 S.W.3d 638, 641 n.2 (Ky. 2017) (citing *Kentucky Ass'n of Ctys. All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 630 n. 12 (Ky. 2005).  Plaintiff does not seek summary judgment as to this claim. [*See* R. 129-1]  Defendants argue they are entitled to summary judgment because Plaintiff cannot show any of these elements. [R. 125-1 at p. 55]

First, Defendants argue that Plaintiff held no legal title to or security interest in the natural gas assets, but merely "*invested* with Twist (in partnerships, not in wells according to the subscription agreements)." [R. 125-1 at p. 55 (emphasis original)]  Plaintiff's response is that the property he is complaining was converted is not the wells, but the $900,000 he invested, in which he retained ownership and legal title. [R. 136 at p. 28]  Defendants do not reply to this point, and their arguments that the rest of the elements are not met all focus essentially on Plaintiff's rights to the Natural Gas Assets, and ignore Plaintiff's explanation (and the clear language of the First Amended Complaint) that the allegedly converted property was *the money*, not the wells.  Nevertheless, Plaintiff failed to demonstrate that genuine issues of material fact foreclose summary judgment against him as to this claim.  As to the first element of conversion, Plaintiff does not cite to any authority or record evidence demonstrating that he retained legal title over the money he invested with Twist.  The same is true of the second element — Plaintiff has not shown that he had the right to possess the money he invested.  It is doubtful whether he could cite to any authority so showing, since the concept of investing one's money with another necessarily involves giving that money to someone else for them to do something else with that

money.  Any right that Plaintiff may have had to possess the money would have had to have come from the investment contracts between him and Twist/the Twist entities.

But, as demonstrated in a somewhat similar case, such a purely contractual right would not give rise to a viable conversion claim.  In *Francis v. Nami Res. Co., LLC*, No. CIV.A. 04-510, 2008 WL 852047 (E.D. Ky. Mar. 28, 2008), *on reconsideration in part,* No. CIV.A. 6:04-510, 2008 WL 5169561 (E.D. Ky. Dec. 9, 2008), the plaintiff entered into agreements regarding oil and gas wells.  Under these agreements, the plaintiff was to pay certain amounts to cover estimated drilling costs in addition to paying monthly operating fees. *Id.* at *6–8.  The defendant was to send the plaintiff monthly production statements along with payments based on the production of the oil and natural gas. *Id.*  The parties began to dispute whether their agreement obligated plaintiff to pay certain expenses for some of the wells, and the defendant stopped paying the plaintiff revenue from the sale of gas from those wells. *Id.*  Plaintiff sued for a number of claims, including conversion. *Id.* at *12, *14.  His pleaded theory of conversion was that he had a contractual right to receive production proceeds from the wells, as well as ownership interests in the wells which the defendant had converted to his own use. *Id.* at *13.  At the summary judgment stage, the plaintiff argued that his conversion claim was based in his right to possess the gas in the wells (pursuant to certain assignments), not his right to the revenues from gas the wells had produced, and that defendant had wrongfully possessed the gas. *Id.*

The Eastern District of Kentucky rejected the claim that defendant had converted either the gas in the wells or the proceeds from the wells, explaining that the rights that were allegedly interfered with were created by contract, meaning the only remedy under Kentucky law was a breach of contract action, not a conversion claim. *Id.* at *13–14 (citing *Davis v. Siemens Medical Solutions USA, Inc.*, 399 F. Supp. 2d 785 (W.D. Ky. 2005)) (explaining that "[a] conversion

claim and contract claims are not always incompatible. Here, however, the conversion claim does not lie because the property right alleged to have been converted arises entirely from the contractual rights to compensation.") and *Mims v. Western–Southern Agency, Inc.*, 226 S.W.3d 833, 836 (Ky. App. 2007) (explaining that "[t]he failure to perform a contractual obligation typically does not give rise to a cause of action in tort . . . . However, if a plaintiff can establish the existence of an independent legal duty, he may maintain an action in tort even though the acts complained of also constitute a breach of contract."). Here, as in *Francis*, it appears that to the extent the property right alleged to have been converted existed, it must necessarily have arisen entirely from the contract, meaning that Kentucky law views the claim as barred in favor of a breach of contract claim.

