UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| GEORGE A. GRAYIEL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:15-CV-821-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| AIO HOLDINGS, LLC, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On December 29, 2022, the Court entered its Findings of Fact and Conclusions of Law ("Findings and Conclusions") following a bench trial. [R. 288]; [R. 294].[1] This matter is now before the Court on the issue of damages. Consistent with the Court's order for additional briefing, Plaintiff George A. Grayiel filed his Memorandum Concerning Damages on March 1, 2023. [R. 302]. Defendants Gregory Anastas and AIO Holdings, LLC and Defendants Teema Sarinprapa and Blue Light of Kentucky Limited Liability Company responded, [R. 310]; [R. 311], and Grayiel replied [R. 313]. Also pending before the Court is Grayiel's Motion for Appointment of Receiver Over Certain of Defendants' Property. [R. 303]. Defendants Gregory Anastas and AIO Holdings, LLC and Defendants Sarinprapa Teema and Second Blue Light, LLC responded in opposition to the motion, [R. 305]; [R. 306], and Grayiel replied [R. 307]. The parties subsequently tendered a Proposed Agreed Order [R. 327] agreeing to some of the terms of a receivership, should the Court appoint one over the Defendants' objections.

For the reasons that follow, the Court will award Grayiel compensatory damages in the amount of $1,652,416.00 and post-judgment interest at the rate of 5.35%, and it will award Grayiel

---

[1] All undefined terms within this Memorandum Opinion and Order shall have the meaning as defined in the Court's Findings of Fact and Conclusions of Law at [R. 288].

punitive damages equal to the compensatory damages award of $1,652,416.00. In addition, the Court will deny Grayiel's motion for a receiver [R. 303]. Finally, the Court will enter a final judgment consistent with the Findings and Conclusions and with the findings below.

## I.    BACKGROUND[2]

This complex case arises from the fraudulent schemes of convicted con man Martin Twist, now deceased, and those who worked alongside him to evade creditors, like Plaintiff George Grayiel. Twist owned many entities, including Martin Twist Energy Company, LLC ("MTEC"), Blue Flame Energy Company, LLC ("Blue Flame"), Cherokee Drilling Company, LLC ("Cherokee Drilling"), Cherokee Energy Company, LLC ("Cherokee Energy"), Joerhea Realty, LLC ("Joerhea") and Seca Energy, Inc. ("Seca") (collectively, "Twist Entities"), which were all involved in a natural gas drilling operation in West Virginia. [R. 218, pp. 1–2, ¶ 3]. Grayiel fell victim to Twist's scheme, investing most of his life's savings in the oil and gas wells owned by Twist and Twist Entities and receiving virtually nothing on his original investment. As outlined in detail in the Court's Findings and Conclusions, AIO, Anastas, and Teema were willing confederates in Twist's fraudulent schemes, helping Twist shield assets from creditors.

Grayiel first sought to recover his investment by suing Twist and the Twist Entities in the Circuit Court of Putnam County, West Virginia in 2008, which ultimately awarded Judgment in his favor on February 6, 2014 against the Twist Entities, [JX 82], and on August 15, 2014 against the Twist Estate in the amount of $2,671,880.84 (collectively the "West Virginia Judgments"). On November 6, 2015, after uncovering evidence of the fraudulent nature of Twist's enterprises and the involvement of AIO, Anastas, and Teema, Grayiel brought this action. [R. 1].

---

[2] For a more detailed factual background, see the Court's December 29, 2022 Findings and Conclusions. [R. 288].

Following a bench trial in June 2022, the Court found in favor of Grayiel on each the following claims: Count I (Actual Fraudulent Conveyance as to AIO), Count II (Actual Fraudulent Conveyance as to Teema and Second Blue Light), Count III (Constructive Fraudulent Conveyance as to AIO), Count V (Aiding and Abetting Fraud as to AIO, Anastas, and Teema), Count VI (Civil Conspiracy as to AIO, Anastas, and Teema), and Count VII (Common Law Fraud as to AIO and Anastas), and Count IX (Alter Ego/Veil Piercing as to AIO and Anastas).

At trial, Grayiel presented some evidence on the issue of actual damages, for example, the amount of his investments and his recovery from Teema of vacant lots in the Virgin Islands. [R. 218, pp. 1–2, ¶ 3]; [R. 266, 99:1–14]. Grayiel also presented evidence from retained expert Christopher Meadors, [R. 95 (the "Meadors Report")], concerning the valuation of the Natural Gas Assets and revenues from those assets. In addition, tThe parties presented evidence of the revenues shared between AIO and Second Blue Light since early 2014 pursuant to the AIO/SBL Operating Agreement and offered some argument on damages-related issues. [JX97]; [Teema Ex. 1; Teema Ex. 2]. The Court ordered additional briefing on the issue of damages to address trailing questions. [R. 295]; [R. 301]. Consistent with the Court's order, the parties submitted supplemental damages briefs. [R. 302]; [R. 310]; [R. 311]; [R. 313].

On June 15, 2023, the Court held a video hearing to discuss damages and the Court's authority to appoint a receiver. [R. 317]. During the hearing, counsel for Defendants Anastas and AIO reiterated previous objections to the appointment of a receiver as stated in their response [R. 305]. Primarily, those Defendants oppose a receiver because they maintain the Court no longer has jurisdiction over the Natural Gas Assets. Otherwise, the parties appeared to agree that Grayiel's counsel, Holland & Knight, would be an appropriate receiver should the Court appoint one. Based on the discussion during the hearing, the Court advised the parties to file another round of briefs

by Thursday, June 22, 2023, and to file a proposed Agreed Order appointing Holland & Knight as receiver over the Natural Gas Assets. Apparently unable to come to a complete agreement, Grayiel tendered a Proposed Agreed Order [R. 323], which was followed by a response [R. 325] from Defendants Anastas and AIO indicating objection to certain language in the Proposed Order. The Court allowed the parties additional time to come to an agreement on the terms of any receivership, and on June 28, 2023, the parties tendered a new Proposed Agreed Order [R. 327], but that "Agreed Order" reserved all the objections Anastas and AIO made in [R. 325].

Consistent with the Court's additional directive at the June 15, 2023 hearing, [R. 317], the parties further supplemented their damages briefs to specifically address alternative methods of computing compensatory damages. [R. 320]; [R. 321]; [R. 322]. At the Court's request, Grayiel also tendered a Proposed Final Judgment [R. 324],[3] which Defendants Anastas and AIO again submitted objections to [R. 326]. All outstanding issues having been fully briefed, they are ripe for the Court's consideration.

## II.    ANALYSIS

At the outset, the Court notes that the Defendants, in their respective briefs, largely attempt to rehash issues of liability, which the Court has already exhaustively addressed, *see* [R. 288], and declines to reconsider. For example, Anastas and AIO submit that Plaintiff failed to demonstrate

---

[3] The Court notes that while it referenced Grayiel's Proposed Final Judgment in fashioning its own, Grayiel erroneously suggests that because the Court found Anastas and AIO were the alter egos of Twist, they are liable for "all debts owed to Plaintiff by Martin Twist or his estate, including but not limited to the judgment amount of $2,671,880.84 owed to Plaintiff by Martin Twist due to the August 15, 2014 judgment entered by the Circuit Court of Putnam County, West Virginia" *in addition to* the damages in this case. [R. 324, p. 3]. Defendants Anastas and AIO note in their response that "the award of these damages would seem to be granting double recovery to the extent the same damages are set forth in the foregoing paragraphs," [R. 326, p. 2], and they are correct. The very reason Grayiel is entitled to damages for the Defendants' fraud is because they worked with Twist to ensure he could *not* recover what he was owed by Twist. To award Grayiel damages based on his *inability* to recover against Twist, but to also order Anastas and AIO to separately compensate Grayiel for his original debts from Twist would indeed constitute double recovery. The Court's alter ego finding that Anastas is "personally liable for Grayiel's West Virginia state court judgment against Twist," [R. 288, p. 103], was intended as an alternative method of holding Anastas accountable for the damages owed in this case, and not an additional award on top of them. For this reason, the Court has omitted Grayiel's Finding No. 5 in its Final Judgment.

the necessary motive to prove a conspiracy between the Defendants and Twist, that Anastas and AIO would have priority over Grayiel in recovering their respective "investments" from Twist and the Twist Entities, and that Plaintiff failed to submit "clear and convincing proof" that he was "misled by the Agreed Judgment at any time that would create a claim for damages." [R. 310, pp. 5, 9–10]. Similarly, Teema and Second Blue Light "respectfully submit that Grayiel has failed to prove to a reasonable certainty that [their] tortious conduct has caused him damages." [R. 311, p. 2]. But the Court has already found Anastas, AIO, Teema, and Second Blue Light liable for various frauds upon Grayiel, and further found that Grayiel's injuries are "readily apparent; he was unable to recover on his West Virginia judgment against the Twist estate because the Natural Gas Assets were transferred out of the estate and shielded from creditors." [R. 288, p. 81]. That the Defendants caused Grayiel at least some damages has therefore been determined.

The Court further found, contrary to Anastas and AIO's assertion that "[t]here was a typical quid pro quo" and "valuable consideration" exchanged between them and Twist, [R. 310, p. 2], that their agreement was not a legitimate loan agreement, but rather a deliberate attempt to shield assets from Twist's creditors. *See* [R. 288, p. 52]. Even so, Anastas and AIO now ask the Court to respect and enforce the terms of the AIO Loan and related Deed of Trust, including interest rates and priority-secured creditor status to AIO, in another baseless attempt to re-litigate the merits of the case. [R. 310, pp. 1–12]. Specifically, Anastas and AIO argue the AIO Loan remains valid and, consequently, that Grayiel's damages award should be reduced to account for the Loan's payment terms in favor of AIO. *Id.* This position is not only at odds with the Court's Findings and Conclusions, it is a blatant misconstruction of them.

In its Findings and Conclusions, the Court outlined in great detail how the entire AIO Loan transaction and all related documents, including the Deed of Trust, were riddled with fraud from

the start in 2005, culminating in the sham AIO Complaint and Agreed Judgment in 2008. [R. 288, pp. 8–21]. Then the Court thoroughly explained, which specific focus on the culmination of the fraud through the Agreed Judgment, why the Agreed Judgment was avoidable as to Grayiel under Kentucky's fraudulent transfer statutes at the time, as an actual fraudulent transfer and constructive fraudulent transfer. *Id.* at 47–60, 68–74.

Incredibly, notwithstanding the copious amount of ink already spilled over this issue, AIO and Anastas contend, "[t]here was a typical quid pro quo between a lender (AIO-$360,000) and the borrower (the grant of the Security interests)." [R. 310, p. 2]. AIO and Anastas claim that AIO's security interests through the Deed of Trust remain intact and give AIO a priority security interest in the Natural Gas Assets. *See* [R. 310, p. 19] ("AIO is entitled to priority over Mr. Grayiel as to its Security Interests."); *id.* at 12 ("[A]s a matter of law and equity, [Grayiel] would be second in line behind AIO as to the gas well proceeds with or without the Agreed Judgment."). In doing so, they attempt to narrow and isolate the Court's fraudulent transfer ruling to the Agreed Judgment only, arguing "[t]he Court took umbrage with the Agreed Judgment because it felt that AIO was granted too much collateral." [R. 310, p. 9]. But as the one-hundred-plus-page Findings and Conclusions makes abundantly clear, the Court took "umbrage" at the entire AIO Loan transaction that began with the AIO Note and Deed of Trust in 2005 and continued with the sham foreclosure of the AIO Loan and Deed of Trust through the Agreed Judgment in 2008. Indeed, the Court found that AIO and Anastas entered into the AIO Loan and Deed of Trust in 2005 with actual intent to defraud Twist's creditors, like Grayiel:

> Armstrong further testified that Twist pivoted from the Armstrong Complaint and instead pursued a $2,000,000 loan from Anastas and lien on the Natural Gas Assets to evade creditors: [T]he way Martin [Twist] explained it was that he was going to get a lien through Anastas for $2 million and it was going to be the same principal and the same scenario that he was suing me for $500,000, only more money, and

yet he would have control of it. And all it was getting away from the creditors and stuff.