Further, as to the third element of conversion, Plaintiff's own brief demonstrates that it is not met. In his Response to Defendants' Motion for Summary Judgment, Plaintiff states that he had legal title "to the approximately $900,000 of his life savings, of which he was solicited to invest in the Twist Entities by Twist." [R. 136 at p. 28] He then goes on to say that "[u]nder the Agreed Judgment and the subsequent dealings between AIO and Second Blue Light, the Defendants systematically and unlawfully **encumbered and transferred the Natural Gas Assets** as a means of keeping defrauded investors, including Grayiel, from ever recovering returns on their investments. Thus, Defendants each exerted dominion over the Grayiel Investment in a manner which deprived Grayiel's rights to use and enjoy the property, as a result of the fraudulent transfer of assets." *Id.* (emphasis added). But this argument tries to have it both ways: the property to which Plaintiff claims he had title was the money, but the property which he claims Defendants encumbered and transferred was the Natural Gas Assets. This shows that Plaintiff did not in fact have title to the property over which Defendants allegedly exercised

dominion — that is, they did not "exercis[e] dominion over the *Plaintiff's* property." *Baerg*, 532 S.W.3d at 641 n.2 (emphasis added).  Rather, the situation is somewhat analogous to that in *Clayton, Jr. v. Heartland Res., Inc.*, No. CIV A 1:08CV-94-M, 2009 WL 790175, at *8–9 (W.D. Ky. Mar. 24, 2009).

In *Clayton*, shareholders who bought oil and gas securities sued defendants including an attorney who allegedly helped with a fraudulent securities offer. *Id.* at *1.  The Western District of Kentucky found that the conversion claim against the attorney failed, because there was no allegation that the attorney ever exercised dominion and control over the plaintiffs' investment money; rather, the gravamen of the complaint was that the attorney prepared offering documents while knowing that they contained material misstatements or omissions, and the other defendants used those documents to get plaintiffs to invest their money.  This is similar to the situation here: the gravamen of the complaint is not really that these defendants are the ones that "cut and run" with Plaintiff's investment, but that they helped *Twist* (and Twist Entities) after he did so.  Such behavior is certainly tortious if true — just not under *this* tort.

Finally, of course, if the third element was not met, the fourth element (intent) and the sixth element (that Defendants' act was the legal cause of the plaintiff's loss of the property) are necessarily impossible to meet.  Thus, for a multitude of reasons, Plaintiff's conversion claim must fail, entitling all defendants to judgment as a matter of law on this claim.  Further, as with other claims against Samir, the Plaintiff simply failed to demonstrate a genuine issue of fact regarding his involvement, giving another reason to grant summary judgment on this claim as to Samir.  Thus, the Court will grant Defendants' Motion for Summary Judgment on this count.

### D. Veil Piercing/Alter Ego (Count 9)

Count 9 of the First Amended Complaint does not state separate claims, but states theories of recovery aimed at enforcing the West Virginia Judgments against AIO and ultimately Gregory: AIO was the alter ego of Twist (and thus liable for judgments against Twist and Twist Entities), and the corporate veil should be pierced to hold Gregory liable for AIO's debts. [R. 136 p. 21] The parties agree on the standard: to pierce a corporate veil, a court must find "(1) domination of the corporation resulting in a loss of corporate separateness and (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *Inter-Tel Techs., Inc. v. Linn Station Properties, LLC*, 360 S.W.3d 152, 165 (Ky. 2012). The Court need not conduct a detailed analysis of the relevant subfactors to find that genuine issues of material fact on each element foreclose summary judgment. As already thoroughly discussed in this opinion, whether Twist and Gregory schemed to defraud Grayiel by (among other things) teaming up to abuse the corporate form of AIO (which there is some evidence that they both owned through other shell entities) is the question around which this entire case revolves. If they did so, it would appear to be "a clear example of circumstances under which entitlement to the privilege of separate corporate existence should be forfeited." *Id.* at 155; *see also id.* at 168 (explaining that "an intentional scheme to squirrel assets into liability-free corporations while heaping liabilities upon an asset-free corporation" satisfies the second prong of the veil piercing test). And *Inter-Tel Techs* makes clear that Defendants' arguments that the corporate veil of Advantage Investments must be separately considered and that veil piercing is barred by *res judicata* are unavailing. Many genuine issues of material fact thus make summary judgment as to Count 9 inappropriate.

## III.    CONCLUSION

A court may deny a motion for summary judgment "where, although the movant may have technically shouldered his burden, the court is not reasonably certain that there [are] no triable issues of fact[.]" *ACME Roll Forming Co. v. Home Ins. Co.*, 31 F. App'x 866, 869 (6th Cir. 2002). The Court does not believe that either movant has technically shouldered their burden on summary judgment (other than with regard to the claims noted above). But even if they did, on this complicated and contentious record, the Court cannot say it is "reasonably certain that there are no triable issues of fact" as to Plaintiff's remaining claims.

Accordingly, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1.      Defendants' **Motion for Summary Judgment [R. 125]** is **GRANTED solely as to the following claims: Count 4 as to all defendants; Count 5 as to Defendant Samir only; Count 6 as to Defendant Samir only; Count 7 as to Defendants Samir and Teema only; and Count 8 as to all defendants.** The Motion is **DENIED in all other respects**.

2.      Plaintiff's **Motion for Summary Judgment [R. 128]** is **DENIED**.

3.      A telephonic status conference to discuss scheduling of a jury trial and pretrial deadlines will be set by separate order.

This the 7th day of April, 2020.

*Claria Horn Boom*

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

cc:      Counsel of record