[R. 288, p. 9]. The Court continued,

> Regardless, it is obvious AIO received far more from the Twist Entities than it was owed, and Anastas knew that at the time. At the time of the transaction, Anastas believed he was receiving assets worth at or above $2,000,000. [R. 264, 144:3–6]. Anastas's October 5, 2005 email to Twist and Fleu, providing comments on the lien releases for the AIO Loan, openly acknowledges that AIO took assets [through the Deed of Trust] never intended to secure the AIO Loan. [JX 28]. Anastas, as lender, agreed to *presigned* releases to allow Twist to "hock his assets (*that I have not financed*)[.]" [JX28] (emphasis added).

[R. 288, p. 52].

Notwithstanding, AIO and Anastas now boldly claim, "[t]he Security Interests [per the Deed of Trust] are not part of the Court's determination of fraud and constructive fraud." [R. 310, p. 3]. But again, this misconstrues (deliberately, it would seem) the Court's previous findings, which made clear that the AIO Loan and Deed of Trust were inextricably linked to the Agreed Judgment and found avoidable as against Grayiel:

> The intentional omission [in the AIO Complaint] of the actual amount owed served as a half-truth, meant to misrepresent AIO's right to recover the entirety of the Natural Gas Assets. Further, the parties failed to disclose, in either the AIO Complaint or the Agreed Judgment, that Twist controlled AIO or that the parties intended to execute an operating agreement, immediately after the filing of the Agreed Judgment, wherein a Twist entity would continue to control and benefit from the Natural Gas Assets. The AIO Complaint contained "only favorable matters [the $2,000,000 figure] and omit[ted] all reference to unfavorable matters [the true amount owed and AIO's intent to immediately hand over possession and control of the Natural Gas Assets through the 530/AIO Operating Agreement]" in order to misrepresent the true nature of the Agreed Judgment and the relationship between Twist, AIO, and Anastas. Rest. (2d) of Torts, § 529 cmt. a. In truth, it was a sham lawsuit with a predetermined outcome. *As such, the Court finds that the half-truths provided in the Deed of Trust, AIO Complaint, and Agreed Judgment are "as much a false representation as if all the facts stated were untrue."*

[R. 288, p. 77] (emphasis added). Indeed, the Agreed Judgment resulted from the sham foreclosure of the AIO Loan and Deed of Trust. That is, the Agreed Judgment was the magnum opus of the

loan scheme that moved title to the Natural Gas Assets to AIO, shielding them from Twist's creditors, including Grayiel. It defies logic for Anastas and AIO to now argue that AIO's payment terms and security interest in the Natural Gas Assets should remain effective as against Grayiel after the Court found the Agreed Judgment (obtained through the foreclosure of the sham AIO Loan and Deed of Trust) avoidable.

Even assuming AIO made a loan to Twist and was never repaid, that is, quite frankly, a consequence of doing business with a known fraudster and has no bearing on this Court's ruling. Put simply, and to make the point abundantly clear, this Court found the Agreed Judgment avoidable as to Grayiel. Because that Agreed Judgment sprang from the foreclosure of the sham AIO Loan and Deed of Trust, the Court likewise finds that any payment terms, interest rate, or security interests granted to AIO under the AIO Note, AIO Loan, and Deed of Trust are avoidable and unenforceable as against Grayiel.

Beyond this, the Court will not address any of the Defendants' arguments that do not relate to the Court's clear instruction to brief the only remaining issue in this case: the *amount of damages* owed to Grayiel. As Anastas and AIO acknowledge in their opening paragraph, any arguments that do not pertain to damages "are reserved for a later date in the appeal process," [R. 310, p. 1], and are not properly before this Court.

### A. Damages

#### i. Alter Ego Theory

This Court previously found AIO and Anastas personally liable for the $2,671,880.84 West Virginia Judgments under the alter ego theory, detailing relevant Delaware and Kentucky law on veil piercing, [R. 288, pp. 92–103]. The Court found that AIO, through the fraudulent schemes of Twist and Anastas, functioned as façade of Twist and was his most successful attempt to shield

his assets in a shell company. *Id.* at 99, 57 ("Twist and Anastas concocted the AIO Complaint and Agreed Judgment to ensure Twist's continued ownership and control over the Natural Gas Assets."). The Court further pierced the corporate veil of AIO and Advantage Investments to hold Anastas personally liable for the West Virginia Judgment, finding no corporate formalities had been met and that these were the companies used by Anastas to assist Twist in his fraudulent schemes. *Id.* at 92–103. As explained, "Anastas and Twist collectively utilized AIO to evade Twist's creditors." *Id.* at 100. Specifically, the Court found:

> The misuse of the corporate form by both Twist and Anastas could not be more apparent. The two men used shell corporations to essentially transfer the Natural Gas Assets from Twist to Anastas to evade Twist's creditors. Therefore, in light of relevant Delaware and Kentucky law and in the interests of equity, the Court finds Anastas personally liable for Grayiel's West Virginia state court judgment against Twist.

*Id.* at 103. Accordingly, under the law and in equity, the Court found Anastas personally liable for Grayiel's West Virginia state court judgment against Twist in the amount of $2,671,880.84.

The Court now makes these same findings as to Teema and Second Blue Light, who "slid into Twist's (and First Blue Light's) shoes after Twist died and worked alongside AIO to ensure that the Natural Gas Assets remained shielded from creditors to the benefit of Twist, Teema, and Anastas." *Id.* at 67. As the Court explained previously, "[t]he fraudulent impetus for the creation of Second Blue Light and assignment of the Right of Way Agreement could not be more clear or more improper: to provide Teema and her son an 'inheritance' outside of Twist's estate and outreach the reach of Twist's creditors." *Id.* at 62–63.

Although the Court remains convinced under the facts of this case and applicable law that alter ego liability holds, the Court nevertheless finds that holding Defendants liable for the entire West Virginia Judgments would be improper since those Judgments ostensibly spanned the entire scope of Twist's fraud against Grayiel, beginning around 1999 or 2000. *See* [R. 288, p. 3]. Anastas

first met Twist in 2005 and commenced his fraudulent activities around that time, *id.* at 8–18, and Teema's fraud began around 2012, *id.* at 26–31. Thus, holding them responsible for the entire amount of the West Virginia Judgments would include Twist's fraud that pre-dated their involvement. Rather than hold the Defendants responsible for the West Virginia Judgments, the Court will, instead, employ an alternative measure of damages that, as outlined below, more precisely holds Defendants responsible only for their own fraudulent conduct that caused Grayiel damages. *See infra* Section II(A)(ii).

### ii.      Compensatory Damages[4]

"[F]ederal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). When state substantive law governs a claim for relief, that state's law and decisions guide the allowable damages. *Id.* at 437 (citations omitted). "The fundamental rule in assessing damages for fraud is that the victim of fraud is entitled to compensation for every wrong which was the natural and proximate result of the fraud." *KSA Enters., Inc. v. Branch Banking & Tr. Co.*, No. 5:14-CV-00182, 2015 WL 5611655, at *6 (W.D. Ky. Sept. 23, 2015), aff'd, 761 F. App'x 456 (6th Cir. 2019) (citing *Sanders, Inc. v. Chesmotel Lodge, Inc.*, 300 S.W.2d 239, 241 (Ky. 1957)). In Kentucky, "the measure of damages for fraud is . . . the actual pecuniary loss sustained," such that the defrauded party should be placed "in the same position that he would have occupied had he not been defrauded." *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 59 (Ky. 2018) (quoting *Sanford Constr. Co. v. S & H Contractors, Inc.*, 443 S.W.2d 227, 239 (Ky. 1969)); *see also Dempsey v. Marshall*, 344 S.W.2d

---

[4] In his memorandum concerning damages, Grayiel acknowledges that monetary damages are unavailable on his fraudulent conveyance claims. *See* [R. 302, p. 5 n.2] (citing KRS § 378.010; KRS § 378.020; *Mattingly v. Gentry*, 419 S.W.2d 745, 747 (Ky. 1967)) ("Kentucky's previous fraudulent transfer statutes applicable to this case only provide for the sole remedy of voiding fraudulent transactions."). For this reason, the Court's damages assessment concerns only Grayiel's other remaining claims.

606, 607 (Ky. Ct. App. 1961) (noting damages for fraud include not only what the purchaser parted with in the bargain, but also "the benefits of his bargain, by permitting him to show what the property would have been worth had it been as represented").

In Kentucky, the *existence* of damages due to a defendant's tortious conduct must be proven to a reasonable certainty. *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 324 (6th Cir. 2011); *see also EQT Prod. Co. v. Magnum Hunter Prod. Co.*, 266 F. Supp. 3d 961, 972–73 (E.D. Ky. 2017) (quoting *Curry v. Bennett*, 301 S.W.3d 502, 506 (Ky. Ct. App. 2009)) ("'[C]ontingent, uncertain and speculative damages generally may not be recovered' under Kentucky law."). "However, 'where it is reasonably certain that damage has resulted, mere uncertainty as to the amount does not preclude one's right of recovery or prevent a jury decision awarding damages.'" *EQT Prod.*, 266 F. Supp. 3d at 972–73 (quoting *Curry*, 301 S.W.3d at 506); *see also Roadway Exp., Inc. v. Don Stohlman & Associates, Inc.*, 436 S.W.2d 63, 65 (Ky. 1968). Thus, "if it is established with reasonable certainty that damage has resulted from a breach of duty or a wrongful act of defendant, mere uncertainty as to the *amount* will not preclude recovery." *Roadway*, 436 S.W.2d at 65 (emphasis added). "But no recovery is allowed when resort to speculation or conjecture is necessary to determine whether the damage resulted from the unlawful act of which complaint is made or from other sources." *Id.*

Before outlining the Court's methodology in calculating damages, the Court will first overview the evidence relied on by the Court concerning damages. As mentioned, Grayiel presented the expert report of Christopher Meadors, which established a valuation of the Natural Gas Assets and projected revenues. [JX 95]. Defendants produced their own expert report by Michael T. May, a registered professional geologist. [JX 96]. May's report criticizes Meadors' analysis, arguing that his approach was "fatally flawed" because he did not consider Decline Curve

Analysis and did not properly account for several necessary factors in reaching his conclusion. *See id.* at 1–9. However, it does not appear, and Defendants do not argue, that May offered a contrary valuation of the Natural Gas Assets. Regardless, Meadors based his analysis on the production records available, and, due to the lack of record-keeping, made supportable assumptions and evaluations for the value of the Natural Gas Assets and the proceeds generated.

Further, the Court relied on the Defendants' own summary exhibits detailing the net proceeds generated from the Natural Gas Assets for the period February 2014 through May 2023, during which time Anastas and Teema split all the net proceeds generated from the Natural Gas Assets. *See* [JX 97]; [R. 316-1]; [R. 316-3].[5] The Defendants advise that after the Court's liability ruling in December 2022, [R. 288], they have gathered the net proceeds and held them in escrow, declining to receive any new disbursements. [R. 316; R. 316-3]. Based on this information and the entire record, the Court has sufficient evidence on which to calculate and award compensatory damages with a reasonable degree of certainty. "'A trial court's finding of fact on the issue of compensatory damages is not reversible error unless it manifests plain injustice, or is so grossly excessive as to be clearly erroneous.'" *King v. Zamiara*, 788 F.3d 207, 215 (6th Cir. 2015) (quoting *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 485 (6th Cir. 2005)). "No formula exists to determine with precision compensatory damages. The amount is left to the sound discretion of the fact finder." *Smith v. Heath*, 691 F.2d 220, 227 (6th Cir. 1982).

Initially, Grayiel seeks compensatory damages in an amount equal to the West Virginia Judgments, $2,671,880.84, plus pre-judgment interest in the amount of $1,712,587.52 for the period since those Judgments were entered. [R. 302, pp. 5–8]. In addition, Grayiel seeks post-judgment interest on his compensatory damages award and $2,671,880.84 in punitive damages

---

[5] As explained by Defendants, the actual disbursements from the assets lag about four months behind the time of production.

against each Defendant. *Id.* at 8–13. Concerning his compensatory damages, Grayiel argues he is entitled to the value of the Natural Gas Assets plus all proceeds since entry of the Agreed Judgment in 2008:

> Since the outset of the case, Plaintiff has made **perfectly clear** the damages he is seeking from the Defendants: the damages due to Plaintiff amount to the value of the Natural Gas Assets and all proceeds derived therefrom after the initial fraudulent transfer through the Agreed Judgment. *See* Amended Complaint at ¶ 183 ("but for the entry of the fraudulent Agreed Judgment, as well as the formation of a seemingly legitimate company Second Blue Light, Grayiel would have sought recovery of the Natural Gas Assets in satisfaction of his judgments against the Twist Entities and the Twist estate.").

[R. 313, p. 2] (emphasis in original). Grayiel calculates this amount as follows:

| | |
|---|---|
| $1,058,333 | (value of the assets Oct. 6, 2017, Meadors Report, [JX 95]) |
| $1,285,683 | (proceeds from assets Feb. 2009 – Sept. 2014, Meadors Report, [JX 95]) |
| + $431,684 | (proceeds from assets Oct. 2014 – Nov. 2021, [JX 97]) |

$2,775,700 Total.

Because this amount eclipses the West Virginia Judgments of $2,671,880.84, he offers to "cap" his compensatory damages at $2,671,880.84, arguing those Judgments "are only relevant to serve as a cap on the amount of compensatory damages resulting from the Defendants' conspiracy to shield Twist's assets from Grayiel and frustrate execution on those same assets." *Id.* at 4.

Whether capped or not, Grayiel's calculation of damages is inflated for multiple reasons. First, although the Court has tried mightily to understand the revenue figure of $1,285,683 for the time period February 2009 through September 2014, it appears excessive and unsupported by the Meadors Report. As best the Court can tell, Grayiel attempts to use gross revenues (after gathering) to calculate net proceeds from the assets, without deducting royalty payments and other operating expenses. [JX 95, p. 19, Table 1]. This measure overstates the net proceeds. In any event, starting the net proceeds calculation from 2008, when the Agreed Judgment was entered, fails to sufficiently link the Defendants' fraud with any tangible, measurable harm to Grayiel based on the

current record. Although it is clear that Anastas's fraudulent conduct began in 2005, Teema's did not begin until 2012. Further, and more to the point, although the Agreed Judgment (a cornerstone of Anastas and AIO's fraud which moved Twist's assets out of Grayiel's reach) was entered in 2008 and Grayiel filed suit later that year, Grayiel did not succeed to a Judgment in the West Virginia case until 2014. That is, until he obtained a Judgment against Twist and the Twist Entities, he could not have recovered any of the Natural Gas Assets (or the proceeds therefrom), whether they were in Twist's name or AIO and Second Blue Light's name. The Court is mindful that commencing net proceeds starting in 2014 fails in some respects to remedy the full scope of Defendants' fraud, which, for Anastas and AIO, began in 2005. However, Grayiel has presented insufficient evidence for the Court to monetize the pre-2014 fraud into a damages award.

### 1. Damages Based on Value of the Natural Gas Assets and Net Proceeds Commencing in 2014

The Court finds that the most accurate measure of compensatory damages is to award Grayiel the value of the Natural Gas Assets as of 2014, when he first could have executed on them through the West Virginia Judgments, plus all net proceeds Defendants have collected since February 2014.

On November 17, 2008, Grayiel filed suit against, *inter alia*, Twist, and a number of Twist Entities related to his $860,000 investment with Twist. [R. 288, p. 4]; *see also* [JX 38]. After nearly six years of litigation, on February 6, 2014, Grayiel obtained Judgment against the Twist Entities and on August 15, 2014, the West Virginia court entered Judgment against the Estate of Martin Twist, in the amount of $2,671,880.84. [R. 218, p. 11, ¶ 94]; [JX 82]; [JX 85]; [JX 86]. Grayiel was unable to recover against the Natural Gas Assets because, as detailed at length in the Court's Findings and Conclusions, [R. 288], the Defendants worked alongside Twist to ensure these assets

were shielded from Twist's creditors, like Grayiel, and available instead for the benefit of Defendants and Twist.

The Defendants' fraudulent conduct is the direct and proximate cause of Grayiel's inability to collect on the West Virginia Judgment. As this Court previously found, "Grayiel's injury is readily apparent; he was unable to recover on his West Virginia judgment against the Twist Estate because the Natural Gas Assets were transferred out of the estate and shielded from creditors." [R. 288, p. 81]. As Grayiel explained, and as reflected in the probate records, "the Twist estate contained nearly no assets." [R. 288, p. 31]. Had the Natural Gas Assets not been transferred to AIO and Second Blue Light, Grayiel could have executed on his West Virginia Judgments and succeeded to *all* the Natural Gas Assets and their net proceeds over the years since 2014, since the value of those assets at the time was below the Judgment amount.[6] Accordingly, the compensatory damages which are the natural and proximate result of the Defendants' fraud are equal to the value of the Natural Gas Assets as of February 2014 plus all proceeds derived therefrom since 2014. The Court calculates this amount as follows:

| | |
|---|---|
| $928,644 | (value of Natural Gas Assets as of February 2014) |
| +$723,772 | (net proceeds Feb. 2014 – May 2023) |

**$1,652,416[7]**

*See* [JX 95 (Meadors Report, using conservative growth rate of 5%)]; [R. 316-1]; [R. 316-3]. By awarding Grayiel the value of the Natural Gas Assets as of 2014, plus all net proceeds the

---

[6] According to the Meadors Report, the Natural Gas Assets would have been valued at around $928,644 in February 2014: $721,607 (value as of Natural Gas Assets as of Dec. 2008) x $(1.05)^{5.17}$ years = $928,644. This amount is well below the amount of the West Virginia Judgments ($2,671,880.84) and would have entitled Grayiel to pursue any other assets of Twist up to the Judgment amount (had there been any), in addition to the Natural Gas Assets.

[7] Because, as stated, the net proceeds payments from the Natural Gas Assets lag by approximately four months and the most recent report ends as of May 2023, *see* [R. 316-3], the Court orders that Grayiel also receive any additional net proceeds generated from the Natural Gas Assets since May 2023.

Defendants have derived therefrom since 2014, Grayiel is placed "in the same position he would have occupied had he not been defrauded." *Yung*, 563 S.W.3d at 59.

The Court notes this method is necessarily conservative in many respects. As explained by the Meadors Report, this valuation applies a conservative growth rate of 5% in calculating the value of the Natural Gas Assets as of February 2014. [JX 95, pp. 17–21]. The net proceeds Grayiel is to receive are calculated using the spreadsheet provided by Defendants that details the net proceeds actually split between Defendants from February 2014 through May 2023, so there is no speculation or even estimation involved. [JX 97]; [R. 316-1]; [R. 316-3]. Even Defendants tacitly acknowledge that the 2014 date is fair, and sufficiently provides a causal connection between AIO/Anastas and Grayiel's damages:

> Whatever AIO and Greg did, *they did not cause damages to Mr. Grayiel before March 31, 2014* by proof that was reasonably certain. There is simply no causal connection shown or proven as to who benefited from the proceeds of the wells from 2006 to 2014 and therefore no causal connection between the damages claimed by Mr. Grayiel and what he alleges that AIO and Greg did to defraud him during that period.

[R. 310, p. 15] (emphasis added). Teema similarly acknowledges that the value of the Natural Gas Assets and the proceeds therefrom is a reasonable measure of Grayiel's damages, conceding "[i]t is possible that the assets' value and profits therefrom are somehow related to Grayiel's damages." [R. 311, p. 4]. Teema, however, argues the causal link is missing. The Court disagrees, as explained above.

Further, using 2014 as the triggering date cabins the damages award to actions by Defendants that directly caused Grayiel damages. As explained, by February of 2014, Grayiel had a lawful, enforceable Judgment against the Twist Entities that he could have immediately executed on but for Defendants' fraudulent conduct in shielding Twist's assets. Undoubtedly, the fraud perpetrated by Anastas and Teema pre-2014 slowed and complicated Grayiel's West Virginia

litigation against Twist, increased attorney fees, escalated other expenses, and took an extreme toll on Grayiel. But the record developed by Grayiel on this issue provides little on which to anchor any award of damages prior to 2014.

This methodology also addresses, and mostly obviates, the relevant arguments lodged by Defendants concerning other methods for calculating damages. Although the Court is not basing its damages award on the West Virginia Judgments (other than using those Judgments as a marker for when damages commenced), the Court will briefly address some of Defendants' arguments related to those Judgments as they tangentially bear on the Court's ultimate damages award here. Anastas and AIO lodge various arguments concerning the substance and validity of the Judgments themselves. *See, e.g.*, [R. 310, pp. 12, 13] ("[P]art of the West Virginia Judgment against Mr. Twist is for emotional injury of $500,000 for which there was no claim made in the present action. . . . There is insufficient evidence to support an award for emotional injury. . . . Presumably the $886,162.00 stated in the West Virginia judgment (JX85) against Mr. Twist is what Mr. Grayiel invested. But in Kentucky, damages must be established by the claimant with reasonable certainty that they were caused by wrongful act of the defendant.").

To be clear, however, the merits of the underlying claims for the West Virginia Judgments have no bearing on the Court's ultimate award of damages in this action. Indeed, although Anastas and AIO suggest "the Court is being asked in effect to enforce the West Virginia Judgments against Twist," [R. 310, p. 19], that is simply incorrect. The Court's damages calculation references the Judgments only as a starting point for when ascertainable damages may be calculated. Even so, whatever misguided arrows Defendants may lodge, the West Virginia Judgments are valid judgments, entered by a lawful court, and would have been enforceable against Twist had Defendants not fraudulently assisted Twist in making himself judgment-proof. The Court's award

is simply not based on the West Virginia Judgments, other than to use their date of entry as the date damages in *this case* are calculable and sufficiently linked to Defendants' fraud.

Along the same lines, AIO and Anastas note that "[t]he West Virginia court found the damages to which Mr. Grayiel was entitled against Mr. Twist and his entities, but this is not the same as proof that what AIO did caused these damages to Mr. Grayiel," and argue "[t]here must be proof that AIO's actions caused damages to Mr. Grayiel with reasonable certainty." [R. 310, p. 14]. Similarly, Teema and Second Blue Light argue that since "[n]one of the defendants in the present case were parties in either of the West Virginia cases" and "[t]hose cases encompassed different claims against different parties," the Judgments awarded to Grayiel are "not competent evidence for a determination of damages in the present case." [R. 311, p. 7].

The Court largely agrees with these arguments, but it is not holding the Defendants liable for the claims underlying the West Virginia Judgments. Instead, the Court has tailored the damages award in this case to the specific actions of Defendants that caused damage to Grayiel by rendering him unable to execute on the West Virginia Judgments. This Court has already found that Grayiel could not "recover on his West Virginia judgment against the Twist Estate because the Natural Gas Assets were transferred out of the estate and shielded from creditors" with the help of the Defendants, [R. 288, p. 81]. Stated another way, but for the Defendants' fraudulent schemes, including the sham AIO Loan and entry of the Agreed Judgment, and formation of Second Blue Light, Grayiel would have been able to recover on his West Virginia Judgments against Twist's Estate and the Twist Entities through the Natural Gas Assets. That Defendants "caused damages" to Grayiel has already been proven with reasonable certainty.

The Court has now calculated the *amount* of those damages, cabining Grayiel's damages directly to the fraudulent actions of Defendants that caused Grayiel's harm. *See KSA Enters.*, 2015

WL 5611655, at *6 (citation omitted) ("The fundamental rule in assessing damages for fraud is that the victim of fraud is entitled to compensation for every wrong which was the natural and proximate result of the fraud."); *Yung*, 563 S.W.3d at 59 (citation omitted) (explaining "the measure of damages for fraud is . . . the actual pecuniary loss sustained," such that the defrauded party should be placed "in the same position that he would have occupied had he not been defrauded"); *Dempsey*, 344 S.W.2d at 607 (noting damages for fraud should include "the benefits of [the] bargain, by permitting [defrauded plaintiff] to show what the property would have been worth had it been as represented").

AIO and Anastas also argue awarding Grayiel damages equal to the West Virginia Judgments would risk double recovery for Grayiel. [R. 310, p. 18] (citing *Hickson Corp. v. Norfolk Southern Railway*, 260 F3d. 559 (6th Cir. 2001) ("Can he collect from both Twist and AIO/Greg for the same set of damages? Double recovery is not permitted, even if theoretical."). First, the Court is not basing its award on the West Virginia Judgments. Even if it did, there is no risk of double recovery. The very reason Grayiel sued the Defendants in this matter is because their actions rendered him *unable to recover* on his West Virginia Judgments against the Twist Estate. *See* [R. 288, pp. 42–43] ("Although Grayiel knew that AIO had obtained the Natural Gas Assets through the Agreed Judgment, he did not know that AIO had worked alongside Twist to effectuate a sham settlement and lawsuit through which Twist retained possession and control over the Natural Gas Assets, while ensuring unfriendly creditors, like Grayiel, could not recover against Twist's estate."). It would defy reason to find that Defendants are liable for the fraud that prevented Grayiel from recovering on his Judgments against Twist, but subsequently determine that allowing damages for that fraud would permit "double recovery."

For all these reasons, the Court will award compensatory damages to Grayiel in the amount of $1,652,416.00.[8]

### 2. Other Potential Method for Calculating Compensatory Damages

Although the Court finds $1,652,416.00 to be the correct measure of damages, it will briefly address the alternative methodology proposed by Grayiel. The Court requested oral argument and additional briefing on an alternative computation method based on Grayiel's initial investment of $860,000 in the Natural Gas Assets. [R. 317]. In the context of fraudulent oil and gas investments, some courts have found that compensatory damage should provide the plaintiff with the "benefit of the bargain," using the plaintiff's initial investment as a starting point to determine what the plaintiff would have received but for the fraud. *See, e.g.*, *Raymond E. Fontaine Tr. V. P & J Res., Inc.*, 475 B.R. 838, 864–65 (Bankr. E.D. Ky. 2012); *Glock v. Carpenter*, 184 F. Supp. 829, 832–34 (E.D. Ky. 1960); *Patek v. Alfaro*, 579 B.R. 75, 186–87 (Bankr. W.D. Tex. 2017) ("Plaintiffs' [who were defrauded investors in fractional interests in oil and gas wells] are entitled to actual damages, which is the value of their investment"); *W.L. Lindemann Operating Co., Inc. v. Strange*, 256 S.W.3d 766, 787–88 (Tex. Ct. App. 2008) (awarding compensatory damages to defrauded investor based, in part, on expert's calculation of "drainage of oil" from well).

The Court first notes, once again, that the Defendants' post-hearing briefs provide no alternative calculation method and generally fail to aid in the Court's damages assessment. Their post-hearing briefs lodge the same general objections to awarding Grayiel damages at all, with the additional argument by Teema that the Court should apportion some fault to Grayiel himself for the damages flowing from the Defendants' fraud upon him. *See* [R. 321, pp. 2, 3] ("Grayiel did

---

[8] Again, the Court intends that Grayiel's award include any additional revenues generated from the Natural Gas Assets and held by the Defendants in escrow since May 2023. *See* [R. 316-3].

not provide records to support any claim of an interest in the Natural Gas Assets, and did not testify

as to which wells and what percentage of said wells he owned. . . . A review of a signed partnership

agreement for the first subscription might have prevented him from paying for additional

subscriptions in Twist's gas well partnerships. A significant amount of fault should be allocated to

Grayiel for causing his own damages.").

As the Court already explained throughout its Findings and Conclusions, Grayiel was an

innocent investor defrauded by Twist and the Defendants, and despite Teema's arguments to the

contrary, "Grayiel did not know of, and could not reasonably have discovered, the Defendants'

involvement in Twist's schemes . . . until his conversation with [Lonnie] Armstrong in 2015." [R.

288 (Findings and Conclusions), p. 25]. Moreover, as the Court also noted in its Findings and

Conclusions, Grayiel testified at trial that "the nature of Twist's scheme made it difficult to trace

which specific wells he invested in, because Twist would 'change[] that all the time. He would

decide to drill a well and then decide to drill—and not do that one and do another one, so there

were—there were names just—bunches of names of wells going around.'" [R. 288 (Findings and

Conclusions, p. 3] (citing [R. 261, 82:21–24]). Teema's argument that Grayiel is at fault for any

portion of the damages he incurred at the hands of the Defendants ignores the Court's previous

findings and, frankly, is incredulous.

One other point raised by AIO and Anastas at the hearing and in their post-hearing brief is

worth noting. They argue that Grayiel has not proven his damages with reasonable certainty

because, in essence, Grayiel has not distinguished what loss he suffered from the Defendants' fraud

and what portion of his initial investment he may have lost anyway due to the risk associated with

investing in the oil and gas industry. [R. 320, p. 4] ("Investments in gas wells are not guaranteed

to work out. People lose money lawfully every day in investing in gas wells that do not produce.

Some of the wells Mr. Grayiel thought he invested in were [as] likely as not to have been dusters, i.e., nonproductive holes in the ground with no gas."). This argument is wholly without merit.

Of course, risk accompanies any investment, but because of Twist's and the Defendants' fraud, Grayiel never had a fair shot at any return on his initial investment. In other words, Grayiel did not incur the *ordinary* risk associated with investing in gas wells, he faced the extraordinary risk of doing business with Martin Twist and, unbeknownst to him, with the Defendants, Twist's willing confederates. The fact that it is unknown whether the wells Grayiel invested in would have been successful or "nonproductive holes in the ground with no gas," as Defendants suggest, is not because of the general risks associated with the type of investment Grayiel made, but rather because Twist and the Defendants conspired to defraud Grayiel and insulate the Natural Gas Assets from Grayiel's reach. In any event, these arguments by Defendants are irrelevant given the Court's methodology in calculating damages as outlined above. The Court's methodology does not hinge on what wells Grayiel invested in, whether they were "dusters," what his subscription agreements provided, or what portion of his investment he might have lost in the absence of fraud. *See supra* Section II(A)(ii)(1). By early 2014, Grayiel had a lawful, enforceable Judgment from the West Virginia court that he could have executed on had the Defendants not fraudulently worked to shield Twist's assets.

Back to the Court's directive. Grayiel submitted proposed calculations for evaluating damages based on the value of Grayiel's initial investment with Twist plus an expected or reasonable rate of return. Grayiel provides such calculation beginning in 2001 (the year of Grayiel's initial investment), 2005 (the year AIO's purported loan to Twist was executed), and 2008 (the year the Agreed Judgment was entered). *See* [R. 322, p. 6]. Based on the Defendants' updated Joint Exhibit 97, *see* [R. 316], Grayiel calculated the annual rate of return on the Natural

Gas Assets between February 2014 and May 2023 as 8.4%. *Id.* at 6. Using the 8.4% return rate, Grayiel's calculations provide for damages in the amount of $5,224,899.37 (2001), $3,784,084.29 (2005), or $2,970,796.85 (2008). [R. 322, p. 6].

As a general matter, the Court finds that a rate-of-return computation could fairly and accurately measure Grayiel's compensatory damages, and this methodology has been endorsed by other courts. Grayiel points to several cases involving fraud in the oil and gas context, noting that courts will sometimes calculate damages based on the initial investment and estimating what the victim would have recovered but for the fraud. [R. 322, p. 3] (citing *P & J Res.¸* 475 B.R. at 864–65 (add'l citations omitted). Indeed, this is not a case where Grayiel was swindled into a gas well investment where no wells existed or where the wells were non-producing "dusters." The record is clear from Defendants' own revenue spreadsheet that these were working, productive wells, and the Defendants (to Grayiel's harm) enjoyed the generous proceeds from them for many years. Even so, the Court has concerns with the figures advanced by Grayiel. First, if using this approach and based on the record in this case, his initial investment amount should be $840,000, not $886,000. [R. 288, p. 3] ("Grayiel testified that he only ever received about $20,000 in repayment of the approximately $860,000 Grayiel Investment."). Second, the Court calculated the average annual rate of return based on Defendant's spreadsheets, [JX 97]; [R. 316-1]; [R. 316-3], to be closer to 7.0%, not 8.4%, for the years 2014 to present (the difference with Grayiel's figures likely being the valuation placed on the Natural Gas Assets).

Further, awarding damages from 2001 (before Anastas and Teema even met Twist), or even 2005 or 2008 (when Anastas entered the fraudulent loan scheme with Twist and when it culminated in the Agreed Judgment) likely overstates damages and insufficiently links the actions of the Defendants with the harm caused to Grayiel. The Court finds that 2014 is the appropriate

triggering date for measuring damages based on this record, even under a rate-of-return methodology, and that 7.0%, rather than 8.4%, is the proper rate. Accordingly, the Court's measure of damages based on Grayiel's initial investment plus a rate of return calculation would be $1,544,305, calculated as follows: $840,000 (value of Grayiel's net investment) x $(1.07)^9$ years (2014-2023) = $1,544,305. Even using Grayiel's 8.4% rate, the award totals $1,735,972. Either calculation is close to the Court's ultimate award of $1,652,416.00, further confirming the accuracy and reasonableness of the Court's final award.

### B. Pre-Judgment Interest

The Court must next determine whether prejudgment interest should be awarded. Grayiel concedes that if the Court uses a methodology that includes a rate of return on his investment or the assets, then applying pre-judgment interest to his damages award would constitute "double counting" and be inappropriate. [R. 322, p. 6 n.4]. The Court agrees. Because the Court's compensatory damages award includes the award of actual net profits received by Defendants beginning 2014, the Court will not award prejudgment interest.

For Courts sitting in diversity, "federal law controls postjudgment interest but state law governs awards of prejudgment interest." *F.D.I.C. v. First Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir. 2000) (citing *Clissold v. St. Louis-San Francisco Ry. Co.*, 600 F.2d 35, 39 n.3 (6th Cir. 1979)). To determine if Grayiel is entitled to pre-judgment interest, the Court must first consider whether his damages are liquidated or unliquidated. This is because "[a]n award of interest on unliquidated claims is subject to the discretion of the trial court." *Ison v. Robinson*, 411 S.W.3d 766, 774 (Ky. App. 2013). However, prejudgment interest on liquidated damages is required as a matter of law. *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 141 (Ky. 1991)).

"A 'liquidated amount' is one which 'can be determined by simple calculation, can be determined with reasonable certainty, can be determined pursuant to fixed rules of evidence or can be determined by well-established market values.'" *Hazel Enterprises, LLC v. Ray*, 510 S.W.3d 840, 843 (Ky. Ct. App. 2017) (citation omitted). Thus, "'liquidated damages' are those 'the amount of which has been made certain and fixed either by the act and agreement of the parties or by operation of law to a sum which cannot be changed by the proof." *Id.* at 843–44. Examples of liquidated damages include "a bill or note past due, an amount due on an open account, or an unpaid fixed contract price." *Nucor Corp.*, 812 S.W.2d at 141. By contrast, "'unliquidated damages' are 'damages that have been established by a verdict or award but cannot be determined by a fixed formula so they are left to the discretion of the judge or jury.'" *Id.* at 844. "In determining whether a claim is liquidated or unliquidated, 'one must look at the nature of the underlying claim, not the final award.'" *Ford Contracting, Inc. v. Kentucky Transp. Cabinet*, 429 S.W.3d 397, 414 (Ky. Ct. App. 2014) (citing *3D Enterprises Contracting Corp. v. Louisville and Jefferson County Metropolitan Sewer District*, 174 S.W.3d 440, 450 (Ky. 2005)).

Plaintiff submits "that this is a liquidated damages case as of the August 15, 2014 date of the entry of the West Virginia Judgments, the date by which Plaintiff's damages were conclusively established by court order." [R. 302, p. 8]. But one must look at the nature of the underlying claims, not the final award, in determining whether a claim is liquidated. *Ford Contracting*, 429 S.W.3d at 414. A look at the underlying claims (fraud, civil conspiracy, aiding and abetting) makes clear that damages cannot be determined by a "simple calculation" and thus are unliquidated.

Although the Court may still exercise its discretion and award pre-judgment interest on unliquidated damages, *see Ford Contracting*, 429 S.W.3d at 414 (citing *University of Louisville v. RAM Engineering & Const., Inc.*, 199 S.W.3d 746, 748 (Ky. App. 2005)), the Court declines to do

so because it has instead awarded Grayiel the actual net proceeds generated from the Natural Gas Assets since 2014.

### C. Post-Judgment Interest

Plaintiff also requests that the Court award post-judgment interest. 28 U.S.C. § 1961 governs post-judgment interest in federal court. The statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court" and "mandates the imposition of post-judgment interest, thus removing the award of such interest from the discretion of the District Court." 28 U.S.C. § 1961(a); *Bricklayers' Pension Trust Fund v. Taiariol*, 671 F.2d 988, 989 (6th Cir. 1982) (internal citation omitted); *see also Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 586 (6th Cir. 2002) ("Under 28 U.S.C. § 1961, district courts are required to award postjudgment interest."). "Such interest shall be calculated from the date of the entry of the judgment," and "shall be computed daily to the date of payment." 28 U.S.C. § 1961(a), (b).

The applicable statute and case law are clear—unlike pre-judgment interest, the Court lacks discretion to decide whether to award post-judgment interest. The Court therefore finds that Grayiel is entitled to post-judgment interest as allowable by 28 U.S.C. § 1961. "Such interest shall be calculated from the date of entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." 28 U.S.C. § 1961(a). *See also Alcazar-Anselmo v. City of Chicago*, No. 07-C-5246, 2011 WL 3236024, at *6 (N.D. Ill. July 27, 2011) ("Plaintiff's compensatory damages, prejudgment interest and liquidated damages add up to $178,952.34. Defendant is also liable to Plaintiff for post-judgment interest on this amount at a rate of 0.252 percent as provided by 28 U.S.C. § 1961."); *Clements v. Prudential Protective Servs., LLC*, 100 F. Supp. 3d 604, 622 (E.D. Mich. 2015), aff'd, 659 F. App'x 820 (6th Cir. 2016)

(taking "notice that the published rate for the week ending April 17, 2015 was 0.23%" and awarding post-judgment interest at that rate). The published rate for the week ending August 9, 2023 was 5.35%. *See* BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, SELECTED INTEREST RATES (DAILY), https://www.federalreserve.gov/releases/h15/ (last visited August 9, 2023). Grayiel is entitled to post-judgment interest at that rate.

### D. Apportionment

The doctrine of apportionment, codified in KRS § 411.182, "spreads the liability for a plaintiff's claims among the tortfeasors based on their relative fault." *Stanford v. United States*, 948 F. Supp. 2d 729, 744 (E.D. Ky. 2013) (citing *Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 779 (Ky. 2000)). "Liability under § 411.182 is several only, so one tortfeasor is never on the hook for the entire amount unless the jury apportions the entire fault to that tortfeasor." *Id.* (citation omitted). "Under the comparative-fault regime, the fact finder is tasked with apportioning fault for the plaintiff's injuries between (or among) those responsible, with the defendant's liability for the plaintiff's damages proportionate to his or her share of the fault." *Grubb v. Smith*, 523 S.W.3d 409, 415 (Ky. 2017), opinion modified on denial of reh'g (Aug. 24, 2017).

Since the statute requires the factfinder to assign a "percentage of fault" to all the parties to a claim, *see* Ky. Rev. Stat. § 411.182(1)(b), "codefendants do not need to raise crossclaims for apportionment." *Stanford*, 948 F. Supp. 2d at 744; *see also Sommerkamp v. Linton*, 114 S.W.3d 811, 817 (Ky. 2003) ("This statute renders a cross-claim for contribution, as well as a counterclaim for contributory or comparative negligence, needless."). Where, however, "a party is not named as a defendant in the original complaint, a named defendant can bring a third-party complaint against the unnamed party to ensure that a share of the total liability is apportioned to them." *Stanford*, 948 F. Supp. 2d at 744 (citation omitted).

Here, the Defendants failed to do so, yet they now request that the Court include Twist (or his Estate) in its apportionment determination. Because neither Twist nor the Twist Estate were ever joined by any of the Defendants, the Court cannot apportion them any fault. *Baker v. Webb*, 883 S.W.2d 898, 899 (Ky. App. 1994) (holding that a defendant that does not bring a joint tortfeasor into litigation through third-party complaint "does so at her own peril"); *Bass v. Williams*, 839 S.W.2d 559, 564 (Ky. Ct. App. 1992), as modified (Sept. 17, 2004) (refusing to apportion fault to a joint tortfeasor who had not been named as a party to the action).

Apparently recognizing this error, AIO and Anastas request, at this late stage in litigation, for the Court to join Twist (presumably, Twist's estate), Thomas McAdam, and Lonnie Armstrong as Defendants in this case "for reasons of equity, given the Findings [and Conclusions]." [R. 310, p. 19]. Equitable considerations, however, do not counsel in favor of joining these third-parties post-trial, after eight years of litigation throughout which they have had no opportunity to defend themselves. Defendants point to no supportive authority—and the Court knows of none—that would allow the Court to join new defendants *after* liability has been determined and solely for the purpose of apportioning damages to them. Defendants' request to join the Twist Estate, Thomas McAdam, and Lonnie Armstrong in this Court's apportionment determination is denied.

The Defendants next suggest the Court should offset any damages award by the value of the interest in the Virgin Island lots transferred to Grayiel by Teema. [R. 310, p. 17]; [R. 311, pp. 8–9]. Grayiel argues Defendants are not entitled to any offset for these assets. [R. 302, p. 16]; [R. 313, p. 10]. On this issue, the Court will first note that because Kentucky is a several liability state, any offset related to the lots transferred to Grayiel by Teema would only apply to the damages owed by Teema and would not affect the amount owed by Anastas and AIO. Second, the Court notes that no party cites to even remotely helpful authority on the issue. Plaintiff relies on *Central*

*Kentucky Drying Co., Inc. v. Kentucky Department of Housing* for support, but there, the Kentucky Supreme Court simply noted that a defendant is "not entitled to credit for any amount paid by a settling defendant who was found not to be at fault." 858 S.W.2d 165 (Ky. 1993). That scenario is entirely inapplicable here, where Teema seeks credit for assets she—a Defendant herself—assigned to Plaintiff.

Plaintiff does acknowledge that "Teema could point to [Virgin Islands] assignment as evidence of partial satisfaction of the judgment against her in post-judgment proceedings, similar to how a post-judgment sale of the Natural Gas Assets would be treated." [R. 313, p. 11]. However, unlike the Natural Gas Assets, the Virgin Island lots have already been transferred to Grayiel. [R. 264, p. 3]. The Court therefore finds that Teema should be credited for those assets at this time, and not during post-judgment proceedings, to avoid post-judgment interest from accruing on the portion of the award she has already satisfied. According to records produced by Grayiel, the assessed value of the Virgin Islands land "for tax purposes only" totals $229,400.00. *See* [R. 313-1, Ex. A, p. 2]; [R. 264, p.3]. While Grayiel quibbles that Defendants failed to request an evidentiary hearing or call an expert on the issue of the lots' valuation, the same can be said for him (who ultimately bears the burden of demonstrating damages). The Court finds the tax value is a reasonable estimate of the value of the Virgin Islands lots. The Court therefore credits Teema and Second Blue Light for this amount as partial satisfaction of their attributable damages owed to Grayiel.

The Court turns, at last, to the apportionment of fault between Defendants Anastas, AIO, Teema, and Second Blue Light. The Court has substantial discretion in apportioning fault, and such a finding is reviewed "for clear error." *Waldman v. Stone*, 665 F. App'x 432, 434 (6th Cir. 2016) (citing Fed. R. Civ. P. 52(a)(6); *Vill. of Milford v. K–H Holding Corp.*, 390 F.3d 926, 936

Case 3:15-cv-00821-CHB-LLK   Document 328   Filed 08/16/23   Page 30 of 49 PageID #: 6990

(6th Cir. 2004)). Grayiel suggests that AIO and Anastas should be apportioned 75% fault and Teema (and presumably Second Blue Light) should be apportioned 25% fault. [R. 302, p. 14]. Other than AIO and Anastas suggesting the Court should join the Twist Estate as a party to this action and apportion the majority of fault there, the Defendants do not otherwise discuss how fault should be apportioned between them.

The Court agrees with Plaintiff that a greater percentage of fault should be apportioned to Anastas and AIO than to Teema and Second Blue Light. As Plaintiff notes, Teema "only joined the second stage of the conspiracy" after Twist was indicted, whereas Anastas was involved "in every step of the fraud" beginning with the AIO Loan in 2005. [R. 302, p. 15]. Further, Plaintiff points out that "while Anastas and Teema may have shared the proceeds from the Natural Gas Assets, it is Anastas who holds title to the Natural Gas Assets and thus the tortfeasor that profited the most from the Defendants' fraudulent conduct." *Id.*

Indeed, as more thoroughly laid out in the Court's Findings and Conclusions, Anastas began scheming with Twist in 2005, forming AIO Holdings, a shell company, on June 2005 "to effectuate a loan to Twist" and to insulate Twist's assets from creditors like Grayiel. [R. 288, pp. 99, 10]. As the Court then noted, "AIO was simply Twist's most successful attempt to shield his assets," *id.* at 99, and Anastas was a willing participant in and beneficiary of Twist's schemes. In fact, as noted above, the evidence adduced at trial showed that Anastas was so intimately involved in Twist's schemes that the Court found AIO an alter ego of Twist. *See* [R. 288, pp. 92–103]. The fraudulent schemes between Anastas and Twist have been ongoing for nearly two decades.

Conversely, although the Court found "the vast weight of the evidence [showed] that Twist and Teema transferred valuable assets to Second Blue Light to ensure Teema and her son could profit off Twist's estate while creditors were left out to dry," *id.* at 65–66, and found Teema liable

- 30 -

for fraud and civil conspiracy, "Teema and Second Blue Light slid into Twist's (and First Blue Light's) shoes after Twist died and worked alongside AIO to ensure that the Natural Gas Assets remained shielded from creditors to the benefit of Twist, Teema, and Anastas," *id.* at 67. And while the tortious conduct attributable to Teema and Second Blue Light can be traced back at least to Second Blue Light's formation on October 1, 2012, it picked up steam when Twist died sixteen months later, on February 23, 2014, and with the help of Anastas and AIO. *See* [R. 288, p. 31] ("Anastas testified that he first met Teema at Twist's funeral, and spoke to both her and Tammy Twist, Martin Twist's daughter, about operating the oil and gas wells. . . . Anastas explained that he decided to enter into an agreement with Teema over a better offer from Tammy, who told Anastas she would 'get [Anastas] paid back quicker' and take less of a split, because of the 'bad taste' he had in his mouth with Twist."). Thus, the majority of the fraud involving Teema lasted for less than a decade and could not have been executed without the assistance of Anastas and AIO. In addition to the length of each Defendant's fraudulent conduct, the Court also finds that the actions of Anastas and AIO were particularly egregious. Indeed, the Agreed Judgment alone perpetrated a fraud not only on Grayiel and other investors, but the Jefferson County Circuit Court and the public at large. Moreover, Anastas admitted in this case to committing perjury in a separate lawsuit to perpetuate his fraudulent scheme with Twist. [R. 288, p. 85].

For all these reasons, the Court finds Anastas and AIO responsible for seventy-five percent (75%) of Grayiel's damages and Teema and Second Blue Light responsible for twenty-five percent (25%) of Grayiel's damages.

### E. Punitive Damages

Lastly, Grayiel seeks punitive damages "in the customary amount under Kentucky law, equal to the amount of the base compensatory damages award [] due to Defendants['] fraudulent

acts which shock the conscience." [R. 302, p. 4]. Grayiel requests punitive damages in the amount of $2,671,880.84 from each Defendant, for a total punitive damages award of $5,343,761.68.

"As often noted, punitive damages exist to punish and discourage certain types of bad behavior." *Yung*, 563 S.W.3d at 64. A punitive award is designed to "punish a defendant, deter future wrongdoing, and express … moral condemnation." *Id.* "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to plaintiff." *Id.* at 64–65 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)). "Simply put, the amount of an award should embody the fact-finder's determination as to the degree of reprehensibility reflected in the defendant's actions." *Id.* at 65.

An award of punitive damages under Kentucky law is governed by two statutes: KRS §§ 411.184 and 411.186. These statutes "determine the level of punitive damages that Kentucky will allow in different classes of cases and in any particular case and they require that the damages awarded be reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence." *Trilogy Healthcare of Fayette I, LLC v. Techau¸* 605 S.W.3d 60, 70 (Ky. Ct. App. 2019) (citation omitted).

Under KRS § 411.184(2), "[a] plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." "Fraud" is defined as "an international misrepresentation, deceit, or concealment of material fact known to the defendant and made with the intention of causing harm to the plaintiff." *Id.* at § 411.184(1)(b). "Malice" is defined as "either conduct which is specifically intended by the defendant to cause tangible or intangible injury to the plaintiff or conduct that is carried out by the defendant both with a flagrant indifference to the

rights of the plaintiff and with a subjective awareness that such conduct will result in human death or bodily harm." *Id.* at § 411.184(1)(c).

Under KRS § 411.186, the statutory guidelines for assessing the culpability of the defendant and the amount needed to deter or to make such behavior unprofitable are:

> (a) The likelihood at the relevant time that serious harm would arise from the defendant's misconduct;
> (b) The degree of the defendant's awareness of that likelihood;
> (c) The profitability of the misconduct to the defendant;
> (d) The duration of the misconduct and any concealment of it by the defendant; and
> (e) Any actions by the defendant to remedy the misconduct once it became known to the defendant.

KRS 411.186(2). In applying KRS 411.186, "[r]eferences to the wealth and resources of a party are generally not permitted." *Nami Res. Co., L.L.C. v. Asher Land and Min., Ltd.*, 554 S.W.3d 323, 339 (Ky. 2018).

Here, each factor clearly counsels in favor of awarding punitive damages. First, that the Defendants' misconduct would cause serious financial harm to creditors like Grayiel was more than likely; it was all but certain. And, second, Defendants were plainly aware of this likelihood. Indeed, as the Court explained in its Findings and Conclusions, the existence of numerous badges of fraud showed that it was precisely the Defendants' intent to shield assets for their own and Twist's gain at creditors' peril. *See* [R. 288, p. 68]. Next, as discussed more thoroughly in the Findings and Conclusions, the profitability of this misconduct was great. *See id.* at 90 ("Anastas/AIO and Teema/Second Blue Light continue to profit off assets that would have been in the Twist's estate—and therefore recoverable by Twist's creditors—if not for the fraudulent conveyances to AIO and Second Blue Light."); *see also* [JX 97]; [R. 316-1]; [R. 316-3]. The first three factors strongly support awarding punitive damages.

- 33 -

Fourth, concerning the duration and concealment of their misconduct, both counsel in favor of punitive damages. As discussed further in the Findings and Conclusions, Anastas and AIO actively concealed their misconduct from Grayiel in an attempt to delay his discovery until the statute of limitations had run. *See id.* at 43 ("Indeed, it would be a steep burden if Grayiel's claims lapse due to the willful fraud by AIO and Anastas on the Kentucky Circuit Court, when nothing on the face of the Agreed Judgment placed Grayiel, the Circuit Court, or anyone else on notice of the underlying fraud. Meanwhile, AIO and Anastas concealed material facts about their connection to Twist and the fraudulent nature of the AIO Complaint and Agreed Judgment."). Moreover, the Court has previously characterized the Defendants' misconduct as a "decades-long conspiracy to defraud creditors" that is "still ongoing." [R. 288, pp. 92, 46].

Finally, the Defendants have made little, if any, attempts to remedy their misconduct. Although Teema transferred her interest in the Virgin Island lots to Grayiel, and despite the Defendants' claims that they are "leaving the oil and gas industry," the Defendants largely maintain that Twist was the mastermind behind all their schemes and that they were ignorant to his plan to defraud creditors. For all the reasons stated in the findings and Conclusions, the Court remains unconvinced.

The Court therefore finds by clear and convincing evidence that punitive damages are appropriate. "Because the amount of an award is a reflection of the fact-finder's measure of a defendant's reprehensible conduct, the ratios must be assessed on a case-by-case basis." *Yung*, 563 S.W.3d at 72. Even so, the Supreme Court has found that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," and that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."

- 34 -

*Exxon Shipping Co. v. Baker*, 554 U.S. 471, 501 (2008). Here, Grayiel seeks punitive damages in an amount equal to his requested compensatory damages award, $2,671,880.84, against *each* Defendant.[9] The Court, however, does not find that method appropriate, particularly where it has already found the Defendants severally liable for Grayiel's compensatory damages. Instead, the Court finds it appropriate to award punitive damages attributable to all Defendants at a one-to-one ratio to compensatory damages, for a total punitive damages award of $1,652,416.00. The award shall be apportioned between the Defendants in the same way compensatory damages were apportioned: seventy-five percent (75%) attributable to Anastas and AIO and twenty-five percent (25%) attributable to Teema and Second Blue Light.

Notwithstanding their egregious conduct for more than a decade, both Anastas and Teema argue punitive damages should not be awarded because they have no plan to continue in the gas well business. *See* [R. 310, pp. 16–17] ("[An] award of punitives will not serve [the] purpose of deterrence since it does not appear either AIO or Greg will be involved in the gas well industry in the future. The Court should decline to make any award of punitive damages as the statutory goal of deterrence of similar future activity does not exist in this case."); [R. 321, p. 10] ("There is no need for a deterrent effect, as nothing indicates that Teema will be engaged in the oil and gas business in the future. There is no indication that Teema intended to cause harm to Grayiel or any other person."). The Defendants' narrow focus on deterrence is misguided. As stated, "punitive damages exist to *punish* and discourage certain types of bad behavior" to "deter future wrongdoing, and *express . . . moral condemnation*." *Yung*, 563 S.W.3d at 64 (emphasis added). The fact that

---

[9] While he does not make it clear, the Court presumes Grayiel is seeking $2,671,880.84 from Defendants Anastas and AIO and $2,671,880.84 from Defendants Teema and Second Blue Light, for a total punitive damages award of $5,343,761.68. Even if Grayiel is seeking $2,671,880.84 from each individual and entity Defendant separately, for a total of $10,687,523.36, the Court's analysis and conclusion are unaffected.

the Defendants have apparently decided to leave the oil and gas industry for good does not detract from any of the other factors discussed above which support awarding punitive damages.

### F.  Motion for Receiver [R. 303]

Pursuant to Federal Rule of Civil Procedure 66, Grayiel seeks the appointment of a receiver over certain property at issue in this matter "held, owned, or beneficially owned" by AIO, Anastas, Teema, and Second Blue Light. [R. 303, p. 1]. The property at issue includes:

> (a) the Natural Gas Assets and any proceeds derived therefrom and (b) any and all rights of the Defendants to manage, operate or sell the Natural Gas Assets, including but not limited to rights conferred pursuant to the Agreed Judgment, AIO/SBL Operating Agreement; and the Right of Way Agreement.[10]

[R. 327, p. 2].

In their respective responses, Defendants do not address Grayiel's entitlement to a receiver on the merits. In fact, Anastas and AIO agree, "[t]here is no doubt that the funds from the Gas Wells should be preserved while this litigation continues and the appeal is resolved as a matter of common sense." [R. 305, p. 2]. Similarly, Teema advises she "stands ready to transfer the operation of the wells to an individual of Plaintiff's choosing or as ordered by the Court" that she "is also willing to transfer the right of way to such individual" and "willing to transfer the remaining funds in the Blue Light account to an escrow account agreed upon by the parties." [R. 306, p. 2]. Counsel for Teema and Second Blue Light reiterated this stance during the June 15, 2023 video hearing. Further, Teema advises that since the Court's entry of its Findings and Conclusions on December 29, 2022, she "has not paid herself any funds from the Blue Light account, but has used those funds only to pay the expenses of the operation of the wells." *Id.* Teema makes no similar representation

---

[10] Grayiel originally requested a receivership over the following additional assets: the membership interests in and assets of Second Blue Light, the membership interests in and assets of Advantage Investments LLC, and the membership interests in and assets of AIO. *See* [R. 303, pp. 1–2]. The Proposed Agreed Order [R. 327], however, does not include or mention those assets. The Court therefore presumes Grayiel no longer seeks a receivership over the assets omitted from the subsequent Agreed Order.

regarding whether proceeds have been paid to Anastas since that time. However, Defendants AIO and Anastas filed a Notice related to the proceeds prior to the June 2023 hearing on damages. [R. 316]. In the Notice, they similarly advise that since the Court's liability determination in December 2022, the proceeds from the Natural Gas Assets after payment of expenses were "being held in escrow since neither [Second Blue Light] nor AIO received any distributions after the ruling on liability . . . The amount in escrow is believed to be approximately $57,373.09." *Id.*; [R. 316-3] (listing proceeds being held in escrow for production payments from January 2023–May 2023).

After the June 15, 2023 hearing, the parties submitted a Proposed Agreed Order [R. 323] that, while preserving the Defendants' objections to a receivership generally, was to outline the agreed upon details of a receivership in the event the Court overruled the Defendants' objections. Instead, it seemed Grayiel and Defendants Teema and Second Blue Light had come to an agreement, but Defendants Anastas and AIO responded [R. 325] with several proposed changes before the first Proposed Agreed Order [R. 323] could be fairly construed as such. However, after additional discussions amongst the parties, they tendered a new Proposed Agreed Order [R. 327], which, although styled as an Agreed Order, still maintains all objections previously lodged by AIO. *See* [R. 327, p. 8, ¶ 25] ("The Court overrules the Defendants' objections to the appointment of a Receiver made on the record in this case including without limitation the lack of jurisdiction over Mr. Twist and his entities, the exclusive jurisdiction of the Jefferson District Court Probate Division as to the Estate of Mr. Twist, and the objections of AIO and Anastas set forth in Document 325, as joined in by Teema and Second Blue Light."). Having considered the parties' respective briefs and the new Proposed Agreed Order [R. 327], and for the reasons that follow, the Court will deny Grayiel's motion for a receiver [R. 303] and decline to enter the parties' Proposed Agreed Order [R. 327]. The Court will likewise deny the first Proposed Agreed Order [R. 323] as moot.

i.        Jurisdiction and Clarification of the Court's Findings and Conclusions

AIO and Anastas argue that the Court lacks jurisdiction to appoint a receiver over the Natural Gas Assets[11] because they belong to non-parties, the Twist Estate and/or Twist entities. [R. 305, p. 2]. In essence, Defendants argue that because the Court found the Agreed Judgment avoidable under relevant Kentucky fraudulent transfer statutes, and because the Agreed Judgment "vested title to the Gas Wells in AIO," the Court's avoidance means the "ownership of the Gas Wells reverts to" Twist. *Id.* at 3. In other words, AIO and Anastas claim that because the Court found the Agreed Judgment "avoidable," the ownership of the Natural Gas Assets somehow automatically reverted to Twist and his entities. And, "[s]ince there is no personal jurisdiction over Mr. Twist, his Estate and his entities in this proceeding," according to Defendants, "the Court simply does not possess the authority to exercise its power to create a receivership as to non-party assets." *Id.* Defendants, however, offer a "solution" for this apparent issue: "setting aside the Judgment by agreement no matter how distasteful to the Court and the Plaintiff but that is the practical cure for the problems created by voiding the Agreed Judgment which deprived AIO of title to the Gas Wells." *Id.* at 4.

The Court finds this jurisdiction argument meritless for several reasons. First, AIO and Anastas provide no supporting case law for their position that the assets somehow automatically reverted to Twist, and this alone is grounds to reject it. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)); *see also Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995) (observing that "[w]e consider issues not fully developed and argued to be waived").

---

[11] As Plaintiff notes, Defendants do not suggest any other assets for which Grayiel seeks a receiver would be outside the Court's jurisdiction.

Next, to the extent there is any confusion between the parties or any other court reviewing this Court's Findings and Conclusions, [R. 288], the Court will further clarify its fraudulent transfer rulings, as the Court has yet to enter final judgment in this case. *See* [R. 294] ("The Court was careful not to include language [in its Findings and Conclusions] indicating its Findings and Conclusions were final and appealable and did not enter separate judgment under Rule 58."); *see also Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 492 (M.D. Tenn. 2019) (citation omitted) (explaining that as long as a case remains pending, with respect to interlocutory orders, "[i]t is within the sole discretion of the court to determine if a prior ruling should be reconsidered, and the Sixth Circuit has declined to impose any conditions or limitations upon a court's power to review a prior ruling"). Although this Court found certain transfers between Twist and the current Defendants avoidable under Kentucky's fraudulent transfer statutes, [R. 288, pp. 47–74], rather than reverting title to the assets to Twist (a fraudster himself) or a Twist Entity, it is this Court's intention to instead place a lien on such assets for the benefit of Grayiel.

In its Findings and Conclusions, the Court found that because "Grayiel proved several badges of fraud, and AIO failed to demonstrate good faith," the Agreed Judgment was "avoidable under KRS § 378.010." [R. 288, p. 60]. That is, the Court found the AIO Loan, Deed of Trust, and related documents were a sham transaction whereby Anastas and AIO assisted Twist in evading his creditors, which ultimately culminated in the AIO Complaint and Agreed Judgment. *Id.* at 47–60. Alternatively, the Court also found that because "Grayiel was a then existing creditor of Twist's at the time of the transfer, and AIO did not provide valuable consideration for the Natural Gas Assets," the Agreed Judgment was "also void as a constructive fraudulent conveyance under KRS § 378.020." *Id.* at 74. Although AIO and Anastas focus their jurisdiction argument on the Agreed Judgment, the Court similarly found the Right of Way Agreement and the AIO/SBL Operating

Agreement involving Teema and Second Blue Light avoidable. *See* [R. 288, p. 66] (related to the Right of Way Agreement); [R. 288, p. 68] (related to the AIO/SBL Operating Agreement). To ensure clarity, the Court further finds as follows: Because the avoidable Agreed Judgment sprang from the foreclosure of the fraudulent AIO Loan and Deed of Trust, the Court finds that any payment terms, interest rate, and security interests granted to AIO under the AIO Note, AIO Loan, and Deed of Trust are avoidable and unenforceable as against Grayiel.

Nothing in the Court's Findings and Conclusions concerning any of the above assets automatically reverted title in the Natural Gas Assets or the Right of Way Agreement (and related AIO/SBL Operating Agreement) to Twist or his entities, or even expressed an intention to do so upon entry of final Judgment. Rather, the Court simply determined that the transfers were "avoidable" under Kentucky law. Common sense dictates that the Court's avoidance of the fraudulent transfers would not result in Twist, a co-conspirator, or the Twist Estate, receiving title. Instead, the Court will employ its equitable power to place a lien on the assets for the benefit of Grayiel upon entry of its Final Judgment. *See Bolling v. Adams*, 296 S.W.2d 696, 696–97 (Ky. Ct. App. 1956) (setting aside fraudulent conveyances and placing lien on subject property for the amount of judgment); *Morgan v. Hibbard, Spencer, Bartlett & Co.*, 299 Ky. 57, 62–63 (Ky. Ct. App. 1944) (declining to set aside fraudulent transfer but placing lien on assets at issue for the benefit of the plaintiff); *McMurray v. McMurray*, 410 S.W.2d 139, 140 (Ky. 1966) (affirming in relevant part lower court's judgment voiding fraudulent transfer and granting appellee "a lien to secure [the judgment] amount, and ordering the property sold to satisfy the lien"); *Owensboro Banking Co. v. Lewis*, 269 Ky. 277, 106 S.W.2d 1000, 1004 (1937) ("An equitable lien may . . . [be] declared by a court of equity out of general consideration of right or justice as applied to the relations of the parties and the circumstances of their dealings in the particular case.").

In *Bolling v. Adams*, creditors argued that conveyances of real property deeds by parents to their son should be set aside as fraudulent. 296 S.W.2d 696, 696–97 (Ky. Ct. App. 1956). The trial court ruled in favor of the parties to the conveyances, but the Kentucky Court of Appeals reversed, explaining: "Wherefore the judgment refusing to set aside the deeds as fraudulent conveyances is reversed, and a judgment is directed to be entered setting aside the deeds as fraudulent conveyances and giving the appellants a lien on the property for the amount of their personal judgment, interest and costs." *Id.* at 700. In *Morgan v. Hibbard, Spencer, Bartlett & Co.*, the Kentucky Appeals Court refused to set aside the transfer of fraudulently conveyed property given the circumstances of the case but permitted the plaintiff to "subject the conveyed property only to the extent of its debts" as a matter of equity. 299 Ky. 57, 62–63 (Ky. Ct. App. 1944). Thus, as Grayiel's counsel further explained during the hearing, where an asset is the subject of a fraudulent transfer, Kentucky courts have found it appropriate to place liens on those assets to preserve them. Importantly, the Defendants have not argued that this Court lacks jurisdiction to place a lien on the assets at issue, but only that it lacks jurisdiction to appoint a receiver.

The Court's clarification of its fraudulent transfer rulings largely (if not entirely) moots AIO and Anastas's jurisdiction argument, as it is abundantly clear that the Court did not order the assets be transferred to Twist, or more accurately, his Estate or Entities.[12] For all these reasons, the

---

[12] Moreover, because Anastas and Teema continue to manage and profit off the Natural Gas Assets, and because that arrangement has not changed since the Court voided the Agreed Judgment, Defendants' argument that the assets are out of the Court's reach because they belong to "non-parties" is not well taken. *See Sec. & Exch. Comm'n v. Creative Cap. Consortium, LLC*, No. 08-81565-CIV, 2009 WL 10664430, at *1 (S.D. Fla. Sept. 21, 2009) (appointing receiver where "defendants controlled [assets at issue] and had authority to transfer money from them" because defendants were the alter ego of assets' owners). Even if the assets did belong to the Twist Estate or various Twist entities, the Court nevertheless has jurisdiction to appoint a receiver over them due to the Defendants' operation, control, and authority over them. Furthermore, even entertaining Defendants' argument that the Natural Gas Assets now belong to Twist, over whom the Court lacks personal jurisdiction, the assets would still be subject to this Court's authority. *See In re Armstrong Glass Co., Inc.*, 502 F.2d 159, 163 (6th Cir. 1974) (rejecting appellant's argument that "under Tennessee law a court may appoint a receiver only when the person in possession of the property is before the court"). Even assuming title to the assets automatically reverted back to Twist upon the Court's fraudulent transfer ruling, up until the Court entered its Findings and Conclusions, and for many years prior, the Natural Gas Assets belonged to AIO and Anastas and the Right of Way to Second Blue Light. Both remain parties to this action, and the assets

Court may properly grant a lien or receivership over the Natural Gas Assets and Right of Way. Having determined that the Court has jurisdiction over the assets at issue, it turns to the merits of Grayiel's request for appointment of a receiver.

### ii. Merits of Receivership Appointment

Rule 66 "allows the Court to appoint a receiver in a federal case." *Patel v. AR Grp. Tenn., LLC*, No. 3:20-cv-00052, 2020 WL 5849346, at *9 (M.D. Tenn. Oct. 1, 2020) (citation omitted). For courts sitting in diversity, "an appointment of [a] receiver generally will be governed by federal, not state, law." *Id.*; *see also Fed. Nat'l Mortg. Ass'n v. Mapletree Invs. Ltd. P'ship*, No. 10-cv-10381, 2010 WL 1753112, at *2 (E.D. Mich. Apr. 30, 2010) ("Although the Sixth Circuit itself has not addressed the issue, the weight of authority suggests that appointment of a receiver in a diversity action is controlled by federal law, not state law.") (citation omitted); Wright & Miller, 12 Fed. Prac. & Proc. Civ. § 2983 (3rd ed. Apr. 2022 update) ("Whether a federal court should appoint a receiver in a diversity action appears to be a question properly determined on the basis of federal law.").

Rule 66 also "authorizes the appointment of a receiver if a person with interest in the property provides sufficient justification." *PNC Bank, Nat'l Ass'n v. Goyette Mech. Co.*, 15 F. Supp. 3d 754, 758 (E.D. Mich. Apr. 25, 2014) (citation omitted). Appointment of a receiver is "not

---

themselves have always been at the center of the litigation. Finally, even assuming the Natural Gas Assets reverted back to the Twist Estate or Twist entities, the Court still has jurisdiction to appoint a receiver over the Natural Gas Assets because of the alter ego relationship between Twist, Anastas, and AIO. *See* [R. 288, p. 103 (Court's finding on alter ego liability)]. "Receiverships have been expanded by use of the alter ego doctrine to include entities related to defendants when funds have been comingled or corporate assets used for personal purposes." *S.E.C. v. Torchia*, No. 1:15-cv-3904-WSD, 2016 WL 6212002, at *3 (M.D. Ga. Oct. 25, 2016) (counting cases). Moreover, other courts have included assets of an alter ego within a receivership estate. *See, e.g.*, *SEC v. Elmas*, 620 F. Supp. 231, 234–35 (D. Nev. 1985), aff'd, 805 F.2d 1036 (9th Cir. 1986) (finding "no problem of any taking of property without due process" by piercing the corporate veil to bring assets within receivership); *SEC v. Private Equity Mgmt. Grp., Inc.*, No. CV-09-2901-PSG, 2009 WL 3074604, at *1, 3–6 (C.D. Cal. Sept. 21, 2009) (finding entities disputed for purposes of receivership were "merely the alter egos of entities already within the receivership estate" and bringing disputed entities within the estate); *Creative Cap. Consortium*, 2009 WL 1066430, at *1.

an end itself, but rather a means to reaching some legitimate end." *Mapletree*, 2010 WL 1753112, at *2 (citing *Kelleam v. Md. Cas. Co. of Baltimore*, 312 U.S. 377, 381 (1941)). In considering a receivership application brought under Rule 66, "federal courts exercise the traditional, common law powers of equity." *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006). District courts have "broad equitable powers in fashioning relief in an equity receivership proceeding . . . including to appoint a receiver over assets disputed in litigation before the court." *Id.* (citation omitted); *see also PNC Bank, Nat. Ass'n v. Seminary Woods, LLC*, No. 3:13CV297-S, 2014 WL 1319463, at *1 (W.D. Ky. Mar. 31, 2014) (quoting *Liberte*, 462 F.3d at 551) ("A district court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court."). A receivership is a remedy courts should employ "only in cases of clear necessity to protect plaintiff's interest in the property." *Pension Ben. Guar. Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414 (6th Cir. 2015).

The "receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of assets if necessary." *Id.* (citation omitted). As an "officer of the court, the receiver's powers are coextensive with [the] order of appointment." *Id.* There is no "precise formula for determining when appointment is warranted[.]" *De Boer Structures (U.S.A.), Inc. v. Shafer Tent & Awning Co.*, 187 F. Supp. 2d 910, 925 (S.D. Ohio 2001). However, courts generally consider:

> the validity of the claim by the party seeking appointment; the probability that fraudulent conduct has occurred or will occur to frustrate the claim; imminent danger that property will be concealed, lost or its value diminished; inadequacy of legal remedies; lack of less drastic equitable remedy; and the likelihood that appointment will do more good than harm.

*Id.* (quoting *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993)).

While some of these factors may counsel in favor of appointing a receiver over the assets at issue, the Court finds that, on balance, they weigh more heavily against it. First, concerning the validity of Grayiel's claims, the Court has already found in his favor on all Counts tried. *See* [R. 288, p. 1]. That his claims were valid is, therefore, a foregone conclusion. Second, "the probability that fraudulent conduct has occurred" is no probability at all; the Court has already found the Defendants perpetrated various frauds upon Grayiel. *See generally* [R. 288, pp. 38–87]. Even so, that additional fraud "will occur to frustrate the claim," or rather, to frustrate Plaintiff's ability to recover from Defendants, has not proven likely on the current record. Although the fraud by Defendants which gave rise to this case was egregious and spanned decades, notably, there have been no allegations that the Natural Gas Assets or Right of Way have been wasted or secreted during the eight-year pendency of this action or since the Court entered its Findings and Conclusions. Moreover, the fact that Grayiel seeks a receiver for the first time at this late stage, after eight years of litigation, underscores the lack of "clear necessity" for a receivership. *Pension Ben. Guar. Corp.*, 630 F. App'x at 414.

Third, along the same lines, the Court must disagree with Grayiel that there is imminent danger that the property at issue will be "concealed, lost or its value diminished." The Defendants agree that the assets at issue should be preserved. *See* [R. 305, p. 2]; [R. 306, p. 2]. Indeed, they surely realize it is in their own best interest for the value of the Natural Gas Assets and Right of Way to not be diminished. -The Defendants have provided spreadsheets detailing the proceeds since 2014 and, by all accounts, have been operating the assets in a manner that preserves their value. Further, Defendants have advised Grayiel and the Court that since the Court's liability ruling in December 2022, the proceeds from the Natural Gas Assets (net of expenses) are being held in escrow and not disbursed to Defendants. [R. 306, p. 2]; [R. 316]; [R. 316-3]. Of course, the Court

recognizes Grayiel's fear, as the very nature of this case is Defendants' successful work alongside Twist to conceal, dissipate, or otherwise remove from reach assets that were rightfully owed to creditors like Grayiel. Even so, based on the Defendants' appropriate management of the assets over the last near-decade and their present representations that they fully intend to continue doing so, the Court cannot find that the assets are in imminent danger of disappearance or dissipation.

Fourth, concerning the adequacy of Grayiel's legal remedies, the Court again acknowledges Plaintiff's concerns that "Defendants appear to be functionally insolvent" and "[i]t is highly unlikely that Defendants have assets to satisfy a multi-million dollar judgment." [R. 303, p. 9]. Preservation of the assets that would ensure Plaintiff can recover at least some portion of his award in this case is therefore crucial, and, as stated, the Defendants recognize the same. *See* [R. 305, p. 2]; [R. 306, p. 2]. But Grayiel will not be left without adequate legal remedies absent a receivership. First and foremost, the Court is imposing a lien on the Natural Gas Assets, Right of Way and AIO/SBL Operating Agreements, and all proceeds generated therefrom. Second, Grayiel maintains tools, potentially through this Court or another court with jurisdiction, by which he may obtain relief should Defendants unwisely waste or dissipate the Natural Gas Assets, Right of Way Agreement, or any other assets which Grayiel could seek to recover on as a judgment creditor. *See* Fed. R. Civ. P. 69 (governing money judgment execution); *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241 (5th Cir. 1997) (quoting *Resolution Trust Corp. v. Smith*, 53 F.3d 72, 76 (5th Cir.1995)) ("A district court has continuing jurisdiction in support of its judgment, . . . and '[u]ntil the judgment has been properly stayed or superseded, the district court may enforce it through contempt sanctions.'"); *see also N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987) (citation omitted) ("Although a district court may not alter or enlarge the scope of its judgment pending appeal, it does retain jurisdiction to enforce the judgment."). For that matter,

Grayiel could potentially petition this Court under Rule 66 once again, or under Rule 69, if new facts and/or evidence reveal that a receivership is truly necessary. In other words, should the Defendants waste, dissipate, transfer, pledge, or neglect the assets at issue in this case (which the Court is placing a lien on), Grayiel will not be without recourse.

Fifth, particularly since the parties clearly agree that the assets should be preserved and have previously indicated a mutual willingness to work together to ensure the assets are properly managed, the Court finds that less drastic equitable remedies exist to sufficiently preserve them. Indeed, the record is devoid of any allegations of waste or neglect and instead all parties have expressed a commitment and desire to preserve the value of the assets. This also informs the final factor, as it does not appear the appointment will do more good than harm since the assets are already being preserved. In fact, Defendants were previously willing to voluntarily transfer management of the Natural Gas Assets to a third party, [R. 306, p. 2], they concede that the assets should be preserved, *id.*, and Teema indicates she was "already willing to" preserve the assets.

A final point worth making, the Sixth Circuit has made clear a receiver should be an indifferent person between the parties, and not one party's law firm. *see Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 n.2 (6th Cir. 2006) (quoting 1 *Clark on Receivers* § 11(a) (3d ed.1959)) ("'A receiver is an indifferent person between parties, appointed by the court to receive the rents, issue, or profits of land, or other thing in question, pending the suit, where it does not seem reasonable to the court that either party should do it.'"). This, too, bears on the Court's evaluation of the need for a receiver and the propriety of ordering this extraordinary remedy based on the current record. Although the parties mutually agreed to Tye Hancock of Holland & Knight LLP serving as a receiver if the Court were to appoint one, his perceived lack of neutrality gives the Court pause. Even if the Court could overlook this convention given the agreement between

the parties, such underscores whether the merits warrant appointment of a receiver in the first place, or if, instead, it is being requested for the convenience of the parties. Indeed, counsel for Grayiel acknowledged at the June 2023 hearing that they would prefer a receiver because it would somehow "insulate" or "protect" any actions taken by the receiver. But, as mentioned, the appointment of a receiver is an extraordinary remedy, not a tool to be utilized for the convenience of the parties, even where they largely agree to its terms.

Of course, none of the foregoing precludes the parties from agreeing between themselves for the assets to be managed by a third party, even Hancock and Holland & Knight. But, because case law indicates it may be improper for the Court to appoint Grayiel's counsel as the receiver, it declines to do so. Further, because the parties are all in agreement that the assets should be preserved and the Defendants have indicated they would prefer a third-party to manage them, [R. 305, pp. 1–2]; [R. 305, pp. 1–2], the parties are free to reach agreement on that issue on their own.

For all these reasons, the Court will overrule Grayiel's Motion [R. 303] and will instead impose an equitable lien on: (1) the Natural Gas Assets and any proceeds derived therefrom, including those proceeds outlined in [JX 97]; [R. 316-1]; and [R. 316-3]; (2) the Right of Way Agreement and any proceeds derived therefrom; and (3) the AIO/SBL Operating Agreement and any proceeds generated therefrom.

### III.    CONCLUSION

Based on the foregoing, the Court finds that Grayiel's compensatory damages total $1,652,416.00, and awards punitive damages in the amount of $1,652,416.00, for a combined total of $3,304,832.00. Further, Grayiel is entitled to post-judgment interest on the entire Judgment at a rate of 5.35%.

**IT IS THEREFORE ORDERED** as follows:

1.      Compensatory damages in the amount of **$1,652,416.00** are awarded to Plaintiff George A. Grayiel. Seventy-five percent (75%) of this award shall be apportioned, jointly and severally, to Defendants Gregory Anastas and AIO Holdings, LLC and twenty-five percent (25%) of this award shall be apportioned, jointly and severally, to Defendants Teema Sarinprapa and Blue Light of Kentucky Limited Liability Company. Teema and Second Blue Light are credited $229,400.00 in partial satisfaction of their portion of the award. To ensure full clarity, for the myriad reasons outlined herein and in the Court's Findings and Conclusions, Defendants AIO and Anastas are not entitled to any payment terms,  credits or offsets, security interest or payments of principal and interest by virtue of the AIO Loan, Deed of Trust, AIO Complaint, Agreed Judgment, or related documents as against Plaintiff George A. Grayiel, as the Court found these were all part of the fraudulent transfers culminating in the Agreed Judgment.

2.      Punitive damages in the amount of of **$1,652,416.00** are awarded to Plaintiff George A. Grayiel. Seventy-five percent (75%) of this award shall be apportioned to Defendants Gregory Anastas and AIO Holdings, LLC, jointly and severally, and twenty-five percent (25%) of this award shall be apportioned to Defendants Teema Sarinprapa and Blue Light of Kentucky Limited Liability Company, jointly and severally.

3.      Post-judgment interest at the rate of **5.35%** shall apply to Plaintiff George A. Grayiel's entire judgment, including both compensatory and punitive damages. Post-judgment interest on Teema and Second Blue Light's 25% portion of the award shall be calculated after applying their $229,400.00 credit.

4.      Plaintiff George A. Grayiel's Motion for Appointment of a Receiver Over Certain of Defendants' Property [**R. 303**] is **DENIED**. The parties' Proposed Agreed Orders at [**R. 323**] and [**R. 327**] are **DENIED as moot**.

5.      A separate Judgment will follow.

This the 16th day of August, 2023.

*Claria Horn Boom*

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

Cc:     Counsel of Record